**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N**, **AUDUBON SOCIETY OF PORTLAND**, and **DEFENDERS OF WILDLIFE**, | Case No. 3:19-cv-01550-SB |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| **JOSE LINARES**, State Director (Acting),[1] BLM Oregon/Washington, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants | **(Environmental Matter)** |

---

[1] Jose Linares, successor to Theresa Hanley as acting State Director for BLM Oregon/ Washington, is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

## NATURE OF ACTION

1.      This case seeks judicial reversal, vacatur, and other relief with regard to the Bureau of Land Management's ("BLM") March 2019 decision to reverse and abandon a provision from the agency's 2015 conservation plan for Greater sage-grouse (*Centrocerus urophasianus*) (hereinafter "sage-grouse") in Oregon that had closed about 22,000 acres in 13 specially-protected Research Natural Areas ("RNAs") to livestock grazing, for scientific research and study. These ungrazed areas serve as indispensable control sites to study the effects of grazing—and of not grazing—on unique sagebrush plant communities that are essential to the survival and recovery of the sage-grouse. Although BLM recognizes this fact, the agency under the Trump Administration has decided to forsake its research goals identified in the 2015 plan, first by unlawfully withholding implementation of the 2015 closures in the first place and now by annulling the closures entirely. If implemented as approved, BLM through this plan amendment will abandon science, severely limiting the agency's ability to contribute to conservation of the sage-grouse.

2.      BLM's 2015 conservation plan—the Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment ("2015 ARMPA")—amended eight Resource Management Plans ("RMPs") in Oregon to conserve, enhance, and restore sage-grouse habitat. The 2019 decision—the Oregon Greater Sage-Grouse Record of Decision and Approved Resource Management Plan Amendment ("2019 ARMPA")—amends these RMPs to eliminate the grazing closures to protect sage-grouse habitat within RNAs that the earlier plan implemented. The elimination of the grazing closures in the 13 RNAs, and adjustment to three related management objectives and direction, were the only changes the 2019 ARMPA made to the 2015 plan.

3.      The Trump Administration falsely asserts that the 2019 amendment, and similar contemporaneous amendments in other states across the West, builds upon and improves the 2015 plan. In truth, the 2019 amendments universally decrease protections for the sage-grouse, remove key regulatory mechanisms on which the U.S. Fish and Wildlife Service ("FWS") based its 2015 decision that the sage-grouse is "not warranted" for listing under the Endangered Species Act ("ESA"),[2] and will hasten the sage-grouse's decline toward extinction. The conservation and scientific importance of the closure of RNAs to grazing was essentially undisputed during the public process. These places represent important habitat areas for sage-grouse in Oregon, as well as other natural and cultural values. They are critical to BLM's ability to assess the impacts of livestock grazing and associated grazing management actions on sage-grouse, whether the removal of livestock will promote the recovery of degraded habitat to the benefit of sage-grouse, and whether the agency's 2015 plan is actually working.

4.      Plaintiffs, the Oregon Natural Desert Association, Audubon Society of Portland, and Defenders of Wildlife, file this action to ensure that BLM is not permitted to blindly repudiate the science-based conservation and research measures required by law and adopted for 13 identified RNAs in the 2015 plan. Accordingly, plaintiffs seek relief from this Court to set aside and vacate BLM's 2019 ARMPA and the related Final Environmental Impact Statement ("FEIS"), order BLM to immediately implement the 2015 ARMPA's key RNA closures, and order BLM to prepare a new or supplemental environmental review with regard to any portions

---

[2] 12-Month Findings on a Petition to List Greater Sage-Grouse (*Centrocerus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858 (Oct. 2, 2015) (determining sage-grouse "not warranted" for listing as an endangered species, based on the important new conservation measures adopted in the 2015 sage-grouse plans in Oregon and throughout the West).

of the 2019 ARMPA found by this Court to be adopted arbitrarily, capriciously, in abuse of discretion, or otherwise not in accordance with law.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–87, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701–06.

6.      Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, the decision to approve the 2019 ARMPA was issued within this district by the BLM's State Director in Portland, Oregon, defendants reside in this district, and the public lands and resources and agency records in question are located in this district.

7.      The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

8.      Plaintiff OREGON NATURAL DESERT ASSOCIATION ("ONDA") is an Oregon non-profit, public interest organization of about 10,000 members and supporters. It has offices in Portland, Oregon and Bend, Oregon. ONDA's mission is to protect, defend, and restore forever, the health of Oregon's native deserts. ONDA actively participates in BLM and Department of the Interior proceedings and decisions concerning the management of public lands

in eastern Oregon. ONDA brings this action on its own behalf and on behalf of its members and

staff, many of whom regularly enjoy and will continue to enjoy the public lands and resources

that are the subject of the final agency decision challenged in this action, for educational,

recreational, spiritual, and scientific activities. ONDA has been active in monitoring ecological

conditions for the sage-grouse on public lands managed by BLM throughout eastern Oregon,

including within the agency's Prineville, Lakeview, Burns, and Vale Districts. ONDA

participated throughout the public processes that led to BLM's adoption of the 2015 ARMPA

and the 2019 ARMPA.

