IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON NAUTRAL DESERT ASS'N, AUDUBON SOCIETY OF PORTLAND, and DEFENDERS OF WILDLIFE**, <br><br> Plaintiffs, <br><br> v. <br><br> **BARRY BUSHUE, State Director of BLM Oregon/Washington, and BUREAU OF LAND MANAGEMENT, an agency of the United States Department of Interior**, <br><br> Defendants, <br><br> and <br><br> **CAHILL RANCHES INC., an Oregon Corporation** <br><br> Defendant-Intervenor | Case No. 3:19-cv-1550-SI <br><br> **OPINION AND ORDER** |

Peter Macnamara Lacy, OREGON NATURAL DESERT ASSOCIATION, 2009 NE Alberta Street, Suite 207, Portland, OR 97211; and David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 24242 S Engstrom Road, Colton, OR 97017. Of Attorneys for Plaintiffs.

Barclay T. Samford, Arwyn Carroll, and Luther Langdon Hajek, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, 1961 Stout Street, 8th Floor, Denver, CO 80294. Of Attorneys for Defendants Barry Bushue and Bureau of Land Management.

Caroline Lobdell and Tate F. Justesen, WESTERN RESOURCES LEGAL CENTER, 9220 SW Barbur Blvd., Suite 327, Portland, OR 97219. Of Attorneys for Defendant-Intervenor Cahill Ranches Inc.

**Michael H. Simon, District Judge.**

Plaintiffs bring this action challenging Defendants' authorization of grazing on pastures containing 13 Research Natural Areas (RNAs) for the 2022 season. Plaintiffs allege that Bureau of Land Management (BLM) regulations required Defendants to install fencing to section off the RNAs from surrounding pastures so that they would not be grazed and provide baseline data for research into the recovery of sage grouse habitat. Plaintiffs claim that Defendants have unlawfully withheld compliance with that requirement. Defendants respond that under the Federal Land Policy and Management Act (FLMPA) and its regulations, they were required to send two-year notices to permittees and lessees of those pastures and that under the National Environmental Policy Act (NEPA), they are required to conduct site-specific analyses of the environmental impact of fencing before any fencing is installed. Defendants contend they are currently reviewing the impact of the proposed fencing. Plaintiffs move for a temporary restraining order (TRO) enjoining Defendants from allowing grazing on the pastures that contain the RNAs, which would not require additional fencing. For the reasons below, the Court denies Plaintiffs' motion.

## STANDARDS

In deciding whether to grant a motion for temporary restraining order (TRO), courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer

irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction). The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

In addition, a TRO is necessarily of a shorter and more limited duration than a preliminary injunction.[1] Thus, the application of the relevant factors may differ, depending on whether the court is considering a TRO or a preliminary injunction.[2] Indeed, the two factors most

---

[1] The duration of a TRO issued *without* notice may not exceed 14 days but may be extended by a court once for an additional 14 days for good cause, provided that the reasons for the extension are entered in the record. Fed. R. Civ. P. 65(b)(2). When a TRO is issued with notice and after a hearing, however, the 14-day limit for TROs issued without notice does not apply. *See Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 n.1 (D. Or. 2016). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id.* Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a TRO.

[2] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses toward its conclusion. *See Pac. Kidney*, 156 F. Supp. 3d at 1223 n.2.

PAGE 3 – OPINION AND ORDER

likely to be affected by whether the motion at issue is for a TRO or a preliminary injunction are the "balancing of the equities among the parties" and "the public interest." Finally, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entmt. Mgmt., Inc*., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND

### A. Sage-Grouse

The Greater Sage-Grouse is a bird that depends on large expanses of sagebrush grasslands. Today, fewer than 16,000 sage grouse remain in Oregon. In 2010, the U.S. Fish and Wildlife Service determined that Endangered Species Act protection was warranted for the sage grouse due to a loss and fragmentation of habitat. The Fish and Wildlife Service ultimately declined to include the sage grouse as an endangered species due to other species with higher priorities. Nevertheless, BLM and the U.S. Forest Service (USFS) have developed protections for the sage grouse, some of which include minimizing the impact of livestock grazing.