9.      Plaintiff AUDUBON SOCIETY OF PORTLAND ("Portland Audubon") is an

Oregon non-profit, public interest conservation organization with over 17,000 members. Portland

Audubon's mission to "promote the enjoyment, understanding and protection of native birds,

other wildlife and their habitats." Portland Audubon has a long-standing interest in protecting

birds, wildlife, and habitat and engaging people with nature in central and eastern Oregon dating

back to its founding in 1902. Among its earliest priorities was advocating for the protection of

Malheur National Wildlife Refuge. It continues this work in central and eastern Oregon through

engagement in wildlife policy issues, research projects, field trips, volunteer work parties, and

public outreach events. Portland Audubon currently has one full-time staff position located in

Harney County and augments this position with additional paid seasonal support. Portland

Audubon has a strong and long-standing interest in the protection of the Greater sage-grouse. It

commissioned a Status Report of sage-grouse populations with an emphasis on populations in

Oregon and Washington in 1994. Portland Audubon has served on the Oregon Sage-grouse

Conservation Partnership (SageCon) since its inception in 2010. Portland Audubon and its

members regularly visit the areas and landscapes at issue here on natural history related trips, and

Portland Audubon has engaged with the BLM and Department of the Interior throughout the public processes that led to BLM's adoption of the 2015 ARMPA and the 2019 ARMPA. Portland Audubon brings this action on its own behalf and on behalf of its members, staff, and volunteers, many of whom regularly enjoy and will continue to enjoy the public lands that are the subject of the final agency decision challenged in this action, for educational, recreational, spiritual, scientific and other activities and pursuits.

10.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a national non-profit conservation organization focused on wildlife and habitat conservation and the preservation of biodiversity nationwide. Based in Washington, D.C., the organization also maintains field offices across the country and represents approximately 1.8 million members and supporters, including 34,280 in Oregon. Defenders is deeply engaged in public lands management and wildlife protection, including the conservation and recovery of Greater sage-grouse and sagebrush habitats. The organization has participated in every phase of the National Greater Sage-Grouse Planning Strategy since its inception in 2011. This has included years of BLM planning in sage-grouse habitats in Oregon, where Defenders has provided extensive input and data to support improved management of sage-grouse and other sagebrush-dependent species on millions of acres of public lands. Defenders brings this action on its own behalf and on behalf of its members, staff, and volunteers, many of whom regularly enjoy and will continue to enjoy the public lands that are the subject of the final agency decision challenged in this action, for educational, recreational, spiritual, scientific and other activities and pursuits.

11.     The plaintiffs and their members use and enjoy the waters, public lands, and natural resources on and surrounding the 13 Research Natural Areas at issue in this case, for recreational, scientific, spiritual, educational, aesthetic, and other purposes. They enjoy fishing,

hiking, camping, hunting, bird watching, study, contemplation, photography and other activities in and around these public lands. The plaintiffs and their members also participate in information gathering and dissemination, education and public outreach, participating in agency land use and conservation planning processes, and other activities relating to BLM's management and administration of these public lands.

12.    Defendant JOSE LINARES is sued solely in his official capacity as acting State Director of the BLM Oregon/Washington, in Portland, Oregon. The State Director is the BLM official responsible for signing and approving the 2019 ARMPA at issue in this case, and has principal authority for the actions and inactions alleged herein.

13.    Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, and is charged with managing the public lands and resources governed by the 2019 ARMPA at issue in this case, in accordance and compliance with federal laws and regulations.

## STATEMENT OF FACTS

14.    Greater sage-grouse are symbolic of the vast, open lands between the Rocky Mountains and the Sierra Nevada and Cascade ranges. But sage-grouse are in trouble. As many as 16 million of these iconic birds once ranged across 297 million acres of sagebrush grasslands, an area of western North America so vast it is sometimes called the Sagebrush Sea. Over the past 200 years, agriculture and development have reduced the bird's available habitat by nearly half. In that time, sage-grouse abundance has steadily declined to perhaps fewer than 50,000 birds range wide today, by some estimates. Scientists understand that the fate of the sage-grouse may be a harbinger for hundreds of other species dependent upon the West's sagebrush habitats.