Livestock grazing is one of many factors that have contributed to sage grouse population decline. BLM and USFS have determined that livestock impact sage grouse habitat by consuming native plants, trampling shrubs, contributing to soil erosion, and spreading weeds. Other factors not affected by livestock grazing, however, also impact sage grouse habitat, such as the spread of juniper. Carefully managed livestock grazing may also help mitigate fire risks, which in turn benefits sage grouse habitat.

### B. 2015 ARMPA

In 2015, BLM and USFS issued a series of conservation plans designed to promote the protection of sage grouse. Among those plans was the 2015 Oregon Greater Sage-Grouse Record

of Decision/Approved Resource Management Plan Amendment (2015 ARPMA), which made 15 RNAs unavailable for livestock grazing. BLM and USFS set aside these key RNAs to provide a set of control data for research on the restoration of sage grouse habitat. The 2015 ARMPA provides that BLM will not issue any new grazing permits for those key RNAs and will make the RNAs unavailable to grazing for existing permitholders within five years. When the 2015 ARMPA was issued, livestock had already been removed from two of the RNAs. To close off the remaining 13 RNAs, the 2015 ARMPA explains that BLM will have to take additional steps such as building approximately 39 miles of fencing and deciding whether to remove existing fences, corrals, or water storage facilities. The fencing is necessary to section off the RNAs from adjacent BLM land that will remain available for grazing.

In accord with the 2015 ARMPA, BLM did not issue any new grazing permits for the key RNAs.[3] In June 2017, Defendant-Intervenor Cahill Ranches (Cahill) filed a lawsuit challenging the validity of the 2015 ARMPA.

## C.  2019 ARMPA

Shortly after Cahill filed its lawsuit and after a change in administration, BLM issued the 2018-2019 Sage-Grouse Resource Management Plan Amendment (2019 ARMPA), which altered the priorities of the 2015 ARMPA and again made the previously identified 15 RNAs available for grazing. Plaintiffs filed this lawsuit in September 2019, challenging the validity of the 2019 ARMPA. One month later, another district court enjoined BLM from implementing

---

[3] At oral argument, Plaintiff asked the Court to take judicial notice of the Declaration of William J. Mulder in support of Tree Top Ranches' motion to intervene. ECF 96. Plaintiff contends that Mr. Mulder's declaration shows that BLM issued permits after the 2015 ARMPA. The Court does not resolve in this Opinion and Order the pending motions to intervene filed on March 25, 2022. The Court notes, however, that Exhibit B of Mr. Mulder's declaration shows that BLM issued Tree Top Ranches' permit in 2015. *See* ECF 96, at 23.

the 2019 ARMPA and reinstated the 2015 ARMPA. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019).

**D. Defendants' Implementation of the 2015 ARMPA**

After the injunction issued, BLM took up the planning and decision making process necessary to close off the 13 remaining RNAs. In January 2020, BLM issued two-year notices to grazing permittees and lessees for pastures containing the RNAs. These notices advised the permittees and lessees that BLM may decrease permitted use or cancel their permit or lease due to the decrease in public land available for grazing. After issuing the notices, several BLM field offices began the scoping process to ensure that new fencing would minimize impact on other resources within the RNAs. In the process, BLM identified several resource conflicts between the proposed new fencing and Wilderness Study Areas and sage grouse leks. BLM then examined other methods it could use to close off the RNAs without causing resource conflicts, which include establishing range line agreements with permittees, requiring active herding, removing water developments, and adjusting the timing of available grazing.

BLM also began site-specific NEPA analyses of the impacts of installing fencing to close the RNAs and evaluate the identified alternatives to fencing. This analysis aimed to identify potential adverse impacts of the fencing, including interference with sage grouse leks, populations of sensitive plants, cultural resources, local wildlife populations, and habitat. In December 2021 and January 2022, BLM issued notices that opened a 30-day scoping period seeking public comment on the proposed fencing. The periods of public comment closed in January and February 2022, and BLM is reviewing the public comments it received. BLM has been able to close one of the key RNAs by reaching a voluntary range-line agreement with one of the permittees.

**E.  The Present Lawsuit**

As noted above, Plaintiffs filed this lawsuit in 2019, one month before another district court enjoined Defendants from implementing the 2019 ARPMA. After that injunction issued, Plaintiffs communicated to Defendants its belief that Defendants needed to close the RNAs "immediately." Defendants responded that additional steps, such as issuing two-year notices to permittees and lessees, scoping fencing locations, assessing the environmental impact of new fencing, and installing the fencing was required before it could close the remaining RNAs. Defendants then began to take those additional steps, as described above.