15.     Today, the sagebrush ecosystem is among the most vulnerable in North America. The sage-grouse is in danger of extinction from fragmentation and loss of its sagebrush habitat and increasing isolation of populations due to human activities, including livestock grazing, energy development and transmission, and ever-expanding motorized transportation networks. Other factors, like Earth's changing climate, the establishment and spread of weeds and invasive species that replace sagebrush plant communities, and changing wildfire regimes in sagebrush landscapes, also have damaged sage-grouse habitat throughout the West.

16.     Livestock grazing is one of the most ubiquitous threats to the sage-grouse. Grazing cattle consume native plants, trample and destroy soils and fragile spring and riparian areas, and increase the spread of sagebrush-replacing weeds. Cattle grazing in sage-grouse nesting areas during the April-May nesting season can cause sage-grouse hens to abandon their nests. The infrastructure of watering systems and barbed-wire fencing needed to manage large herds of cattle in the desert also fragment and destroy sagebrush habitat, artificially concentrating cattle in important sage-grouse habitat areas, dewatering natural springs and water courses, and creating thousands of potential breeding grounds for West Nile virus-carrying mosquitoes as water stagnates in reservoirs, cattle troughs, and even cattle hoof prints. The virus is 100% fatal to sage-grouse.

17.     On December 29, 2003, plaintiff Oregon Natural Desert Association, joined by 20 other conservation groups, petitioned the FWS to list the sage-grouse as threatened or endangered under the ESA. *See* 12-Month Findings on a Petition to List Greater Sage-Grouse (*Centrocerus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858, 59,859 (Oct. 2, 2015) (table summarizing previous federal actions for sage-grouse). The FWS denied that petition, concluding that the sage-grouse was "not warranted" for protection under

the ESA. In 2007, a federal district court reversed that determination. *W. Watersheds Proj. v. U.S. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173 (D. Idaho 2007).

18.     After further study, the FWS published a new finding in 2010, determining that ESA protection was now "warranted" for the sage-grouse because of loss and fragmentation of sagebrush habitat and the inadequacy of the various state conservation plans then in place. 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910 (Mar. 23, 2010). However, FWS also determined that listing of the sage-grouse was precluded by higher priority listing actions. *Id.* at 13,910.

19.     The FWS based its "warranted" determination upon a 2009 monograph commissioned by the U.S. Geological Survey—*Ecology and Conservation of Greater Sage-grouse: A Landscape Species and its Habitats*—regarding the imperiled status of the sage-grouse and its habitat. The monograph collected unprecedented new research on the bird's life history, habitat needs, and threats to its survival and recovery. Much of the new research showed that sage-grouse are affected by habitat disturbance on far greater spatial scales than scientists had previously recognized.

20.     Citing that 2010 FWS finding, BLM, along with the U.S. Forest Service, launched its National Greater Sage-Grouse Planning Strategy in 2011. Under the Strategy, the agencies would amend federal land use plans across the West with sage-grouse conservation measures to avoid ESA listing. To guide that Strategy, a National Technical Team of sage-grouse experts was convened. The team released its Report on National Greater Sage-grouse Conservation Measures ("NTT Report") in December 2011.

21.    The NTT Report emphasized the "overall objective" of protecting priority sage-grouse habitats from anthropogenic disturbances. The National Technical Team recognizes the importance of monitoring to provide an objective appraisal of the effects of potentially positive conservation actions and the relative negative effects of management actions to sage-grouse populations and their habitats. Adaptive management, based on monitoring, reveals gaps in knowledge about key processes and functional relationships. In turn, this helps to identify and prioritize research needs. The National Technical Team recommends that BLM study, among other things, the long-term effects of overgrazing on sagebrush habitat, habitat changes due to herbivory, and altered sage-grouse behavior due to the presence of domestic livestock.

22.    In 2013, the FWS released its own expert Conservation Objectives Team Report ("COT Report"). That report identified Priority Areas for Conservation ("PACs"). These are key habitats necessary for sage-grouse conservation. The COT Report states that preserving the PACs "is the essential foundation for sage-grouse conservation." There are twenty PACs in Oregon.

23.    Finally, in 2015, BLM and the Forest Service unveiled a series of sweeping new plans to protect the sage-grouse and its sagebrush habitats on public lands across the West. The 2015 plans—known as Approved Resource Management Plan Amendments or "ARMPAs"—amended 98 existing land use plans across ten western states. This included eight BLM RMPs in Oregon, in the agency's Prineville, Lakeview, Burns, and Vale districts. The 2015 ARMPAs incorporated the NTT and COT Reports and were based on the "best available science."

24.    Key features of the 2015 ARMPAs include protections for highest-priority habitats designated as Sagebrush Focal Areas, density and disturbance caps for energy and other industrial activity, buffers around sage-grouse breeding sites (called "leks"), triggers for

increased protections if habitats or populations fall below specified levels, and a net conservation gain mitigation requirement for activities that affect grouse habitat.