On December 23, 2021, Defendants informed Plaintiffs that it was "unlikely that all 13 closures will be implemented before the 2022 grazing season." ECF 61-6, at 2. On January 19, 2022, Defendants confirmed that grazing would continue on pastures containing the RNAs for the 2022 season because none of the pastures were ready for a rest year and methods of closing off the RNAs within the pastures had not been finalized. On February 14, 2022, Defendants provided the earliest dates that livestock would be turned out on each of the pastures containing the RNAs. Grazing will begin on three pastures on April 1, 2022 and on one pasture on April 15, 2022. ECF 99-1. The remaining pastures will open in May, June, July, and August at the earliest.

Plaintiffs filed their motion for temporary restraining order on February 24, 2022. Plaintiffs' motion seeks emergency relief before April 1st, the earliest date for grazing on three pastures containing key RNAs. Due to the compressed briefing schedule, the Court directed Defendants to assume, only for purposes of this motion, that there are "serious questions" going to the merits of Plaintiffs' motion and that the only issues left to resolve are whether Plaintiffs will suffer irreparable harm absent an injunction, whether the balance of the equities tips "sharply" in Plaintiffs' favor, and whether an injunction would serve the public interest. *See Cottrell*, 632 F.3d at 1131-32.

PAGE 7 – OPINION AND ORDER

## DISCUSSION

### A. Irreparable Harm

As a threshold matter, Plaintiffs' delay in filing this motion casts doubt on their allegations of irreparable harm. Plaintiffs knew as early as December 2021 that Defendants planned to allow grazing on pastures containing RNAs this year. Defendants confirmed that fact in January and again in February 2022. Further, Plaintiffs did not inform the Court of the possibility of a motion for temporary restraining order in its recent February 4, 2022 status report. Four days after the parties filed that status report, one of Plaintiffs' witnesses signed a declaration in support of the pending motion for TRO. *See* ECF 59. Plaintiffs, however, did not file their motion until February 24, 2022, more than two months after they learned grazing would continue in 2022. This delay counsels against a finding of likely irreparable harm. *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Giving Back Fund Inc. v. Miami Mktg. Grp. LLC*, 2011 WL 13217774, at *4 (C.D. Cal. Jan. 20, 2011) (stating that the plaintiffs' two-month delay in filing their motion "certainly implies a lack of urgency and accordingly counsels against finding a likelihood of irreparable harm").

Even if Plaintiffs had filed their motion without delay, they have not shown a substantial likelihood of irreparable harm. Plaintiffs raise three forms of irreparable harm: harm to their ability to use and enjoy the RNAs, harm to their scientific research interests, and harm to the sage grouse population. The Court addresses each in turn.

#### 1. Use and Enjoyment of the Land

Plaintiffs argue that absent a temporary restraining order, they will suffer likely irreparable harm due to an inability to view and enjoy undisturbed sagebrush grassland. For example, one of ONDA's members states that allowing grazing in pastures that contain RNAs

will affect her quality of life because her camping trips in other cattle-grazed areas have recently felt unsatisfying. ECF 60, ¶ 8.

The Ninth Circuit has held that loss of an ability to view, experience, and use undisturbed forested land can constitute irreparable harm. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1136 (9th Cir. 2011). *Cottrell*, however, draws a critical distinction from this case in that the plaintiffs there sought an injunction barring logging activity on undisturbed, forested land. Here, the pastures containing RNAs set for grazing in April have been grazed within the last three years and on a rotating basis since at least 1934. Thus, even if the Court were to enjoin grazing this year, Plaintiffs would not immediately be able to view the RNAs in an undisturbed, ungrazed state.