25.    Monitoring habitat condition informs adaptive management and assessment of whether the plans are working. In Oregon, the 2015 ARMPA, through Objective LG 2 and Management Decision LG 1, closed 13 "key" RNAs to livestock grazing, reserving these areas for scientific research and study. These 13 RNAs cover a total of 21,959 acres of public land. BLM had already closed two other key RNAs (Foster Flat and Guano Creek-Sink Lakes) to livestock grazing during previous land management planning processes. The map below shows the location of the key RNAs in eastern Oregon.

//

//

//

//

//

//

//

//

//

//

//

//

//

//



26.    BLM explained that the key RNAs were critical to the agency's ability to assess

the impacts of livestock grazing and associated grazing management actions on sage-grouse, and

for gauging the effectiveness of the 2015 plan's grazing measures. By removing grazing from

these areas, BLM can study how a series of unique sagebrush plant communities respond in the

absence of this otherwise ubiquitous, potentially destructive land use. In other words, these places were to serve as undisturbed baseline reference areas for the sagebrush plant communities they represent. There are almost no ungrazed areas on public lands within the range of the sage-grouse in eastern Oregon, so the key RNAs grazing closure is crucial BLM's ability to understand the effects of its grazing decisions and management throughout Oregon's high desert on the sage-grouse.

27.    Under the September 18, 2015 Record of Decision ("2015 ROD"), the 2015 ARMPA's Objective LG 2 and Management Decision LG 1 are "Immediate Decisions" that "go into effect when the ROD is signed." 2015 ROD at 1-41 (listing "goals, objectives, allowable uses, and management direction" as immediate "decisions [that] require no additional analysis and guide future land management actions and subsequent site-specific implementation decisions"). The Final Environmental Impact Statement supporting the 2015 ROD disclosed that "[p]ermitted livestock grazing would be unavailable for grazing within 5 years on all or portions of 13 of the 15 key RNAs." 2015 Final Environmental Impact Statement at 2-46.

28.    In issuing the September 18, 2015 ROD, BLM notified the public of the key RNA grazing closure decisions.

29.    Grazing operations holding BLM-issued permits to graze livestock within the key RNAs were also aware of the closure decisions through other communications from and with BLM.

30.    Any further required regulatory processing for the RNA closures should have been completed years ago at this point. *See* 43 C.F.R. § 4110.4-2 (providing, with exceptions, for "2 years' prior notification" for certain changes to permitted livestock grazing); 80 Fed. Reg. 57,633, Notice of Availability of the Record of Decision and Approved Resource Management

Plan Amendments for the Great Basin Region Greater Sage-Grouse Sub-Regions of Idaho and

Southwestern Montana; Nevada and Northeastern California; Oregon; and Utah (Sept. 24, 2015)

(notification of final decision).

31.   The 2015 federal plans represented an important step forward for sage-grouse

conservation. This is clear from the steady stream of ensuing lawsuits filed by industry groups and

state and county governments hostile to the conservation of the sage-grouse and its remaining

habitats.[3] In all of those lawsuits, the plaintiffs asked courts to throw out BLM's sage-grouse plans—

which would leave the bird unprotected save for scattershot, inconsistent, and generally far weaker

state plans.

32.   For some time, Oregon was the only state whose 2015 ARMPA was not subject to

any direct challenge in federal court. BLM's sage-grouse plan for Oregon had resulted in large

measure from collaborative work undertaken by the Sage Grouse Conservation Partnership

("SageCon"). Using an "all lands, all threats" approach to sage-grouse conservation, and

supporting community sustainability in eastern Oregon into the future, the SageCon group

sought to coordinate federal, state, and local efforts to address the multiple threats to sage-grouse

across the eastern Oregon sagebrush landscape. While BLM's 2015 ARMPA for Oregon was not

---

[3] *See Cahill Ranches, Inc. v. BLM*, No. 1:17-cv-960-CL (D. Or. filed June 19, 2017); *Bd. of Cnty. Commr's of the Cnty. of Garfield, Colo. v. Zinke*, No. 1:17-cv-01199-WYD (D. Colo. filed May 15, 2017); *Harney Soil & Water Conservation Dist. v. U.S. Dep't of the Interior*, No. 1:16-cv-2400-EGS (D.D.C. filed Dec. 7, 2016); *W. Energy Alliance v. U.S. Dep't of Interior*, No. 16-cv-112 (D.N.D. filed May 12, 2016); *Am. Exploration & Mining Ass'n v. U.S. Dep't of the Interior*, No. 16-cv-737 (D.D.C. filed Apr. 19, 2016); *Wyo. Coalition of Local Gov'ts v. U.S. Dep't of Interior*, No. 2:16-cv-41 (D. Wyo. filed Mar. 1, 2016); *Herbert v. Jewell*, No. 2:16-cv-101 (D. Utah filed Feb. 4, 2016); *Wyo. Stock Growers Ass'n v. U.S. Dep't of Interior*, No. 2:15-cv-181 (D. Wyo. filed Oct. 14, 2015); *Otter v. Jewell*, No. 1:15-cv-1566 (D.D.C. filed Sept. 25, 2015); *W. Exploration, LLC v. U.S. Dep't of the Interior*, No. 3:15-cv-491 (D. Nev. filed Sept. 23, 2015).