Further, because short-term grazing is different from harvesting trees in a forest, the loss of use and enjoyment analysis turns on whether the grazing would itself harm the land. Otherwise, a plaintiff's subjective statement that he or she desires to use and enjoy an ungrazed parcel of land might suffice to show irreparable harm. Here, Plaintiffs have not made that showing. All four pastures at issue have been grazed on a rotating basis for decades and met all applicable standards in their most recent rangeland health assessments. Additionally, all four pastures have been only lightly grazed, except for the Sucker Creek Pasture, which was grazed at 45 percent in 2020. Moreover, Plaintiffs' reply brief appears to abandon their argument that grazing will irreparably harm their ability to use and enjoy the land and confirms that continued grazing will not cause harm to the land itself. *See* ECF 75, at 12 ("This case is not about grazing causing 'harm to the *allotments*.'" (emphasis in original)); *id.* at 16 ("This case is not about the extent to which cattle are currently damaging the environment in the RNAs.").

One of Plaintiffs' members, Bella Lacy, states that when she visits Hart Mountain this summer, she would like to visit a nearby RNA, such as Fish Creek RNA, so that she can "experience what it's like as it begins to recover from the impacts of a century or more of grazing." ECF 60, ¶ 11. But Plaintiffs' members, including Ms. Lacy, have already been able to view RNAs as they begin to recover from grazing because BLM's pastures are grazed on a cyclical basis. Each pasture is rested every one to two years to facilitate regrowth, and during those rest years, Plaintiffs' members may observe that regrowth. Plaintiffs have not shown that the inability to view those initial stages of regrowth during the 2022 season as opposed to a future rest year likely will cause irreparable harm. Thus, Plaintiffs have not shown a substantial likelihood of irreparable harm to their ability to view and enjoy undisturbed RNAs.

### 2. Interest in Scientific Research

Plaintiffs next argue that without a TRO, they will suffer irreparable harm because scientific data will be lost. Plaintiffs contend that because the purpose of closing the RNAs under the 2015 ARMPA was to facilitate scientific research in the restoration of sage grouse habitat, any delay in beginning that research constitutes irreparable harm and that seven years of data has already been lost. The basis of Plaintiffs' claim on the merits, however, is that the 2015 ARMPA imposes a five-year deadline to close the RNAs, indicating that at least five years of data has not been "lost." Further, Plaintiffs' expert, Dr. J. Boone Kauffman, opines that the 15 RNAs "are far below the minimum number of sites and areas necessary to completely provide 'sufficient replication and support a coherent research plan that would provide data with [] statistical power.'" ECF 58, ¶ 18. Dr. Kauffman instead characterizes the closure of the 15 RNAs as an "important start" that will allow BLM to begin to understand how it can better manage public lands. *Id.* Considering that Plaintiffs must show that it likely would incur irreparable harm before the expiration of a TRO, the Court notes that the other eleven RNAs may also serve as an

PAGE 10 – OPINION AND ORDER

"important start" to beginning Plaintiffs' land use research. Because, as Plaintiffs' expert notes, the 15 RNAs in total are "far below" the required number of sites for reliable scientific data, the Court finds that continued grazing on four of those sites will not irreparably harm Plaintiffs' research interests.

### 3. Sage Grouse Population

Plaintiffs also contend that grazing will cause irreparable harm to the sage grouse population. One of Plaintiffs' members, Amy Stuart, explains that she enjoys hunting big game and uplands birds in the Oregon high desert and has hunted sage grouse in the past. Ms. Stuart has not hunted sage grouse since 2015 due to the bird's population decline. If the sage grouse population recovers, Ms. Stuart states that she will take up sage grouse hunting again. In addition to Ms. Stuart, Ms. Lacy and Mark Salvo state that they will be irreparably harmed if grazing continues this year because they will have a lower chance of viewing sage grouse in the wild.

In making this allegation of irreparable harm, Plaintiffs rely on statistics showing that the sage grouse population has declined throughout Oregon. Plaintiffs, however, must show more than a mere possibility of irreparable harm. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

Plaintiffs have not shown that continued grazing this year on four RNAs will cause a significant decline in sage grouse. In fact, Ms. Stuart states that the sage grouse population has increased in some BLM districts between 2003 and 2021, and most of that land is grazed. Glenn Frederick, a wildlife biologist at BLM, states that the sage grouse population has declined on Oregon Priority Areas of Conservation containing the RNAs at issue, but that after a review of that decline, the U.S. Fish and Wildlife concluded that the effects of livestock grazing were

PAGE 11 – OPINION AND ORDER

unclear. *See* ECF 68. Further, this Court has previously found that grazing at a 30 percent usage level does not cause likely irreparable harm to the sage grouse population. *See W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1256 (D. Or. 2019). Here, based on data available since 2015, East Pasture was grazed at an average of under ten percent, South Ridge Pasture at 26 percent, Bull Flat Pasture at 32 percent, and Sucker Creek Pasture at 45 percent.