perfect,[4] a broad cross-section of stakeholders, including state and local governments, conservation groups, landowners, ranchers, and others, largely felt that the plan was an important first step in the difficult task of saving the sage-grouse from extinction.

33.    In 2017, however, after Donald J. Trump took office, his new Secretary of the Interior, Ryan Zinke, issued an order directing the Department of the Interior to "review" the federal sage-grouse plans. A departmental review team in Washington, D.C. issued a report identifying ways to generally weaken or remove protections or processes established in the 2015 plans.

34.    By that time, all of the anti-grouse challengers to the 2015 plans had agreed to stay their lawsuits as the Department of Interior continued its "review." In October 2017, BLM published a Notice of Intent to reopen the process and amend the 2015 sage-grouse plans across the West, including the one for Oregon.

35.    Even before the end of the first public comment period, the anti-grouse plaintiffs already gained significant rollbacks from the 2015 plans. Secretary Zinke announced in October 2017 that he was cancelling a 10 million acre mining withdrawal that had been part of BLM's 2015 decisions. And, in December 2017, he rescinded several BLM policies on mitigation, including eliminating "compensatory" mitigation that had allowed the agency to charge fees where, for example, an energy development would result in lost acres of sage-grouse habitat.

36.    BLM issued a Draft RMP Amendment and Environmental Impact Statement for public review in April 2018. Throughout the NEPA process, the Oregon Natural Desert

---

[4] *See, e.g.*, *W. Watersheds Proj. v. Schneider*, No. 1:16-cv-00083-BLW (D. Idaho filed Feb. 25, 2016) (lawsuit filed by environmental plaintiffs fighting on behalf of the sage-grouse, aimed at upholding the plans while at the same time fixing some of their key problems including BLM's failure to undertake any range-wide analysis of sage-grouse habitats and populations).

Association, Portland Audubon, and Defenders of Wildlife (referred to hereinafter collectively as "ONDA") and their members participated by attending public meetings, speaking with BLM officials, reviewing agency environmental reviews, and submitting comment letters and other materials for the agency to consider. In general, ONDA and others asked BLM to reject the Trump administration's proposal to remove protections and conservation measures from the 2015 plan for Oregon. If anything, argued ONDA, the agency should consider other reasonable alternatives—for example, a less drastic, partial reversal, or addressing important issues that had been ignored in the 2015 plan, like winter habitat, genetic connectivity, and global climate change.

37.    ONDA asked BLM to disclose information essential to a meaningful review—for example, economic and land management information—that would allow public reviewers (as well as the agency decisionmakers) to understand the actual effects of what was being proposed, and whether BLM's stated justifications for amending the plan had any basis in fact. ONDA asked for that kind of information both through its comment letters and, when BLM did not include the information in its public NEPA documents, requests made under the Freedom of Information Act ("FOIA").

38.    ONDA pointed out that sage-grouse continue to struggle in Oregon. The bird's statewide population has declined dramatically in recent years. It dropped by 7.7% in 2017, then by another 10.2% in 2018, and then by another 24.9% in 2019. By the end of 2019, the Oregon Department of Fish and Wildlife had estimated that the Oregon statewide sage-grouse population has now dropped to about 13,827 individuals. This is far below the State of Oregon's population goal and is now 53% below the 2003 baseline population estimate of 29,237 individuals. This is the lowest population count of sage-grouse in Oregon since 1980.

39.     Through these and other comments, ONDA urged BLM to either select the "No Action" alternative, leaving the 2015 plan unchanged, or to undertake a new or supplemental review to address the many problems ONDA and others had identified with the 2015 plan throughout the public process.

40.     On November 26, 2018, BLM issued a Proposed Resource Management Plan Amendment and FEIS. The agency refused to consider in detail any of the other alternatives ONDA and the public had suggested, and proposed to select its only "action" alternative, the Proposed Plan Amendment, which eliminated the grazing closures on 13 key RNAs.