Even assuming that continued grazing on four RNAs during the 2022 season would lead to some decline in the sage grouse population, Plaintiffs would need to show that decline significantly impacts the species as a whole. *See Humane Soc'y of the U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008) (concluding that a 0.3 to 4.4 percent decline of protected salmon did not constitute irreparable harm); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1263 (W.D. Wash. 2015) ("Courts that have found irreparable harm stemming from the deaths of a small number of individual animals have done so when the 'loss of those individuals would be significant for the species as a whole.'" (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008))); *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (denying injunctive relief where the plaintiffs failed to show that the challenged plan would "harm the species as a whole").

Plaintiffs have not identified the approximate number of sage grouse that will perish absent an injunction and have not explained how that population decline will impact the species as a whole. Moreover, Plaintiffs' reply brief appears to abandon their argument that grazing likely will irreparably harm the sage grouse population. *See* ECF 75, at 12-13 ("ONDA is not trying to enjoin grazing in order to directly or immediately preserve habitat for sage-grouse.");

*id.* at 17 ("ONDA's claim is not address at the *direct* effects of livestock grazing in RNAs on individual sage-grouse populations." (emphasis in original)).

Plaintiffs have not met their burden to make a "clear showing" of a substantial likelihood of irreparable harm absent a temporary injunction. *See Winter*, 555 U.S. at 22.

**B. Balance of the Equities**

In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). When the government is the defendant, generally the balancing of the equities and the public interest factors merge. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When the interests of a private third party may be affected, a court must consider these factors separately. *Id.* (considering the factors separately in light of the intervenors' interests).

Plaintiffs argue that the equities tip sharply in their favor because absent an injunction, they will be unable to begin research on the ungrazed RNAs and years of data has already been lost. As described above, the 2015 ARMPA itself contemplates that BLM would take approximately five years to install the fencing and close off the key RNAs and thus data from those years has not been "lost." Plaintiffs also do not explain how the inability to begin research this year instead of perhaps next year causes hardship to their organization or members. Plaintiffs have identified no funding that will be lost or other specific hardship to Plaintiffs beyond their general desire to begin the research. Instead, Plaintiffs assert that "[w]hen 'environmental injury is sufficiently likely, the balance of the harms will usually favor the issuance of an injunction to protect the environment.'" ECF 75, at 21 (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988)). Plaintiffs, however, have repeated that their claims are not

PAGE 13 – OPINION AND ORDER

based on direct environmental injury due to livestock grazing. ECF 75, at 16 ("This case is not about the extent to which cattle are currently damaging the environment in the RNAs."). Plaintiffs have not shown they will likely suffer hardship if they cannot begin research on the four RNAs set for grazing in April.

Plaintiffs also argue that the equities tip sharply in their favor because an injunction would provide areas of undisturbed sage grouse habitat. But as Plaintiffs point out, grazed pasture, even on a rest-rotation schedule, make take years to restore fully. BLM expects repopulation of sagebrush on the South Ridge Bully Creek RNA will take 50 years to recover due to a wildfire in 2015. ECF 71, ¶ 13. Further, in a letter dated April 24, 2017, ODFW opined that removing grazing in the Rahilly-Gravelly RNA (within the Sucker Creek Pasture) "will not improve habitat quality for sage grouse" and that if fencing is installed, "there are potential negative impacts to sage grouse." ECF 73-4. ODFW explained that the "majority of the habitat issues affecting sage grouse in the area are due to juniper encroachment and the presence or absence of cattle will not affect that issue." *Id.* Thus, it is unclear whether the RNAs at issue will in fact provide refuse for the sage grouse if they are not grazed this year. Any hardship to Plaintiffs, therefore, is minimal, especially in comparison to the burden on Cahill.