41.     On January 7, 2019, pursuant to BLM's land use planning regulations, the Oregon Natural Desert Association, Audubon Society of Portland, Defenders of Wildlife, and other conservation groups protested the agency's proposed decision. The groups argued that BLM had failed to provide a reasoned explanation for its about-face, failed to demonstrate that it took the required "hard look" at the environmental effects of weakening the 2015 ARMPA by eliminating the 2015 RNA grazing closures, and failed to ensure the reversal in policy would not result in impermissible "unnecessary or undue degradation" to the public lands and resources in the planning area.

42.     On March 15, 2019, the Acting State Director for BLM Oregon/Washington, Theresa Hanley, issued a Record of Decision ("2019 ROD") approving the 2019 ARMPA to amend BLM's Oregon sage-grouse plan. The 2019 ARMPA reverses the 2015 ARMPA decision to close to livestock grazing, for scientific research and study, the 13 "key" RNAs, and changes two Objectives and one Management Direction related to these again-unprotected RNAs. These are the specially-designated areas that the agency had explained in 2015 were critical to BLM's ability to assess the impacts of grazing and associated grazing management actions on sage-

grouse, and for gauging the effectiveness of the 2015 plan. The 2019 ARMPA does retain the closures of the Foster Flat and Guano Creek-Sink Lakes RNAs that had been closed to grazing prior to the 2015 ARMPA.

43.     BLM bases its 2019 decision on a desire "to eliminate economic impacts to certain livestock operators." Yet, BLM fails to name the operators, the federally-issued permits, or even the federal grazing allotments at issue, and provides no specific, quantitative, economic analysis of the presumed financial impacts. Instead, BLM merely references "the potential for economic impacts" in the most general of terms. The only numeric indicator BLM provides—the number of animal unit months[5] not available for grazing—is actually shown in the 2018 FEIS to be lower today than BLM said it was in the agency's 2015 statement. In other words: whatever the economic impact to these unidentified grazing permits and operations actually might be, the FEIS shows it is actually *smaller* than BLM assumed in 2015. And in 2015, the agency stated that even eliminating the higher number of AUMs would have "negligible or no impact on livestock grazing and range management."

44.     BLM has stated that the 13 "key" RNAs closed to grazing in 2015 were the "minimum number of sites and areas necessary" to provide "sufficient replication and support a coherent research plan that would provide data with the statistical power" to extrapolate the results across all sage-grouse range in Oregon. In 2015, BLM also considered every other known ungrazed area in eastern Oregon, but found that *none* were sufficient to provide the information that the 13 identified key RNAs would provide.

---

[5] An animal unit month, or "AUM," is the amount of vegetation required to support one cow or one cow/calf pair for one month, representing approximately 800 pounds of vegetation.

45.     By reversing course and abandoning the RNA grazing closure—indeed, by failing to implement it in the first place—the Trump administration has signaled that it does not want to collect or even see data about what effects livestock grazing has on sagebrush plant communities in Oregon and whether BLM's sage-grouse conservation plan for Oregon is working—in essence sticking its head in the sand and eschewing science-based conservation.

46.     On October 16, 2019, the court in *Western Watersheds Project v. Schneider*, No. 1:16-cv-00083-BLW, ordered that "BLM is enjoined from implementing the 2019 BLM Sage-Grouse Plan Amendments for Idaho, Wyoming, Colorado, Utah, Nevada/Northeastern California, and Oregon, until such time as the Court can adjudicate the claims on the merits." Memorandum Decision and Order [ECF 189] at 28–29. The court further ordered that "[t]he 2015 Plans remain in effect during this time." *Id.* at 29.

47.     To date, BLM has failed to complete implementation of the key RNA closures in Oregon. BLM contends that the agency has not yet given notice, as required by 43 U.S.C. § 1752(g) and 43 C.F.R. § 4110.4-2, to any of the grazing permittees and lessees.

48.     Affected permittees knew about the key RNA grazing closures when BLM issued the 2015 ROD. For example, Cahill Ranches, Inc. filed a lawsuit suit to challenge the closure affecting its grazing operation, citing the 2015 ROD as the decision that eliminated grazing within the Rahilly-Gravelly key RNA.

## FIRST CLAIM FOR RELIEF
## NATIONAL ENVIRONMENTAL POLICY ACT

49.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

50.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989);

*see* 42 U.S.C. § 4331. NEPA requires federal agencies to study the environmental impacts of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Pt. 1502.

51.     Aimed at informed agency decisionmaking and meaningful public participation, NEPA's "action-forcing" procedures require agencies to, among other things, properly define proposals, develop a reasonable "purpose and need" statement to frame the environmental review, consider a reasonable range of alternatives, establish an accurate baseline for analysis, ensure the professional and scientific integrity if its discussions and analyses, include all information that is "essential to a reasoned choice," discuss mitigation measures including the effectiveness of those measures, and study related proposals in a single impact statement. *See, e.g.*, 40 C.F.R. §§ 1500.1(b), 1500.2(b), 1502.1, 1502.4(a), 1502.13, 1502.15 1502.22(a), 1502.24, 1508.20.