An injunction prohibiting grazing on the pastures containing RNAs set for grazing on April 1st would impose several hardships on Cahill.[4] Cahill is a multi-generational family business that has grazed cattle in the same part of rural Oregon for more than a century. Several families' livelihoods depend on Cahill, which in turn depends on the ability to use public lands

---

[4] Plaintiff contends that under the environmental impact statement accompanying Cahill's grazing permit, the earliest turnout date for Sucker Creek Pasture is May 16th. At oral argument, Defendants responded that for the past eight years, BLM granted Cahill's requests for an April 1st turnout date. BLM also authorized Cahill's request for an April 1st turnout date this year. *See* ECF 99-1. The Court is therefore satisfied that Cahill's turnout date is April 1st.

for its livestock operations. If the Court enjoins grazing on the Sucker Creek Pasture, Cahill will have to displace or dispose of 250 cattle, which is 30 percent of its herd. That Cahill received federal subsidies in the past does not negate the hardship it would undergo if it had to find replacement pasture or rebuild its herd. Joe Cahill, one of the owners of Cahill, states that cattle herds are developed carefully over time and recovering 30 percent of Cahill's herd would take years to recover. If Cahill chose not to dispose of the 30 percent, it would have to purchase hay for feed, which is exceptionally expensive this season due to a recent drought and the COVID-19 pandemic. Further, Mr. Cahill states that Cahill and other livestock operations "typically run on slim margins in the best of times." Thus, even if Cahill and other ranchers receive subsidies, financial hardship puts those slim margins at risk.

Additionally, if Cahill cannot move its herd off its private land and onto the Sucker Creek Pasture for grazing on April 1st as scheduled, it will forgo irrigation opportunities. Cahill represents that due to this year's drought, it is essential to exercise its right to irrigate as early as possible before the water becomes unavailable. Cahill cannot do so when the livestock are still on its private land. The inability to irrigate affects Cahill's ability to grow enough grass to produce hay for the coming winter, which will cause significant financial harm. The lack of irrigation also poses increased fire risks to Cahill and neighboring ranches.

The Court finds that the balance of the equities does not tip sharply in Plaintiffs' favor.

**C. Public Interest**

Plaintiffs argue that an injunction would serve the following public interests: the interest in science-based land management research, the interest in sage grouse conservation, and the interest that BLM comply with its own procedures.

Plaintiffs contend that closing the pastures containing key RNAs will serve the public interest of promoting land management research because it will allow research on land

PAGE 15 – OPINION AND ORDER

restoration to commence using data from these RNAs as contemplated by the 2015 ARMPA. As explained above, Plaintiffs have not shown that the inability to conduct research on the four RNAs would likely cause irreparable harm to their research interests. Thus, although the Court recognizes that the public does have an interest in public land management research, the effect on that interest here is minimal.

With respect to the public interest in sage grouse conservation, Plaintiffs have not shown that continued grazing would cause a significant decrease in sage grouse population. As explained above, Plaintiffs only provide data concerning the sage grouse population in all of Oregon over the past 20 years. Plaintiffs have not identified how grazing on four RNAs would affect that population, and on the other hand, Defendants have offered evidence that grazing on the Rahilly-Gravelly RNA either does not impact the sage grouse or prevents further harm to its habitat. *See* ECF 73-4. Thus, although the Court recognizes that the public does have an interest in the conservation of sage grouse, Plaintiff has not shown that the interest is impacted here.

With respect to the interest that BLM comply with its regulations, Defendants respond that under FLMPA, they are required to issue two-year notices to permittees and lessees and that under NEPA, they are required to conduct site-level analyses on installation of fencing. Because the parties have not fully briefed the merits of Plaintiffs' claim—that BLM is "unlawfully withholding" implementation of the RNA research sites—the Court will reserve comment on whether BLM's decision to send out two-year notices under FLMPA and to conduct site-specific analyses of the environmental impact of fencing and alternatives to fencing under NEPA is a "failure to comply with its own land use plan requirements." ECF 57, at 41. Thus, in this instance, the fact that Plaintiffs allege violations of law does not favor the public interests of either side.