52.     BLM has violated NEPA and its implementing regulations through issuance of the March 15, 2019 Record of Decision and Approved Resource Management Plan Amendment and the accompanying Final Environmental Impact Statement. These violations include, but are not limited to:

   a.   Relying upon a "purpose and need" statement so unreasonably narrow that it constrained BLM's analysis and eliminated reasonable alternatives that would have supported the ARMPA's basic purpose of conserving, enhancing, and restoring sage-grouse habitat;

   b.   Failing to consider a reasonable range of alternatives, including failing to fully consider viable and feasible alternatives offered by the public during the NEPA process;

    c.   Failing to establish an accurate environmental baseline with regard to presumed negative economic impacts and the conservation and scientific value of the key Research Natural Areas;

    d.   Failing to obtain and disclose to the public missing economic and other information essential to a reasoned choice;

    e.   Failing to consider the relationship of the plan amendment to global climate change, including failing to consider effects specific to RNAs that lie within BLM-identified Climate Change Conservation Areas;

    f.   Failing to discuss in a meaningful way whether the vague, unenforceable, and voluntary mitigation measures listed in the EIS will be effective;

    g.   Failing to prepare a programmatic EIS to consider the effects of the plan amendment on a landscape-wide basis; and

    h.   Failing to consider significant factors related to the conditions of sage-grouse and their habitat, including but not limited to recent declines in the sage-grouse population in Oregon and other states throughout the bird's habitat.

53.    Ultimately, BLM's unexplained reversal of its 2015 ARMPA decision to close key Research Natural Areas to grazing, through issuance of the 2019 ARMPA, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the agency failed to give good reasons for its reversal of policy, including by failing to provide the "more specific" assessment of economic effects the agency claimed was necessary and by failing to explain how elimination of the "minimum necessary" baseline research areas is consistent with statutory and regulatory requirements aimed at ensuring BLM takes a "hard look" at its proposal's environmental consequences.

54.     BLM's final decisions to adopt the 2019 ROD and FEIS therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its implementing regulations, and have caused or threaten serious prejudice and injury to plaintiffs' rights and interests.

55.     The 2019 ROD and FEIS constitute final agency actions judicially reviewable by this Court pursuant to 5 U.S.C. §§ 704 and 706(2), and must be held unlawful and set aside for the reasons identified above.

**SECOND CLAIM FOR RELIEF
FEDERAL LAND POLICY AND MANAGEMENT ACT**

56.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

57.     FLPMA requires BLM to "develop, maintain, and . . . revise" land use plans, such as the ones at issue in this case, in order to carry out its obligations to manage the public lands "in a manner that will protect the quality of scientific, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and "preserve and protect certain public lands in their natural condition." 43 U.S.C. §§ 1701(a)(8), 1712(a)–(c); 43 C.F.R. § 1610.5-5. Once developed, BLM must manage the public lands "in accordance with" these land use plans. 43 U.S.C. § 1732(a).

58.     BLM must manage the public lands consistent with the "principles of multiple use and sustained yield" and "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §§ 1732(a), (b). The term "multiple use" includes management "without permanent impairment of the productivity of the land and the quality of the environment." *Id*. § 1702(c). To ensure it has adequate information to fulfill these obligations, BLM must "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other

values." *Id*. § 1711(a). This inventory "shall be kept current so as to reflect changes in conditions." *Id*.

59.    BLM must give priority to the "inventory," "designation," and "protection" of "areas of critical environmental concern." 43 U.S.C. §§ 1711(a), 1712(c)(3). These "ACECs" are areas on the public lands where special management attention is required to "protect and prevent irreparable damage to" important fish and wildlife resources, and other natural systems or processes. *Id*. § 1702(a).

60.    Research Natural Areas are a special kind of ACEC where certain values are protected or managed for scientific purposes and natural processes are allowed to dominate. The "primary purpose" of all RNAs is "research and education." 43 C.F.R. § 8223.0-5(a). "No person shall use, occupy, construct, or maintain facilities in a manner inconsistent with the purpose of the research natural area" and "[s]cientists and educators shall use the area in a manner that is nondestructive and consistent with the purpose of the research natural area." *Id*. § 8223.1(b), (c).

61.    BLM has violated FLPMA and its implementing regulations through issuance of the March 15, 2019 Record of Decision and Approved Resource Management Plan Amendment. These violations include, but are not limited to:

      a.    Failing to prevent unnecessary or undue degradation of public lands and resources, including failing to consider and provide a reasoned explanation as to whether there will be any unnecessary or undue degradation to, or permanent impairment of, the lands as a result of BLM's change in policy and decision to make the 13 key RNAs available for livestock grazing;

b.  Failing to provide any non-arbitrary explanation as to why or how reinstating livestock grazing in the 13 key RNAs closed to grazing is "necessary" for the sage-grouse or for purposes of scientific study;

c.  Failing to give priority to the inventory, designation, and protection of the natural resources and values of the key RNAs, including by making the key RNAs available to livestock grazing, a destructive and inconsistent use of these specially-protected areas;

d.  Failing to manage the key RNAs consistent with their primary purpose of research and education, including by making the key RNAs available to livestock grazing, a destructive and inconsistent use of these specially-protected areas; and

e.  Failing to manage the public lands in accordance with the 2015 ARMPA, which required BLM to immediately implement the key RNA grazing closures.

62.  Ultimately, BLM's unexplained reversal of its 2015 ARMPA decision to close key Research Natural Areas to grazing, through issuance of the 2019 ARMPA, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the agency failed to give good reasons for its unexplained reversal of policy, including by failing to provide the "more specific" assessment of economic effects the agency claimed was necessary, by failing to appropriately prioritize these areas, and by failing to explain how elimination of the "minimum necessary" baseline research areas is consistent with statutory and regulatory requirements to, for example, "prevent unnecessary or undue degradation" of public lands and resources and "protect and prevent irreparable damage to" RNAs.

63.  BLM's final decision to adopt the 2019 ROD and FEIS therefore are arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA and its implementing

regulations, and have caused or threaten serious prejudice and injury to plaintiffs' rights and interests.

64.    The 2019 ROD and FEIS constitute final agency actions judicially reviewable by this Court pursuant to 5 U.S.C. § 706(2), and must be held unlawful and set aside for the reasons identified above.

## THIRD CLAIM FOR RELIEF
## FAILURE TO IMPLEMENT 2015 RECORD OF DECISION

65.    As alleged herein, BLM issued and made available to the public the 2015 ROD, for the 2015 ARMPA. The 2015 ROD defines the 2015 ARMPA's Objective LG 2 and Management Decision LG 1 as "Immediate Decisions" that "go into effect when the ROD is signed." The 2015 ROD was signed by the BLM Director on September 18, 2015.

66.    To date, BLM has failed to implement the key RNA grazing closures.

67.    The Federal Land Policy and Management Act and BLM's grazing regulations provide for "2 years' prior notification" to permittees or lessees under some circumstances before making areas unavailable for livestock grazing. 43 C.F.R. § 4110.4-2; 43 U.S.C. § 1752(g).

68.    Grazing operators holding permits or leases to graze livestock in the key RNAs have known about the key RNA grazing closures since September 18, 2015, when BLM issued the 2015 ROD for the 2015 ARMPA.

69.    In a November 22, 2019 letter, BLM stated to ONDA that two years' notice "has not yet been given."

70.    BLM has unlawfully withheld or unreasonably delayed implementing the 2015 ROD for the 2015 ARMPA by failing to implement and complete the key RNA closures. This is

agency action unlawfully withheld or unreasonably delayed, and thus actionable pursuant to 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Order, declare, and adjudge that defendants' March 15, 2019 Record of Decision and Approved Resource Management Plan Amendment and accompanying Final Environmental Impact Statement are unlawful under, and in violation of, NEPA and FLPMA;

B.    Order, declare, and adjudge that defendants' failure to implement the September 18, 2015 ROD requirement to close the key RNAs to livestock grazing is agency action unlawfully withheld or unreasonably delayed;

C.    Issue an order setting aside and vacating defendants' March 15, 2019 Record of Decision and Approved Resource Management Plan Amendment and accompanying Final Environmental Impact Statement;

D.    Enter injunctive relief barring defendants from implementing or further implementing the March 15, 2019 Record of Decision and Approved Resource Management Plan Amendment, unless and until such time as defendants have completed a lawful environmental analysis and issued a new, lawful decision that complies with the requirements of the APA, NEPA, and FLPMA, as well as any further injunctive or other relief necessary to mitigate for any resource-damaging or -threatening actions taken prior to this Court's issuance of a decision on plaintiffs' claims;

E.    Issue an order directing defendants to immediately implement and impose the closures of the 13 key RNAs provided for in the 2015 ARMPA;

   F.  Award plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

   E.  Grant such other further relief as plaintiffs may request or the Court deems just and proper.

DATED this 13th day of December, 2019.   Respectfully submitted,

                   s/ Peter M. Lacy

                   _____

                   Peter M. ("Mac") Lacy
                   Oregon Natural Desert Association

                   Of Attorneys for Plaintiffs