Defendants assert the following public interests that favor denial of the motion for TRO: the interest in protecting land from over-grazing, the interest in sustaining rural communities in Oregon, and the interest in reducing wildfire risk. Plaintiffs contend that an injunction would impose minimal burden on Defendants in part because Defendants can authorize grazing on other pastures not containing RNAs. Defendants respond that it employs a carefully managed rest-rotation grazing schedule, such that each pasture is grazed for one to two years, then rested for one year. These periodic years of rest allow the land to recover from past years' grazing. If Defendants are enjoined from grazing the pastures that have rested, then they will have to authorize grazing on other pastures, as Plaintiffs point out, but those pastures will not have had the opportunity to rest. Plaintiffs' expert, Dr. Kauffman, contends that the environmental impact on unrested land is minimal because "rest-rotation grazing was developed in the 1950s, and with climate change, the conservation goals of this grazing system are likely no longer valid." ECF 77, ¶ 12. Even if circumstances have changed over the past 70 years, it is unclear how grazing unrested lands would cause less environmental harm today than it did in the 1950s. The Court agrees that the public interest favors denial of an injunction because it would prevent grazing on unrested public lands.

Defendants also contend that enjoining grazing on the four pastures containing key RNAs set for grazing in April would impact the public interest in sustaining rural communities. Rural communities such as those in Lake County, Oregon depend on the availability of public lands for ranching. Mr. Cahill states that in rural ranching communities like Adel, Oregon, "ranching is a main way of life and economic driver," and that because "opportunities to earn a living are very limited," eliminating one of the few remaining ranches "causes significant harm to the local economy." ECF 73, ¶¶ 33, 35. Although Defendants have not shown that an injunction would

lead to the elimination of ranching operations, the Court is satisfied that it could impose significant financial harm, threatening jobs and livelihoods. Further, this ranching economy contributes to national food supply, generates tax revenue, and supports families that participate as active members in their communities serving as volunteer firefighters, on school boards, and on irrigation districts.

Moreover, closure of the four pastures containing RNAs set for grazing in April would enjoin grazing on significant portions of land not designated as an RNA by the 2015 ARMPA. Because fencing has not yet been installed, Plaintiffs propose that the Court order Defendants to close the entire pastures that contain the key RNAs. The total acreage of the key RNAs 21,779 acres. The total acreage of the pastures containing the RNAs is 197,867 acres. Thus, Plaintiffs ask the Court to close 176,088 acres of pasture *not* designated as key RNAs under the 2015 ARMPA. With respect to the South Ridge Bully Creek RNA, Plaintiffs ask the court to enjoin all grazing on the surrounding South Ridge Pasture. The South Ridge Bully Creek RNA is 553 acres and the South Ridge Pasture is 20,495 acres. ECF 61-9, at 8. Plaintiffs therefore ask the Court to enjoin grazing on 20,495 acres to facilitate research on only 2.6 percent of that land. The closure of land not designated as an RNA would burden the permittees and lessees to those pastures, and their surrounding communities, because they would not have been on notice that those pastures would be closed to grazing. *See* Bushue Decl. (ECF 69), ¶ 32 (stating that closure of entire pastures would "likely result in the severe disruption of several permit holders' 2022 operations"). Thus, the Court finds that the public interest in sustaining rural communities favors denial of the motion for TRO.

Defendants also assert that an injunction would impact the public interest in mitigating fire risks. A claim of increased fire danger is given great weight when the claimed danger is

"imminent or the danger has begun." *Connaughton*, 752 F.3d at 766. "Without evidence of an imminent threat . . . the inability to mitigate such risks for a temporary period" generally does not outweigh other public interests. *Id.* Defendants have offered evidence that in general, rest-rotation cattle grazing can reduce the risk of wildfire by reducing the fuel biomass, height, and continuity and increase fuel moisture content during fire seasons and that fall and spring grazing can reduce fire ignitability. Dr. Kauffman agrees that grazing may reduce fire in moderate weather conditions but states that grazing would have minimal effect in hot, dry, high wind conditions. In any event, Defendants have not shown that any risk of fire on the four pastures at issue is imminent. Thus, the Court does not afford great weight to this interest.

On balance, the Court finds that the public interest weighs in Defendants' favor. Because Plaintiffs have not shown a substantial likelihood of irreparable harm, the balance of the equities does not tip sharply in Plaintiffs' favor, and the public interest tips in Defendants' favor, the Court denies Plaintiffs' motion for temporary restraining order.

## CONCLUSION

The Court DENIES Plaintiffs' motion for temporary restraining order (ECF 57).

**IT IS SO ORDERED**.

DATED this 29th day of March, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge