**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
24242 S. Engstrom Rd.
Colton, OR 97017
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N**, *et al.* | No. 3:19-cv-01550-SI |
| Plaintiffs, | **MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| **BARRY BUSHUE**, State Director, BLM Oregon/Washington, *et al.*, | |
| Defendants, | |
| and | |
| **CAHILL RANCHES, INC.**, | |
| Defendant-Intervenor, | |
| and | |

**MACKENZIE RANCH, LLC**, *et al.*,

                    Defendants-Intervenors,

        and

**TREE TOP RANCHES, LIMITED
PARTNERSHIP**,

                    Defendant-Intervenor.
_____

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................*v*

GLOSSARY OF ACRONYMS .................................................................................... *ix*

KEY TO ADMINISTRATIVE RECORD CITATIONS ..................................... *x*

MOTION ..........................................................................................................................*xii*

INTRODUCTION..........................................................................................................1

BACKGROUND ........................................................................................................... 2

I.    THE GREATER SAGE-GROUSE AND ITS DECLINE ..............................................2

II.   FEDERAL EFFORTS TO PROTECT AND CONSERVE THE SAGE-GROUSE.........................................................................................................4

III.  THE BUREAU'S DECISION TO CLOSE KEY RESEARCH NATURAL AREAS IN OREGON TO GRAZING FOR SCIENTIFIC RESEARCH................5

IV.   LITIGATION OVER THE BUREAU'S 2015 SAGE-GROUSE PLANS.................9

V.    DESPITE UNRELENTING SAGE-GROUSE HABITAT LOSS AND POPULATION DECLINES, THE BUREAU CONTINUES NOT TO IMPLEMENT THE KEY RNA CLOSURES AND, IN FACT, HAS ISSUED TWO DOZEN *NEW* PERMITS TO GRAZE IN THESE AREAS..........................10

LEGAL FRAMEWORK AND STANDARD OF REVIEW.................................. 14

ARGUMENT.................................................................................................... 15

I.    THE BUREAU'S FAILURE TO END LIVESTOCK GRAZING IN THE KEY RNAS AS REQUIRED BY THE 2015 ARMPA ENTITLES PLAINTIFFS TO SUMMARY JUDGMENT. .........................................................................16

      A.    The Land Use Plan's Key RNAs Closure Requirement is "Discrete." ...........16

      B.    The Land Use Plan's Key RNAs Closure Requirement is "Legally Required." .................................................................................................18

      C.    Because the Bureau Has Missed a Firm Deadline Set in a Binding Land Use Plan Requirement, it Has *Per Se* Violated the Law, and No Equitable Balancing is Permitted. .........................................................................21

**II.    THE BUREAU'S VIOLATION OF FLPMA AND THE APA REQUIRES DECLARATORY AND INJUNCTIVE RELIEF**.......................................**26**

**III.    EVEN APPLYING THE *TRAC* FACTORS, THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE BUREAU HAS UNREASONABLY DELAYED CLOSURE OF THE KEY RNAS**.......................**27**

    **A.    The Bureau's Delay is Unreasonable Because It Has Failed to Meet Its Land Use Plan Deadline as Required by Congress in FLPMA (Factors 1 & 2).** .....................................................................**28**

    **B.    The Bureau's Delay Risks Significant Harm to Environmental Health and Welfare (Factors 3 & 5).** .......................................................**31**

    **C.    The Bureau Has Unwaveringly Identified Science-Based Conservation of Sage-Grouse as a Top Priority (Factor 4).** .............................**33**

    **D.    A Finding of Impropriety Is Not Required (Factor 6).**......................**34**

**CONCLUSION** ....................................................................................... **35**

## **TABLE OF AUTHORITIES**

**CASES**

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002).................................. passim

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................................... 34

*Brower v. Evans*, 257 F.3d 1058 (9th Cir. 2001).................................................... 22, 28

*Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073 (9th Cir. 2010)............................ 16

*Bullock v. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112 (D. Mont. 2020) ................................ 35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 26

*Ctr. for Food Safety v. Hamburg*, 954 F. Supp. 2d 965 (N.D. Cal. 2013)................................... 27

*Cutler v Hayes*, 818 F.2d 879 (D.C. Cir. 1987) ....................................................... 28

*El Comité Para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062 (9th Cir. 2008)........ 30

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ........................................ 22, 23, 26

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016).................................. 19, 24

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)........................................ *xi*

*Garcia v. Johnson*, No. 14-cv-01775-YGR, 2014 WL 6657591 (N.D. Cal. Nov. 21, 2014)....... 26

*Gonzalez Rosario v. U.S. Citizenship & Immigr. Servs.*,
  365 F. Supp. 3d 1156 (W.D. Wash. 2018)...........................................................24, 26

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017)...................................................... 28

*In re Cal. Power Exch. Corp.*, 245 F.3d 1110 (9th Cir. 2001) ...................................... 28

*In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008) ........................................ 28

*In re Monroe Commc'n Corp.*, 840 F.2d 942 (D.C. Cir. 1988)...................................... 28

*In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015) ........................................ 29

*Indep. Min. Co., Inc. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ...................................... 31

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ........................................ passim

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ........................ 14

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, No. 2:10-cv-1331-SU,
    2014 WL 4832218 (D. Or. Sept. 29, 2014) ................................................................34

*Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016)........................................................ 2

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) ................................. 16

*Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983).............................. 30

*Pub. Citizen Health Rsch. Grp. v. FDA*, 740 F.2d 21 (D.C. Cir. 1984)........................................ 29

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984).............................. passim

*Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068 (9th Cir. 2016) .................................... 15, 18, 26

*W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225 (D. Or. 2019) ..................................... 31

*W. Watersheds Proj. v. Bernhardt*, 519 F. Supp. 3d 763 (D. Idaho 2021) ................................... 33

*W. Watersheds Proj. v. Salazar*, 843 F. Supp. 2d 1105 (D. Idaho 2012) ..................................... 33

## STATUTES

5 U.S.C. § 551(13) ........................................................................................................................ 14

5 U.S.C. § 702 .............................................................................................................................. 14

5 U.S.C. § 706(1) .................................................................................................................. passim

42 U.S.C. § 4331(a) ..................................................................................................................... 31

42 U.S.C. § 4331(b) ..................................................................................................................... 31

42 U.S.C. § 4331(c) ..................................................................................................................... 31

43 U.S.C. § 1701(a)(8) ................................................................................................................ 32

43 U.S.C. § 1702(c) ..................................................................................................................... 32

43 U.S.C. § 1711(a) ..................................................................................................................... 32

43 U.S.C. § 1712(a) ..................................................................................................................... 14

43 U.S.C. § 1712(b) ..................................................................................................................... 32

43 U.S.C. § 1712(c) ....................................................................................... 32

43 U.S.C. § 1712(c)(3) .................................................................................. 32

43 U.S.C. § 1732(a) ................................................................................ passim

43 U.S.C. § 1752(a) ....................................................................................... 16

43 U.S.C. § 1752(d) ....................................................................................... 16

43 U.S.C. § 1752(g) ......................................................................................... 9

## OTHER AUTHORITIES

12-Month Finding for Petitions To List Greater Sage-Grouse (*Centrocercus urophasianus*) as an Endangered or Threatened Species, 75 Fed. Reg. 13,910 (Mar. 23, 2010) .................. 3, 4

12-Month Finding on a Petition To List Greater Sage-Grouse (*Centrocercus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858 (Oct. 2, 2015) ....................................................................................... 4, 5, 25, 31

Coates, P.S., *et al.*, 2021, Range-wide greater sage-grouse hierarchical monitoring framework—Implications for defining population boundaries, trend estimation, and a targeted annual warning system: U.S. Geological Survey Open-File Report 2020–1154, https://doi.org/10.3133/ofr20201154. ...................................................... 11

Executive Order 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.* 86 Fed. Reg. 7,037, 7,037 (Jan. 25, 2021) ................... 33

Kauffman, J. Boone, *et al.*, *Livestock Use on Public Lands in the Western USA Exacerbates Climate Change: Implications for Climate Change Mitigation and Adaptation*, 69 Envtl. Mgmt. 1137 (2022), https://doi.org/10.1007/s00267-022-01633-8. ........................................... 3

N. Popvich, L, Albeck-Ripka and K. Pierre-Louis, *The Trump Administration Rolled Back More Than 100 Environmental Rules. Here's the Full List.*, N.Y. Times, Jan. 20, 2021, https://www.nytimes.com/interactive/2020/climate/trump-environment-rollbacks-list.html ..... 9

Press Release, U.S. Fish & Wildlife Service, Historic Conservation Campaign Protects Greater Sage-Grouse (Sept. 22, 2015), https://www.fws.gov/press-release/2015-09/historic-conservation-campaign-protects-greater-sage-grouse. ................................................ 5

Press Release, U.S. Geological Survey, Greater Sage-Grouse Monitoring (Mar. 30, 2021), https://www.usgs.gov/news/national-news-release/new-research-highlights-decline-greater-sage-grouse-american-west. ....................................................................... 2

Steven T. Knick & John W. Connelly, *Greater Sage-Grouse and Sagebrush: An Introduction to the Landscape*, *in* Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and its Habitats 1 (Steven T. Knick & John W. Connelly eds., 2011). ..........................2

## RULES

Fed. R. Civ. P. 56 ................................................................................................... *xi*

Local Rule 56-1 ...................................................................................................... *xi*

Local Rule 7-1(a)(1) .............................................................................................. *xi*

## REGULATIONS

43 C.F.R. § 1601.0-1 ............................................................................................ 14

43 C.F.R. § 1610.5-3(a) ................................................................................... 14, 19

43 C.F.R. § 1610.5-5 ............................................................................................ 32

43 C.F.R. § 4110.4-2 .............................................................................................. 9

43 C.F.R. § 4120.2 ............................................................................................... 16

43 C.F.R. § 4130.2 ............................................................................................... 16

43 C.F.R. § 8223.0-5(a) ........................................................................................ 32

## <u>GLOSSARY OF ACRONYMS</u>

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| ARMPA | Approved Resource Management Plan Amendment |
| AUM | Animal Unit Month |
| BLM or "the Bureau" | United States Bureau of Land Management |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act of 1973 |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FWS | United States Fish and Wildlife Service |
| GRSG | Greater Sage-Grouse |
| NEPA | National Environmental Policy Act of 1969 |
| ODFW | Oregon Department of Fish and Wildlife |
| ONDA | Oregon Natural Desert Association |
| RMP | Resource Management Plan |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| USGS | United States Geological Survey |

## KEY TO ADMINISTRATIVE RECORD CITATIONS

The Bureau of Land Management lodged the administrative record on February 28, 2020 (ECF 24) and supplemented it on May 10, 2022 and May 31, 2022 (ECF 117, 123). The agency's record consists of multiple parts with overlapping page numbering. This table summarizes those parts and shows how documents from each are cited in ONDA's briefing.

| Title | Dkt # | Citation Format in Brief | Notes |
|---|---|---|---|
| Oregon GRSG Administrative Record | 24-2 | "OR_PUB_xxx" or "OR_xxx" | Documents numbered from— KEY001 through KEY 010 and OR_PUB_001 through OR_PUB_1784  Bates numbers from— OR_0000001 through OR_0110272 |
| Rangewide GRSG Administrative Record | 24-3 | "RW_PUB_xxx" or "RW_xxx" | Documents numbered from— KEY001 through KEY035 and RANGEWIDE_PUB_0001 through RANGEWIDE_PUB_1068  Bates numbers from— RANGEWIDE_0000001 through RANGEWIDE_0085210 |
| Oregon Supplemental Administrative Record[a] | 24-5 | "ORS_PUB_xxx" or "ORS_xxx" | Documents numbered from— OR_PUB_0001 through OR_PUB_0112  Bates numbers from— OR_0000001 through OR_0000621 |
| Oregon Second Supplemental Administrative Record[a] | 117, 123 | "ORS_PUB_xxx" or "ORS_xxx" | Documents numbered from— OR_PUB_0113 through OR_PUB_0839  Bates numbers from— OR_0000622 through OR_0011541 |

ᵃ The "Oregon GRSG Administrative Record" (ECF 24-2) and the "Oregon Supplemental Administrative Record" (ECF 24-5) and "Oregon Second Supplemental Administrative Record" (ECF 117, 123) are separate parts of the administrative record, but the Bureau lodged them with overlapping and duplicated Bates-stamping and "PUB" numbers. To distinguish the two, ONDA uses "ORS" for citations to documents in the first and second "Supplemental" records, although the Bates-stamped numbering for the "Supplemental" record begins with "OR."

In citations, only one leading zero from the Bates number is included for clarity and space considerations.

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56-1, and 5 U.S.C. § 706(1),
plaintiffs, the Oregon Natural Desert Association, Audubon Society of Portland, and Defenders
of Wildlife (collectively, "ONDA"), respectfully move the Court to grant summary judgment and
relief in favor of ONDA as to its fourth claim for relief in its Second Amended Complaint (ECF
33). Specifically, the Court should (1) declare that defendants Barry Bushue *et al*. ("BLM" or
"the Bureau") have violated the Federal Land Policy and Management Act ("FLPMA") and the
Administrative Procedure Act ("APA") by unlawfully withholding the closure of thirteen Key
Research Natural Areas ("Key RNAs") to livestock grazing for scientific research—required by
the Bureau's 2015 conservation plan for greater sage-grouse in Oregon (known as the Approved
Resource Management Plan Amendment or "ARMPA"), which also required the closures be
completed within five years; (2) compel the Bureau to complete the closures as specified in and
required by the ARMPA; and (3) order and enjoin that the Bureau shall not authorize livestock
grazing in any of the thirteen Key RNAs, or the smallest fenced pasture necessary to guarantee
that those areas will not have no livestock grazing, to establish the ungrazed baseline reference
areas required by the 2015 ARMPA. Pursuant to Local Rule 7-1(a)(1), the parties conferred but
were unable to resolve the dispute.[a]

---

[a] This motion is supported by the legal memorandum and attached exhibits below, the
administrative record lodged by the Bureau, the declarations previously submitted on ONDA's
motion for preliminary injunctive relief (ECF 58, 59, 60, 61, 69, 76, 77), which also demonstrate
that plaintiffs have standing. In APA § 706(1) cases, "review is not limited to
the record as it existed at any single point in time, because there is no final agency action to
demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560
(9th Cir. 2000). Here, however, the Bureau has already lodged an administrative record that
contains most of the materials the Court will need to review to resolve the merits of ONDA's
fourth claim. ONDA also attaches, for the convenience of the Court, Exhibit 1 (a published
monograph chapter not readily available online) and Exhibit 2 (a table summarizing pertinent
information from the Bureau's administrative record).

## INTRODUCTION

In September 2015, the Bureau issued a conservation plan (the "ARMPA") to protect greater sage-grouse (*Centrocercus urophasianus*) in Oregon. A key component of the plan was the Bureau's decision to close thirteen specially-identified Research Natural Areas to livestock grazing and establish them as ungrazed reference sites for scientific research needed to inform management of sagebrush habitats. The Bureau declared that the closed Key RNAs would be "unavailable for grazing within 5 years"—by September 21, 2020—providing the agency the time to fence off the closed areas and affording permitted ranching operations notice required by Bureau regulations. FLPMA leaves the Bureau no discretion but to follow this binding land use plan requirement. But the Bureau has never ended grazing in the Key RNAs. Instead, it has withheld the closures required by the 2015 ARMPA and continues to authorize grazing. It has now indicated it will only end grazing, if at all, following several new, spurious "planning" processes initiated in response to litigation, none of which has a deadline for completion.

Because the Key RNA closures were a management decision that took effect the moment the plan amendment was signed, in September 2015, the Bureau was obligated under FLPMA to follow that decision. The APA directs that courts shall compel agency action unlawfully withheld, 5 U.S.C. § 706(1), and the Supreme Court has made clear that a land use plan requirement may be compelled where, as here, it is an "implementation decision" rather than a "policy determination," and the "language in the plan creates a commitment binding on the agency." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 70–71 (2004) ("*SUWA*"). Accordingly, ONDA is entitled to summary judgment on its fourth claim for relief, and the Court should issue an order compelling the Bureau to complete closure of all thirteen Key RNAs to livestock grazing, required by the 2015 ARMPA, so that they are "unavailable for grazing" in 2023.

## BACKGROUND

### I. THE GREATER SAGE-GROUSE AND ITS DECLINE

Sage-grouse are symbolic of the vast, open lands between the Rocky Mountains and the Sierra Nevada and Cascade ranges. As many as 16 million of these iconic birds once ranged across 297 million acres of sagebrush grasslands.[1] This area of western North America is so vast it is sometimes called the Sagebrush Sea. Sage-grouse rely upon sagebrush and associated plant communities at all times in their lives for food, cover, and their breeding, nesting, brood-rearing, and over-wintering habitats. *See Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 565–66 (9th Cir. 2016) ("The greater sage grouse is a sagebrush-obligate bird, meaning that it relies on sagebrush for its survival year-round.").

Over the past 200 years, agriculture and development have reduced the bird's available habitat by half. In that time, sage-grouse abundance has dramatically declined. The range-wide population has declined 80% since 1965,[2] and there are fewer than 16,000 birds remaining in Oregon today. ORS_01486; ORS_01489 (Fig. 3) (2021 sage-grouse population report). Scientists understand that "[c]onservation actions for [sage-grouse] are frequently considered as an 'umbrella'—benefitting other sagebrush species that often lack data or resources for development of individual conservation strategies" throughout the West's sagebrush habitats. ORS_02077 (USGS report in which sage-grouse experts identified more "than 735 species of plants, vertebrates, or invertebrates inhabiting the sagebrush biome in the Great Basin alone").

---

[1] Steven T. Knick & John W. Connelly, *Greater Sage-Grouse and Sagebrush: An Introduction to the Landscape*, *in* Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and its Habitats 1, 1 (Steven T. Knick & John W. Connelly eds., 2011) (attached as Exhibit 1).

[2] Press Release, U.S. Geological Survey, Greater Sage-Grouse Monitoring (Mar. 30, 2021), https://www.usgs.gov/news/national-news-release/new-research-highlights-decline-greater-sage-grouse-american-west (new USGS report "represents the most comprehensive analysis of greater sage-grouse population trends ever produced").

Today, the sagebrush ecosystem is among the "most imperiled" in North America. 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910, 13,916 (Mar. 23, 2010). The sage-grouse is in danger of extinction from fragmentation and loss of its sagebrush habitat and increasing isolation of populations due to human activities, including livestock grazing. *Id*. at 13,924–62 (discussing grazing and other threats). Other factors, like Earth's changing climate, the spread of invasive species that replace sagebrush plant communities, and changing fire regimes, also have damaged or eliminated sage-grouse habitat in Oregon and the West. *Id*. at 13,924, 13,931–39; *see also* ORS_01882–83 (USGS overview of sagebrush habitat threats and management strategies).

Livestock grazing is one of the most ubiquitous threats to the sage-grouse. 75 Fed. Reg. at 13,939–42. In Oregon, the Bureau allows grazing on nearly 99% of the 12 million acres of public land it manages in the bird's sagebrush habitat. *See* ORS_06497 (2015 ARMPA at 2-18); *see also* ORS_07276 (2015 FEIS at 4-16) (describing grazing as "a diffuse form of biotic disturbance" and "the most widespread land use across the sagebrush habitat"). Cattle consume native plants and trample fragile soils, springs and wet meadows; they increase the spread of weeds that replace native plants; and they pollute streams with feces, urine, and eroded sediment. *See* ORS_07276–80 (2015 FEIS at 4-16 to -20) (summarizing harmful effects of grazing identified by sage-grouse experts); 75 Fed. Reg. at 13,939–42 (same). Grazing also intensifies global climate change as cattle emit methane gas and impede the ability of native plants and soil to sequester carbon—making grazed landscapes into sources of increased greenhouse gas emissions, whereas ungrazed lands absorb more carbon from the atmosphere than they release.[3]

---

[3] Kauffman, J. Boone, *et al*., *Livestock Use on Public Lands in the Western USA Exacerbates Climate Change: Implications for Climate Change Mitigation and Adaptation*, 69 Envtl. Mgmt. 1137 (2022), https://doi.org/10.1007/s00267-022-01633-8.

## II. FEDERAL EFFORTS TO PROTECT AND CONSERVE THE SAGE-GROUSE

In 2003, the Oregon Department of Fish and Wildlife ("ODFW") estimated that only 29,327 individual sage-grouse remained in Oregon. ORS_01486, ORS_01489. That same year, the Oregon Natural Desert Association and its partners petitioned the U.S. Fish and Wildlife Service ("FWS") to list the sage-grouse under the Endangered Species Act ("ESA"). Salvo Decl. (ECF 61) ¶ 20; *see also* 12-Month Findings on a Petition to List Greater Sage-Grouse (*Centrocerus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858, 59,859 (Oct. 2, 2015) (table summarizing previous federal actions for sage-grouse).

In 2010, the FWS determined that ESA protection was "warranted" for the sage-grouse because of loss and fragmentation of sagebrush habitat and the inadequacy of the conservation plans then in place. 75 Fed. Reg. at 13,910, 13,924–62, 13,973–82. New research showed that sage-grouse are affected by habitat disturbance on far greater scales than scientists had previously recognized. *See generally id.* The "FWS's determination prompted the BLM and Forest Service, along with several States, to consider protections for the sage grouse to avoid a future ESA listing." *W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1325 (D. Idaho 2019).

In 2015, the Bureau and Forest Service unveiled a series of conservation plans— amending 98 land use plans across ten western states—to protect sage-grouse and their sagebrush habitats on public lands throughout the West. 80 Fed. Reg. at 59,874. The ARMPA for Oregon amended eight of the Bureau's land use plans governing management of about 12 million acres of public land in the high desert and sagebrush steppe east of the Cascade Range. ORS_06864 (2015 FEIS, Fig. 2-1 map). The plans included limits on development and land use in breeding and nesting areas, special protections for habitat strongholds, science-based

monitoring and research, and adaptive management based on those studies. *See W. Watersheds*, 417 F. Supp. 3d at 1325–27 (overview of sage-grouse conservation planning and the 2015 plans); *see also* ORS_06473 ("This ARMPA identifies and incorporates conservation measures to protect, restore, and enhance [sage-grouse] habitat by avoiding, minimizing, and compensating for unavoidable impacts of threats on [sage-grouse] habitat.").

The 2015 plans represented an historic step forward for sage-grouse conservation. Based on strong conservation measures adopted in the plans, the FWS determined that, at that time, an ESA listing was no longer needed for the sage-grouse. 80 Fed. Reg. at 59,858 (despite continued population declines, "the primary threats to greater sage-grouse have been ameliorated by [Federal and other] conservation efforts"). Then-Secretary of the Interior Sally Jewell described the 2015 plans as an "epic conservation effort."[4] The FWS claimed that the 2015 plans "represent a paradigm shift in western Federal lands management." *Id*. at 59,875.

### III. THE BUREAU'S DECISION TO CLOSE KEY RESEARCH NATURAL AREAS IN OREGON TO GRAZING FOR SCIENTIFIC RESEARCH

Oregon's sage-grouse population had fallen to fewer than 20,000 birds by 2015. ORS_01489. An indispensable part of the Bureau's response to help reverse the sage-grouse's decline is new scientific research to be conducted in fifteen specially-identified "Key" RNAs which the 2015 ARMPA closed to livestock grazing. ORS_06497 (2015 ARMPA at 2-18). The Bureau determined these areas to be critical for sage-grouse conservation both because of their high habitat value for the bird and their high scientific and management value as reference areas to gauge the plan's effectiveness. ORS_06902–03 (2015 FEIS at 2-44 to -45).

---

[4] Press Release, U.S. Fish & Wildlife Service, Historic Conservation Campaign Protects Greater Sage-Grouse (Sept. 22, 2015), https://www.fws.gov/press-release/2015-09/historic-conservation-campaign-protects-greater-sage-grouse.

The Bureau needs ungrazed reference areas to compare to grazed areas, evaluate how curtailing livestock grazing might benefit sage-grouse, and adjust future management of the vast areas in Oregon where it allows grazing. Ungrazed Key RNAs will provide essential new information because "the lack of large representative tracks of ungrazed habitat makes it nearly impossible to determine and monitor the actual consequences of livestock grazing." OR_094789 (2018 FEIS at 4-7). Creating these carefully selected reference sites will allow the agency to understand how to better manage the 12,083,622 acres of public land that will remain available for grazing in sage-grouse habitat in eastern Oregon. ORS_06497 (2015 FEIS at 2-18).

Accordingly, in the 2015 ARMPA, through Management Decision LG 1 and Objective LG 2, the Bureau closed and reserved for scientific research all or portions of fifteen Key RNAs.[5] ORS_06497–98 (2015 ARMPA at 2-18 to -19) ("In key RNAs, 22,765 acres[6] will be unavailable to livestock grazing."). The Key RNAs are situated within three of the Oregon land use plan areas amended by the 2015 ARMPA: the Lakeview RMP, Andrews Management Unit RMP, and Southeastern Oregon RMP. *See* OR_094740 (2018 FEIS, Fig. 1-1, map of RNA locations). Through Objectives SD 1 and SD 4, the Bureau additionally specified that the closed Key RNAs must be managed for sage-grouse conservation and as "undisturbed baseline reference areas." ORS_06512 (2015 ARMPA at 2-33).

The Bureau described that removal of grazing from these areas will "[1] provide baseline vegetation information to document successional changes, [2] serve as areas for comparison to

---

[5] Two of the Key RNAs, Foster Flat and Guano Creek-Sink Lakes, had already been fenced off from livestock in prior planning processes, so this case involves only the thirteen Key RNAs closed by the 2015 ARMPA. *See* ORS_06903 (2015 FEIS at 2-45) (Table 2-6 identifying existing and newly-closed areas).

[6] The Bureau shows the figure as 21,957 acres on Table 2-6 and 22,765 acres in the text. ORS_06497. In 2018, the Bureau recalculated the figure at 21,959 acres. OR_094781 (2018 FEIS at 3-21). The differences are attributable to discrepancies in GIS datasets.

[grazed] areas, and . . . [3] document vegetational shifts in the plant communities in the future caused by changes in precipitation and temperature (climate change)." ORS_07909 (2015 FEIS at 8-21). Removing grazing disturbance from the RNAs and conducting subsequent scientific research is an irreplaceable prerequisite to understanding how "natural successional processes would proceed" in plant communities understood to be essential for sage-grouse recovery. ORS_06904 (2015 FEIS at 2-46). The closed RNAs will be "part of a national network of reserved areas" created for "nonmanipulative research and baseline data gathering on relatively unaltered plant community types." ORS_07185 (2015 FEIS at 3-134).

Through the Record of Decision ("ROD"), ARMPA, and FEIS, the Bureau set a five-year deadline for completing the closures and establishing the ungrazed reference areas no later than September 21, 2020. The Bureau's ROD, approved on September 21, 2015,[7] defines the ARMPA's Management Decisions and Objectives as "Immediate Decisions" that "go into effect when the ROD is signed." ORS_010627 (2015 ROD at 1-41); *see also* ORS_06518 (2015 ARMPA at 4-1, stating same). In the 2015 ARMPA, incorporated as part of the ROD, the Bureau decided that the 22,765 acres identified in thirteen Key RNAs "will be unavailable to grazing" in order to conserve sage-grouse and establish "undisturbed baseline reference areas" to study unique "sagebrush plant communities." ORS_06497–98, ORS_06512 (2015 ARMPA at 2-18 to -19, 2-33); *see also* ORS_06458 (the 2015 ARMPA was issued as "Attachment 3" to the ROD).

The accompanying FEIS, likewise incorporated into the ARMPA, promised that, under the Proposed Action, the thirteen Key RNAs "would be unavailable for grazing within 5 years." ORS_06904 (2015 FEIS at 2-46). The ARMPA expressly "adopt[ed] the management described

---

[7] The ROD cover letter is dated September 18, 2015, but the decision was formally approved on September 21, 2015. ORS_010663 (2015 ROD at 6-1).

in the [2015 FEIS.]" ORS_06480 (2015 ARMPA at 2-1).[8] The conditional "would" in the

Proposed Action became an imperative that the Key RNAs "will be unavailable" in

the ARMPA when the ROD selected the Proposed Action as the Bureau's decision.

ORS_06497–98 (2015 ARMPA at 2-18 to -19, Objective LG 2 and Management Decision LG

1). And the Bureau stated that the "Immediate Decisions" to close the RNAs through

Management Decision LG 1 and Objective LG 2 "*require no additional analysis* and guide

future land management actions." ORS_010627 (2015 ROD at 1-41) (emphasis added);

ORS_06518 (2015 ARMPA at 4-1); *see also* ORS_06480 (2015 ARMPA at 2-1) ("This

ARMPA is now the baseline plan for managing [sage-grouse] in Oregon.").

      The decision to close the Key RNAs set out in the ROD, ARMPA, and FEIS, is an

implementation decision, not a policy determination. The Bureau specified how many acres of

each of the thirteen Key RNAs will be closed. ORS_06497 (2015 ARMPA at 2-18, showing that

the Black Canyon and Spring Mountain RNAs were closed in their entirety and identifying

specified portions of the other eleven RNAs for closure); *see also* OR_PUB_1748 through

OR_PUB_1760 (satellite image maps); OR_016529 (OR_PUB_1147) (spreadsheet data on

closures); *see also* OR_016530 (OR_PUB_1148) (plant communities important to sage-grouse in

each RNA). The Bureau calculated the precise amount of grazing (given in terms of animal unit

months or "AUM") eliminated by each closure. ORS_06903–04, ORS_07462–63 (2015 FEIS at

2-45 to -46, 4-202 to -203). And the Bureau decided that fencing is required to guarantee that the

closed RNAs will be "undisturbed" for scientific research after livestock are removed: "[t]o

remove grazing from all or portions of the 13 Key RNAs . . . the Proposed Plan estimated 39

---

[8] The Bureau also committed to complete "[s]ite specific RNA activity plans identifying actions to conserve and manage the RNA values and to utilize these areas for baseline research for plant communities important for [sage-grouse] . . . within 5 years." ORS_06904 (2015 FEIS at 2-46).

miles of new fence would be needed." ORS_08407 (2015 FEIS at V-32) (also describing fencing as "necessary" and that the agency "identified areas that could be fenced in the most efficient manner (minimize fencing)."). The closures will "require" about "39 miles of fence" to provide baseline areas "for long-term monitoring of the plant communities important for [sage-grouse] and research." ORS_06904, ORS_07463 (2015 FEIS at 2-46, 4-203).

## IV. LITIGATION OVER THE BUREAU'S 2015 SAGE-GROUSE PLANS

Despite its 2015 decision to close the RNAs, the Bureau has withheld implementation of the closures and failed to conduct any scientific research. The agency began preparing closure notice letters to livestock operators within weeks of the 2015 decision, but that process was derailed when the Trump administration came into office. *See* ORS_PUB_006 ("RNA implementation timeline").[9] In 2017, then-Secretary of the Interior Ryan Zinke directed the Department of the Interior to "review" the federal sage-grouse plans. RW_PUB_0949. The ensuing report identified ways to weaken or remove protections established in the 2015 plans. RW_PUB_0953; *see also W. Watersheds*, 417 F. Supp. 3d at 1327 (describing Zinke's "Sage Grouse Review Team"). This was part of a broad policy to "dismantle[] major climate policies and roll[] back many more rules governing clean air, water, wildlife and toxic chemicals."[10] In Oregon, the Bureau did not send the notice letters and, in 2019, sought instead to abandon the closures and research altogether. OR_0520 (2019 ARMPA).

---

[9] Implicit in the Bureau's five-year deadline to complete the closures are FLPMA and regulatory provisions providing for "2 years' prior notification" to permittees under some circumstances before making areas unavailable for grazing. 43 U.S.C. § 1752(g); 43 C.F.R. § 4110.4-2(b).

[10] N. Popvich, L, Albeck-Ripka and K. Pierre-Louis, *The Trump Administration Rolled Back More Than 100 Environmental Rules. Here's the Full List*., N.Y. Times, Jan. 20, 2021, https://www.nytimes.com/interactive/2020/climate/trump-environment-rollbacks-list.html (including reference to removal of sage-grouse plan protections).

ONDA filed this case in September 2019. ECF 1. A month later, the Bureau was enjoined from implementing the 2019 ARMPA (in all states, including Oregon) and ordered to continue implementing the 2015 ARMPA. *W. Watersheds*, 417 F. Supp. 3d at 1335. From late 2019 through early 2022, ONDA and the Bureau conferred regularly about whether and when the agency would finally complete the Key RNA grazing closures. *See* Salvo Decl. ¶¶ 25–32. In January 2020, the Bureau finally issued the two-year notice letters it had begun preparing five years earlier. Like the 2015 FEIS, the letters again identified precise acreages and decreases in grazing levels, and they included detailed maps showing the locations of the fences approved in the 2015 ARMPA. ORS_PUB_083 through ORS_PUB_0108 (notice letters).

## V. DESPITE UNRELENTING SAGE-GROUSE HABITAT LOSS AND POPULATION DECLINES, THE BUREAU CONTINUES NOT TO IMPLEMENT THE KEY RNA CLOSURES AND, IN FACT, HAS ISSUED TWO DOZEN *NEW* PERMITS TO GRAZE IN THESE AREAS

The 2015 ARMPA's five-year deadline expired on September 21, 2020, and the Bureau still had not implemented the closures and made the closed Key RNAs unavailable for grazing. A year later, in September 2021, the ODFW estimated that the Oregon sage-grouse population had further declined to 15,927 birds. ORS_01486, ORS_01489. This was the third-lowest population count since the ODFW began counting in 1980, after the two lowest counts in 2019 and 2020. *Id*. The Oregon sage-grouse population had declined by nearly half since 2003 when ONDA and others had first petitioned for the bird's protection under the ESA. ORS_01486; *see also* ORS_07075 (2015 FEIS at 3-24) (describing 21% loss in sagebrush habitat in Oregon since European settlement and hundreds of thousands of acres of habitat lost to wildfire in last decade).

Even more distressing, the Oregon population had declined by 20% just in the five years since the Bureau had adopted the 2015 ARMPA that was supposed to have been a paradigm shift

in federal land management. ORS_01489. Sage-grouse populations sometimes exhibit a modest rebound after periods of decline.[11] But by 2021, the ODFW cautioned that the "lack of a sharp rebound following the 2019 historic low population estimate warrants serious concern for the sage-grouse population in Oregon." ORS_01508. The precipitous population decline evident since 1980, *see* ORS_01489, thus underscores the urgency of more comparative study of habitat management to best support the bird's recovery in Oregon.

Despite this, the Bureau continues to withhold the Key RNA closures and research. To date, the Bureau has not built *any* of the fencing required by the 2015 ARMPA to execute the closures. Similarly, there is no evidence the Bureau has even started any of the "[s]ite specific RNA activity plans" to identify conservation and research actions in the closure areas—also required to have been completed by September 21, 2020. ORS_06904 (2015 FEIS at 2-46).

Instead, the Bureau has continued to authorize livestock grazing in all but one of the RNAs. *See, e.g.*, ORS_PUB_0113 ("Grazing Bill" which Bureau uses to authorize annual turnout, this one for Allotment 4, which contains Black Canyon RNA);[12] *see also* ORS_0768 ("Range Line Agreement" designating a "no livestock use area" for East Fork Trout Creek RNA starting in 2022). Weeks before turnout this year, the Bureau represented to the Court that the 2015 ARMPA decision "*prohibited the BLM from issuing new grazing authorizations in these [Key RNA] areas*," that the agency "*has not issued any new grazing authorizations in the key RNAs*," and that it "*clearly could not issue new grazing permits for those areas.*" Fed. Defs.'

---

[11] Coates, P.S., *et al*., 2021, Range-wide greater sage-grouse hierarchical monitoring framework—Implications for defining population boundaries, trend estimation, and a targeted annual warning system: U.S. Geological Survey Open-File Report 2020–1154 at 26, https://doi.org/10.3133/ofr20201154.

[12] Essentially every document labeled as a "Grazing Bill" or "Grazing Authorization" in the Second Supplemental Administrative Record index (ECF 123-1) is an annual authorization allowing turnout in the specified year.

Opp. to Motion for TRO (ECF 67) at 4, 13 (emphases added). These were misrepresentations: in fact, since adopting the 2015 ROD, the Bureau has issued *two dozen new term permits* authorizing grazing on allotments and pastures containing Key RNAs. Exhibit 2 (identifying new permits issued by Bureau from 2016 to present).

Similarly, the Bureau has authorized a number of grazing permit transfers to new operators since 2015—again authorizing continued grazing in closed Key RNAs, rather than use the permit transfers as opportunities to incorporate the RNA closures required by the 2015 ARMPA into the permits. *See* ORS_PUB_0179, ORS_PUB_0319, ORS_PUB_0365, ORS_PUB_0664, ORS_PUB_0682, ORS_PUB_0746 (permit transfers to new operators or entities between 2016 and in 2022). Relying on the Bureau's misrepresentations, the Court earlier this year stated that, "[i]n accord with the 2015 ARMPA, BLM did not issue any new grazing permits for the key RNAs" after September 21, 2015. March 29, 2022 Opinion & Order (ECF 104) at 5. The supplemented record now shows that is indisputably not true.

In December 2021, the Bureau began sending out "scoping" letters to the public, stating that it was considering "options" for "implementation-level alternatives" for how to make the RNA closures. ORS_PUB_0249, 0271, 0280 (scoping letters). ONDA pointed out that the Bureau already decided in the 2015 ARMPA to do so using fencing, that the agency was required now to adhere to that land use plan decision, and that under FLPMA the only way to change that would be through a land use plan amendment—the 2015 ARMPA requires that the agency execute the closure actions specified in the ARMPA, and precludes further site-specific decisionmaking except for minor adjustments to implement the decision already made. *See, e.g.*, ORS_01028–30 (comment letter submitted to Lakeview District, also quoting the Bureau's statement in 2015 ROD that the Management Decision closures were immediate "decisions [that]

require no additional analysis and guide future land management actions"). None of the Bureau's scoping letters included a timeline for the Bureau to complete the new, superfluous NEPA analyses. To date, the Bureau has not issued an EA or EIS for any of the proposed reviews.

Throughout early 2022, the Bureau, intervenor Cahill, and other permittees intermittently released information about their 2022 grazing plans. Whether and when allotments and pastures containing Key RNAs would be grazed in 2022 shifted frequently. *See, e.g.*, Notice of Fact Development (ECF 99) ("revised" turnout dates provided by Bureau one day before injunction hearing). Dates shown in operative management documents were unreliable. *See, e.g.*, Second Salvo Decl. (ECF 76) ¶ 4 (six-week discrepancy on Sucker Creek turnout dates). On February 24, 2022 (ECF 57), five weeks before the earliest-known turnout date (April 1) for several of the Key RNAs, ONDA sought preliminary injunctive relief.

In response, the Bureau offered additional details on its plans to complete the closures. The State Director declared that the agency's Lakeview and Vale district managers "did not identify a target fiscal year for completion" of closures for the 12 Key RNAs managed by those districts. Bushue Decl. (ECF 69) ¶ 17. He also indicated that "[e]ffectuating closure of the [Toppin Creek Butte Key] RNA is being evaluated as part of [an EIS] process" for the Louse Canyon Geographic Management Area." *Id*. ¶ 26 n.2. Planning for the Louse Canyon EIS has been ongoing for decades. Second Salvo Decl. ¶ 15. In fact, three years have now passed since the Bureau announced its "intent" to prepare an EIS, but the agency has yet to issue even a draft for public review. *See id*. ¶ 15 & n.4.

On March 29, 2022, the Court declined to issue a temporary restraining order (ECF 104). ONDA then withdrew its motion for preliminary injunction, and the parties agreed to a schedule (ECF 116) to timely resolve the merits of ONDA's fourth claim for relief.

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

The Bureau's land management authority is defined by FLPMA. That statute directs that the Secretary of the Interior, who oversees the Bureau, must "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a); *see Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1098–99 (9th Cir. 2010) (describing land use planning under FLPMA).[13] Once issued, or—as here—amended, the Bureau "shall manage" the lands "in accordance with" these plans. 43 U.S.C. § 1732(a). That is, "[o]nce a land use plan is developed, '[a]ll future resource management authorizations and actions . . . shall conform to the approved plan.'" *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (quoting 43 C.F.R. § 1610.5-3(a), the regulatory expression of FLPMA's land use plan consistency requirement). "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *SUWA*, 542 U.S. at 69.

ONDA's fourth claim is subject to judicial review under the APA, which provides the basic framework for judicial review of agency action, inaction, and delays. 5 U.S.C. §§ 702, 706(1). "Agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." *Id.* § 551(13) (emphasis added). Failure to act includes any "*discrete* agency action that it is *required* to take," including "when an agency is compelled by law to act *within a certain time period*." *SUWA*, 542 U.S. at 64–65 (last emphasis added). "Section 706(1) of the APA provides that a court '*shall compel* agency

---

[13] The Bureau also refers to these as "resource management plans" or RMPs. 43 C.F.R. § 1601.0-1. ONDA uses the terms "land use plan" and "resource management plan" interchangeably. *See also SUWA*, 542 U.S. at 59 (noting same).

action unlawfully withheld or unreasonably delayed.'" *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016) (emphasis added) (quoting 5 U.S.C. § 706(1)). The Supreme Court has held that action can thus be compelled "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64.

## ARGUMENT

The Bureau's withholding of the closure of the thirteen Key RNAs mandated by the 2015 ARMPA—and instead continuing to authorize grazing during 2022 and beyond—runs afoul of FLPMA's command that Bureau "shall" manage the public lands "in accordance with" requirements set forth in its land use plans. 43 U.S.C. § 1732(a). Where, as here, an agency withholds "a *discrete* agency action" that it is legally "*required to take*," the APA provides that a court "shall . . . compel" such "agency action unlawfully withheld." *SUWA*, 542 U.S. at 64; 5 U.S.C. § 706(1). *SUWA* makes clear that Section 706(1) applies not just to unlawfully withheld agency action derived from statutory or regulatory text, but also from a land use plan. 542 U.S. at 70–71. In the Ninth Circuit, it is settled that, in instances where an agency misses a "firm deadline," such as the five-year deadline expressed in the 2015 ARMPA, the agency has *per se* violated the law; a court does not have discretion to balance the equities via the *TRAC* factors to determine whether a delay is reasonable. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177–78 & n.11 (9th Cir. 2002) (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*")). Even if the Court applied the *TRAC* factors here, the result would be the same: declaratory and injunctive relief is appropriate to effectuate Congress's command that the Bureau shall manage the public lands in accordance with the Key RNA closures requirement amended into the controlling land use plans for Oregon seven years ago.

//

I.      **THE BUREAU'S FAILURE TO END LIVESTOCK GRAZING IN THE KEY RNAS AS REQUIRED BY THE 2015 ARMPA ENTITLES PLAINTIFFS TO SUMMARY JUDGMENT.**

It is undisputed that the Bureau has not made the thirteen Key RNAs unavailable to livestock grazing. Only the East Fork Trout Creek RNA has been administratively closed, but not fenced, through a Range Line agreement earlier this year. On the other twelve Key RNAs, the Bureau continues to permit and annually authorize livestock grazing.[14] The agency has even issued two dozen *new* term permits on nine different allotments *after* issuance of the 2015 ROD. *See* Exhibit 2. As described above, the Bureau has no timeline for completing closures on any of these RNAs (and no intention to fence the East Fork Trout Creek RNA). Because the closures are "discrete" actions for precisely-identified land areas and the Bureau is "legally required" by FLPMA and binding land use plan requirements to complete the closures by a stated deadline, the Bureau has, as a matter of law, "unlawfully withheld" agency action within the meaning of APA § 706(1). Under the APA, the Court must "compel" the Bureau to act. 5 U.S.C § 706(1).

A.  **The Land Use Plan's Key RNAs Closure Requirement is "Discrete."**

The Key RNAs closure requirement in the 2015 ARMPA is "discrete" because it was an "Immediate Decision" that applies, in precise terms, to thirteen explicitly-described and scientifically-identified RNAs. *SUWA*, 542 U.S. at 64 ("discrete agency action"). There is nothing open-ended or "programmatic" about the Bureau's 2015 land use plan decision to use 39

---

[14] Recall that the Bureau authorizes and manages grazing on public lands through three types of decisions: 10-year term permits issued pursuant to 43 U.S.C. § 1752(a) and 43 C.F.R. § 4130.2; allotment management plans issued pursuant to 43 U.S.C. § 1752(d) and 43 C.F.R. § 4120.2; and variously-named annual decisions including authorization letters (*e.g.*, ORS_PUB_0118), grazing bills (*e.g.*, ORS_PUB_0114) and grazing applications (*e.g.*, ORS_PUB_0136); *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 979–81 (9th Cir. 2006) (detailed description of how agencies authorize grazing pursuant to FLPMA). All of these grazing authorization decisions must be consistent with the governing land use plan. 43 U.S.C. § 1732(a); *see Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1077 (9th Cir. 2010) (so holding for equivalent consistency provision of National Forest Management Act).

miles of new fence to make the thirteen Key RNAs undisturbed for research. *See id.* at 64, 71 (to

be "discrete" a required action must not be "the kind of broad programmatic" action that merely

"guides and constrains actions, but does not (at least in the usual case) prescribe them").

The Bureau identified and mapped the exact locations of each of the thirteen closed areas.

It described the specific nature of the closure: "unavailable for livestock grazing." It described

exactly how the closures are to be implemented: an "estimated 39 miles of new fence . . . would

be necessary" to keep livestock out of the closed areas. ORS_08407 (2015 FEIS at V-32) ("To

remove grazing from all or portions of the 13 Key RNAs . . . 39 miles of new fence would be

needed."). And the Bureau clearly defined the purpose of the closures: to "provide baseline

vegetation information to document successional changes, serve as areas for comparison to

treated areas, and to document vegetational shifts in the plant communities in the future caused

by changes in precipitation and temperature (climate change)." ORS_07909 (2015 FEIS at 8-21).

The ARMPA directs the Bureau to manage the closed key RNAs "as undisturbed baseline

reference areas for the sagebrush plant communities they represent that are important for Greater

Sage-grouse." ORS_06512 (2015 ARMPA at 2-33) (Objective SD 4).

The 2015 ARMPA's closure of the key RNAs includes all the detail and analysis

necessary to complete the closures and therefore is an implementation decision—all that remains

is the ministerial task of effectuating the closure decision. As with any action implementing any

agency decision, some discretion can be exercised during implementation—for example, fine-

tuning fence locations during field work to minimize impacts to wilderness values or relocating

existing facilities like watering troughs. But this does not render Management Decision LG 1

itself, including its five-year deadline for completion, non-discrete. In *Vietnam Veterans*, for

example, an Army regulation imposed a clear "duty to warn" research volunteers about the risks

involved with their participation in chemical and biological weapons research. 811 F.3d at 1074.

> The *precise efforts* the Army must take to identify human subjects in past experiments, and the *precise content* of the notice to those subjects who have been identified, necessarily entail some discretionary judgment. <u>But discretion in the manner in which the duty may be carried out does not mean that the Army does not have a duty to perform a "discrete action" within the meaning of § 706[(1)] and *SUWA*</u>.

*Id*. at 1079 (italics and underlining added) (quoting *SUWA*, 542 U.S. at 65).

This case is similar to *Vietnam Veterans*, except that here the 2015 ARMPA *has* provided specific detail about how the closure decisions are to be implemented, leaving the agency only limited discretion. The 2015 ARMPA established a discrete requirement to fence off and make specific acreage within thirteen Key RNAs unavailable to livestock grazing, no later than September 21, 2020. As such, the APA requires that the Court "shall" compel the Bureau to take this "unlawfully withheld" discrete agency action. 5 U.S.C. § 706(1); *Badgley*, 309 F.3d at 1177–78 & n.11. The Court need not compel discretionary, fine-tuning details beyond those specifically set out in the ARMPA closure decision. For example, the agency retains discretion to "[d]etermine whether to remove [existing] fences, corrals, or water storage facilities (e.g. reservoirs, catchments, ponds)" within the closed RNAs. ORS_06498 (2015 ARMPA 2-19) (MD LG 1). Similarly, while the Bureau was required (also within five years) to complete "[s]ite specific RNA activity plans" to identify conservation and research actions in the closure areas, ORS_06904 (2015 FEIS at 2-46), the content of those activity plans is something courts typically leave to an agency's discretion. *SUWA*, 542 U.S. at 65; *Vietnam Veterans*, 811 F.3d at 1079.

## B. The Land Use Plan's Key RNAs Closure Requirement is "Legally Required."

As described, FLPMA imposes a non-discretionary, statutory requirement that the Bureau "shall" manage the public lands "in accordance with" governing land use plans—in this case, the

Lakeview RMP, Andrews Management Unit RMP, and Southeastern Oregon RMP, each as amended by the 2015 ARMPA. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a); *Brong*, 492 F.3d at 1125. "[A]n action called for in a plan may be compelled . . . when language in the plan itself creates a commitment binding on the agency." *SUWA*, 542 U.S. at 71.

Here, the 2015 ROD defined the Key RNA closures as "Immediate Decisions" that "go into effect when the ROD is signed" and "require no additional analysis." ORS_010627 (2015 ROD at 1-41). In the 2015 ARMPA, issued as part of the ROD, the Bureau declared that "[t]he ARMPA adopts the management described in the [2015 FEIS]" and "[t]his ARMPA is now the baseline plan for managing [sage-grouse] in Oregon." ORS_06480 (ARMPA at 2-1). The "management described" includes the Bureau's clear statement that "[p]ermitted livestock grazing would be unavailable for grazing within 5 years on all or portions of 13 of the 15 key RNAs." ORS_06904 (2015 FEIS at 2-46); *see also* ORS_08407 (2015 FEIS at V-32, declaring that "[f]encing would be necessary" and "39 miles of new fence would be needed").

Importantly, the ARMPA updated the FEIS's conditional "would be unavailable" Proposed Action language to "will be unavailable" once that Proposed Action was selected and approved via the ROD. ORS_06497–98 (2015 ARMPA at 2-18 to -19, Objective LG 2 and Management Decision LG 1, using "will be unavailable"). In *Friends of Animals v. Sparks*, for example, a plan required that "the AML [appropriate management level for wild horses] will be re-calculated within five years or after the revision to the Billings RMP, whichever comes first." 200 F. Supp. 3d 1114, 1125 (D. Mont. 2016). The court found that this constituted a binding commitment: "The Court [in *SUWA*] made it clear that although broad statutory mandates are unenforceable under § 706(1) of the APA, language in a plan creating a commitment binding on the agency is a different matter." 200 F. Supp. 3d at 1125. The requirement to recalculate AML

"within five years" was not a "broad statutory mandate"; rather, "[i]f this language does not constitute a commitment, then no language would suffice." *Id*.

The language the Bureau used to make the Key RNA closures also is different from the *contingent* land use plan direction in *SUWA* that required closure of a specified area only if future monitoring showed damage from motorized use. 542 U.S. at 68–69 (describing "the [land use] plan's statement that the Factory Butte area 'will be monitored and closed *if warranted*.'" (emphasis added)). By contrast, the Key RNA closures were "immediate" decisions that "require no additional analysis." They are not contingent on future monitoring or other action that would leave the Bureau discretion *not* to make the closures, or to make the closures in some way not specified in the ARMPA. This is a specific decision to enclose and exclude cattle from 22,765 acres on 13 Key RNAs by building 39 total miles of fence—unlike the general "statement of priorities" and "management framework" for 1.5 million acres at issue in *SUWA*. 542 U.S. at 70–71; ORS_06497–98 (2015 ARMPA at 2-18 to -19); ORS_06904 (2015 FEIS at 2-46). Put differently, this is the type of "ministerial" or "non-discretionary" plan commitment—a "site-specific implementation decision[ ]" that "creates a commitment binding on the agency"—the Court may compel under the APA. *Id*. at 64, 70–71. Indeed, the Bureau does not deny that the closures are legally required under the ARMPA; it counters only that it has unfettered discretion as to when (and perhaps how) it completes them.

Finally, in contrast to the Key RNA closures, other ARMPA requirements do allow for future discretionary or contingent adjustments. For example, MD SSS-8, providing how Bureau default habitat suitability indicators guide management activities, specifies that "[s]ite suitability values *may be adjusted* regionally where there is scientific justification for doing so." ORS_06486 (2015 ARMPA at 2-7) (emphasis added). Similarly, MD SSS-11 provides that

"[a]nthropogenic disturbances or activities disruptive to [sage-grouse] . . . shall not occur in seasonal [sage-grouse] habitats *unless* the project plan and NEPA document demonstrate the project will not impair the life-cycle or behavioral needs of [sage-grouse] populations." ORS_06488 (2015 ARMPA at 2-9) (emphasis added). The Bureau has no discretion to *not* close the Key RNAs to livestock grazing or to *not* do so except as specified in the ROD, ARMPA, and FEIS. This is a clearly delineated, discrete and legally required management decision.

### C. Because the Bureau Has Missed a Firm Deadline Set in a Binding Land Use Plan Requirement, it Has *Per Se* Violated the Law, and No Equitable Balancing is Permitted.

Where an agency misses a "firm deadline" for a discrete, legally required action, it has *per se* violated the law. *Badgley*, 309 F.3d at 1177 & n.11. Neither the Bureau nor the Court may engage in any equitable balancing as to the reasonableness of the missed deadline. Case law makes clear that this is true whether the deadline comes from a statute, a regulation, or, as here, a binding land use plan requirement.

In *Badgley*, environmental groups sued the FWS for its failure to comply with deadlines imposed by the ESA for determining whether to list species as threatened or endangered. *Id.* at 1169–70. Like the 2015 ARMPA's five-year deadline to make Key RNAs unavailable to grazing, the statute at issue in *Badgley* imposed a mandatory twelve-month deadline for making listing determinations, which the agency failed to meet. *Id.* at 1171. The district court granted partial summary judgment for the plaintiffs and issued an injunction requiring the FWS to make the required listing determinations. *Id.* at 1176. On appeal, the Ninth Circuit affirmed, holding that "Congress imposed a twelve-month deadline for final determinations under the ESA" and the agency's "failure to comply with the twelve-month deadline is not in accordance with the ESA, the governing law." *Id.* at 1177. In so doing, the Ninth Circuit rejected the exact argument

ONDA expects the Bureau to make here:

> The Service urges us to apply the . . . factors developed in [*TRAC*], and considered by us in *Brower v. Evans*, 257 F.3d 1058, 1068 (9th Cir. 2001). However, in *Brower,* we were considering whether there was an unreasonable delay in the absence of a *firm deadline*. *Id.* In this case, Congress has specifically provided a deadline for performance by the Service, *so no balancing of factors is required or permitted.*

309 F.3d at 1177 n.11 (emphases added); *accord id.* at 1178 (holding that "[t]he exercise of discretion is foreclosed when statutorily imposed deadlines are not met").

The Tenth Circuit is in accord and provides useful guidance. *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1182–84, 1189–91 (10th Cir. 1999). In *Forest Guardians*, environmental groups brought an action to compel the Department of the Interior to designate critical habitat for an endangered fish, because the agency had failed to meet the statutory deadline for its action. *Id.* at 1182. Interior admitted to having missed the deadline, but successfully pled fiscal hardship and "resource limitations" to the district court. *Id.* at 1183–84.

The Tenth Circuit reversed and carefully differentiated between agency action "unlawfully withheld" and agency action "unreasonably delayed":

> Thus, if an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that agencies conclude matters presented to them "within a reasonable time," see 5 U.S.C. § 555(b)—a court must compel only action that is delayed unreasonably. Conversely, <u>when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act</u>.

> Thus, the distinction between agency action "unlawfully withheld" and "unreasonably delayed" turns on whether Congress imposed a date-certain deadline on agency action. . . . In our opinion, when an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable. <u>However, when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline. If it withholds such timely</u>

<u>action, a reviewing court must compel the action unlawfully withheld.</u> To hold
otherwise would be an affront to our tradition of legislative supremacy and
constitutionally separated powers.

174 F.3d 1190 (underlining added). Neither *TRAC* itself nor any of the cases on which it relied

were cases involving a mandatory statutory deadline. *Id*. at 1191 & nn.18–19.

In *SUWA*—decided in 2004, after *Badgley* and *Forest Guardians*—environmental groups

sued to compel the Bureau to take action with respect to off-road vehicle use. 542 U.S. at 61. The

groups' second claim was that the Bureau had "failed to comply with certain provisions in its

land use plans, thus contravening the requirement that '[t]he Secretary shall manage the public

lands . . . in accordance with the land use plans.'" *Id*. at 67 (quoting 43 U.S.C. § 1732(a)). The

Court explained that, although land use plans "are normally not used to make site-specific

implementation decisions[,]" nevertheless "an action called for in a plan may be compelled . . .

when language in the plan itself creates a commitment binding on the agency." *Id*. at 70–71.

The land use plan at issue in *SUWA* required that a particular area "will be monitored and

closed [to off-road vehicles] if warranted." *Id*. at 68. The Court held that this was a "continuing

. . . monitoring *program*" and "not a legally binding commitment enforceable under § 706(1)."

*Id*. at 72. Any closure of the area might only occur "if warranted" following the Bureau's

monitoring and review of information gathered. *Id*. at 68. In other words, like the FLPMA

wilderness non-impairment requirement also at issue in that case, the land use plan's vehicle

closure requirement was "mandatory as to the object to be achieved, but it leaves BLM a great

deal of discretion in deciding how to achieve it." *Id*. at 66 (citing 43 U.S.C. § 1782(c), which

provides that the Secretary "shall continue to manage such lands . . . in a manner so as not to

impair the suitability of such areas for preservation as wilderness"); *see also* 542 U.S. at 64

(limitation of § 706(1) to discrete agency action precludes a "broad programmatic attack").

*SUWA* makes clear, however, that APA Section 706(1) allows courts to compel not just unlawfully withheld agency action where a missed deadline comes from statutory or regulatory text, but also from a land use plan, if (1) the decision described in the plan is an "implementation decision" rather than a "policy determination," 542 U.S. at 70, or (2) the deadline comes from "language in the plan [that] creates a commitment binding on the agency." *Id*. at 71. The Key RNA closure requirement meets both measures. First, the ARMPA adopts the closures as a detailed, specific "Management Decision" and expressly "adopts the management described in the [2015 FEIS]" which specifies the five-year deadline. ORS_06480, ORS_06498 (2015 ARMPA at 2-1, -19); ORS_06904 (2015 FEIS at 2-46). Second, the ROD defines the closures as "Immediate Decisions" that "go into effect when the ROD is signed" and "require no additional analysis." ORS_010627 (2015 ROD at 1-41). These are discrete and obligatory implementation decisions, not broad or programmatic statements of policy. They are fundamentally unlike the distinguishable "'will do' projections of agency action" described in *SUWA*, where future road closures were only triggered based on an ongoing monitoring program. 542 U.S. at 68, 72.

Cases seeking to compel action required by implementation decisions within land use plans under § 706(1) are infrequent, but *SUWA* clearly contemplates that such challenges are valid, so long as the plan requirement is "discrete" and not programmatic, and even where the deadline appears in the land use plan rather than a statute. 542 U.S. at 68. As one court recently observed, "nothing in *Badgley* expressly limits its reasoning to statutes enacted by Congress." *Gonzalez Rosario v. U.S. Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1161 (W.D. Wash. 2018). In *Friends of Animals*, discussed above, a requirement that "the AML will be re-calculated within five years or after the revision to the Billings RMP, whichever comes first" was binding and enforceable under *SUWA*. 200 F. Supp. 3d at 1125. In that case, it seemed clear to

the court "that BLM went out of its way to make clear it was committing to a certain process, not simply restating broad statutory mandates. Withdrawing from that commitment seems to violate § 706(1) under *SUWA*." *Id.*

Here, although there is no direct statutory mandate to close RNAs to grazing, the Bureau "went out of its way" to carefully craft and adopt a very definite management decision that included specific, detailed parameters for implementing the closures. The Bureau also went out of its way to specify that the closures should be completed in five years from September 2015, after which the Key RNAs "will be unavailable for grazing." The ARMPA will last 20–30 years, 80 Fed. Reg. at 59,874–75, but the Bureau realized that data generated at Key RNAs is crucial to begin gathering and assessing right away (for adaptive management and assessing plan effectiveness)—and thus set the short, five-year deadline for closing and establishing the ungrazed RNAs. This is one of only four management decisions given an express deadline, out of nearly 150 decisions in the ARMPA. The FLPMA obligation that the Bureau manage "in accordance with" the ARMPA reinforces and mandates compliance with the five-year deadline.

In sum, there can be no serious dispute that the 2015 ARMPA made an immediate and discrete management decision to designate thirteen Key RNAs and close them to livestock grazing "within five years" of September 21, 2015. The closures and deadline are legally required because the Bureau has a statutory duty to manage the public lands "in accordance with" this land use plan requirement. 43 U.S.C. § 1732(a). Because the required timing for completing the closures is express and non-discretionary, there can be no *TRAC* balancing. *Badgley* and *SUWA* control this case and require the Court to enter summary judgment in ONDA's favor as to its fourth claim. All that remains is the nature of the further relief best suited for the Bureau's violation of law.

## II.    THE BUREAU'S VIOLATION OF FLPMA AND THE APA REQUIRES DECLARATORY AND INJUNCTIVE RELIEF.

This Court should grant partial summary judgment in favor of ONDA as a matter of law because the Bureau failed to comply with the 2015 ARMPA's mandated deadline for making the Key RNAs unavailable to grazing by September 21, 2020. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment warranted where moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law). In such instances, "Section 706(1) of the APA provides that a court '*shall* compel agency action unlawfully withheld or unreasonably delayed.'" *Vietnam Veterans*, 811 F.3d at 1075 (emphasis added) (quoting 5 U.S.C. § 706(1)). In the Ninth Circuit, "no balancing of factors is required or permitted" where there is a "firm deadline" for performance. *Badgley*, 309 F.3d at 1177–78 & n.11. That is true here: this is a case of an unlawfully withheld action, in violation of APA § 706(1), not a case of mere unreasonable delay without a deadline. *Forest Guardians*, 174 F.3d at 1190 ("The agency must act by the deadline. If it withholds such timely action, a reviewing court *must* compel the action unlawfully withheld.") (emphasis added).

Courts in this circuit have relied on *Badgley* and *Forest Guardians* in holding that, where an agency fails to meet a mandatory deadline, the court's inquiry ends: the agency has *per se* violated the law, and no *TRAC* balancing is appropriate. *See, e.g.*, *Gonzalez Rosario*, 365 F. Supp. 3d at 1161 ("*Badgley* also forecloses Defendant's argument that the court should apply the six-factor reasonableness analysis from [*TRAC*]. . . . *Badgley* rejected the *TRAC* analysis when the law specifically provides a deadline for performance") (internal quotation marks and alteration omitted); *Garcia v. Johnson*, No. 14-cv-01775-YGR, 2014 WL 6657591, *12 (N.D. Cal. Nov. 21, 2014) ("Ninth Circuit authority suggests that where a firm deadline exists, the

Court need not undertake TRAC's six-factor balancing inquiry"); *Ctr. for Food Safety v. Hamburg*, 954 F. Supp. 2d 965, 971 (N.D. Cal. 2013) ("where Congress has specifically provided a deadline for performance by an agency, 'no balancing of factors is required or permitted.'") (quoting *Badgley*, 309 F.3d at 1177–78 & n.11). Accordingly, *TRAC* balancing is only appropriate in the absence of an express deadline—which is not the case here.

Therefore, the Court should: (1) declare that the Bureau has violated FLPMA and the APA by unlawfully withholding the closure of the thirteen Key RNAs to grazing, as required by the 2015 ARMPA; and (2) compel the Bureau to complete the closures and make all thirteen Key RNAs unavailable to grazing prior to any turnout of livestock in 2023. *See, e.g.*, *Badgley*, 309 F.3d at 1176–77 (affirming district court's issuance of declaratory and injunctive relief compelling defendant agency to make required final determinations).

## III.    EVEN APPLYING THE *TRAC* FACTORS, THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE BUREAU HAS UNREASONABLY DELAYED CLOSURE OF THE KEY RNAS.

Although no equitable balancing is necessary or even permitted here where the Bureau has failed to comply with a "firm deadline" for performance, applying the *TRAC* factors nevertheless leads to the same conclusion: the Bureau's years-long delay in completing science-based conservation measures in defined, high-priority areas, as required by its own land use plan, is not reasonable. This Court should compel the Bureau to act as the ARMPA requires before any further grazing takes place on the closed Key RNAs.

Claims asserting unreasonable delay under the APA are evaluated under the six-factor *TRAC* test:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason[;] (3) delays that

might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake[;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by delay[;] and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Brower*, 257 F.3d at 1068 (quoting language that originated in *TRAC*, 750 F.2d at 80). As discussed below, each factor weighs in favor of ONDA.

### A. The Bureau's Delay is Unreasonable Because It Has Failed to Meet Its Land Use Plan Deadline as Required by Congress in FLPMA (Factors 1 & 2).

The first two *TRAC* factors should be considered together, because the unreasonableness of any delay must take into consideration any congressional expectations or mandates. *See In re Monroe Commc'n Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988); *Cutler v Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987) ("[T]he reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action." (citation omitted)). The first factor is "governed by a 'rule of reason.'" *TRAC*, 750 F.2d at 80 (citation omitted). The statutory requirement set by Congress—here, FLPMA's requirement that the Bureau "shall" manage the lands "in accordance with" its 2015 sage-grouse conservation plan for Oregon—supplies the "content" for this rule of reason (the second *TRAC* factor). 43 U.S.C. § 1732(a).

The Ninth Circuit has stated that the first factor is the most important. *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017) (citing *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)). In general, "[t]he cases in which courts have afforded relief have involved delays of years, not months." *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1125 (9th Cir. 2001). For example, the Ninth Circuit denied a mandamus petition where the EPA had considered an administrative petition for six years without acting but had a "concrete timeline" for resolving

the petition "in a matter of months." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813–14 (9th Cir. 2015). But two years later, when the delay was in its eighth year and the EPA would only commit to *proposing* (not finalizing) a ruling within a year, the agency had simply created a "roadmap for further delay" and "stretched the 'rule of reason' beyond its limits." *Id*. at 814.

That is the case here, where the Bureau is now seven years beyond its "immediate" closure decision, two years beyond the firm backstop deadline of September 21, 2020 set in the land use plan, and has no timetable for completing the closures. As noted, the State Director testified that the Lakeview and Vale districts have no fiscal year target for completion of twelve of the thirteen closures. Bushue Decl. ¶ 17. One Vale District closure, for Toppin Creek Butte RNA, has been cast into a multi-decade NEPA process with no end in sight. *See supra* p. 13. The Burns District considers that it has completed closure of the East Fork Trout Creek RNA, but the "Range Line Agreement" it relies upon is not in accordance with the 2015 ARMPA's decision that closure include fencing to guarantee that the RNAs will remain ungrazed reference sites. *See* ORS_0768 (simply stating agreement "would separate" the RNA from the rest of the pasture and "designate" it "as a no livestock use area," with the foreseeable unauthorized grazing in the RNA merely "subject to trespass"); *cf*. ORS_0557 (map included with notice letter in 2020, showing the less than one mile of ARMPA-required fencing to be built on the RNA's southern boundary).

The Bureau's litigation-driven scoping notices are a "roadmap for further delay" with no stated timeline for completing any of the NEPA processes—processes which in any event are precluded by the ARMPA's declaration that the closure decision requires no further analysis. Although the Bureau claims it must take a closer look at various issues, courts have characterized this sort of agency "progress" as the "least responsive course short of inaction." *Pub. Citizen Health Rsch. Grp. v. FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984) ("[T]here are strong indications that

the agency, by reversing course and issuing an advance notice of proposed rulemaking, has

embarked on the least responsive course short of inaction.") (internal quotation marks omitted);

*Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1153 (D.C. Cir. 1983) (same). The

Bureau's gambit to purport to re-analyze, in specious "implementation-level" EAs, the

management decisions already evaluated and definitively decided in the 2015 ROD, ARMPA

and FEIS is inconsistent with the urgency of the firm timeline adopted in the September 21, 2015

land use plan amendment.

Indeed, the Key RNAs closure is one of just four management decisions—out of nearly

150 such decisions in the ARMPA—tied to an express deadline. *See* ORS_06492, ORS_06495,

ORS_06511 (2015 ARMPA at 2-13, -16, -32, requirements to evaluate post-planting progress

every 10 years in seedings, reduce hazardous fuels within 3 years following management

projects, and initiate travel planning within 5 years). Importantly, foot-dragging on even one of

the closures defeats the Bureau's own finding that closure *in all fifteen of the Key RNAs*

represents "the minimum number" to "provide sufficient replication and support a coherent

research plan" that will generate data with the needed "statistical power" to make meaningful

land management decisions. OR_094754, 094789–80 (2018 FEIS at 2-4, 4-7, 4-8).

The intent of the ARMPA to give Key RNAs the highest management priority also

demonstrates the unreasonableness of the agency's failure to implement the closures within the

fixed five-year deadline. A court should "consider[] administrative intent only if the regulation is

ambiguous." *El Comité Para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1072 (9th

Cir. 2008). Here, "within 5 years" of September 21, 2015 is not ambiguous—but should the

Bureau argue it is, the agency itself declared in 2015 that Key RNAs "should be priority areas for

[sage-grouse] management," ORS_07909 (2015 FEIS at 8-21), and "the [Bureau's] resources

must be prioritized and directed toward [these] areas that would most benefit the [sage-grouse] over the long term." ORS_06905 (2015 FEIS at 2-47); *see also* 80 Fed. Reg. at 59,880 (monitoring sagebrush habitats "is an integral component of any conservation program's long-term success"); *W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225, 1256 n.15 (D. Or. 2019) (noting "the purpose of the [2015 ARMPA] to conserve the sage-grouse"). *TRAC* factors one and two weigh heavily in ONDA's favor.

### B. The Bureau's Delay Risks Significant Harm to Environmental Health and Welfare (Factors 3 & 5).

Third, "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Factor three is intertwined with factor five: "the nature and extent of the interests prejudiced by delay." *Id*. at 80; *see Indep. Min. Co., Inc. v. Babbitt*, 105 F.3d 502, 509 (9th Cir. 1997) (third and fifth factors are "overlapping").

The purpose of the Key RNA closures is to provide (1) permanently ungrazed, statistically significant, scientific baseline research areas and (2) small, but important, parcels of undisturbed habitat for imperiled sage-grouse populations. ORS_06512 (2015 ARMPA at 2-33) (Objectives SD 1, SD2 and SD 4); *see also* ORS_06472 (2015 ARMPA at 1-7) (describing overarching purpose "to identify and incorporate appropriate measures . . . to conserve, enhance, and restore [sage-grouse] habitat"). Environmental regulation is closer to the "less tolerable" human health and welfare category than to economic regulation. *See* 42 U.S.C. § 4331(a), (b), (c) (Congress's declaration of national environmental policy in NEPA, recognizing "the interrelations of all components of the natural environment" including human activity, that protection of the environment supports "safe" and "healthful" conditions for Americans, and

"that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment").

FLPMA requires the Bureau to develop land use plans in order to carry out its obligations to manage the public lands "in a manner that will protect the quality of scientific, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and "preserve and protect certain public lands in their natural condition." 43 U.S.C. §§ 1701(a)(8), 1712(a)–(c) (land use plan requirements). The Bureau "shall give priority to the . . . protection of areas of critical environmental concern." *Id.* §§ 1711(a), 1712(c)(3). And RNAs are a "special type of ACEC" whose "primary purpose" is "research and education" and are "designated . . . to protect special intact representative native plant communities." 43 C.F.R. § 8223.0-5(a); ORS_06532 (2015 ARMPA at 5-11). Livestock grazing, which is generally allowed on Bureau-managed "multiple use" lands, is therefore subservient to the "primary purpose" in RNAs of research, education, and protection from resource damage. *See* 43 U.S.C. § 1702(c) (even "multiple use" management requires Bureau to avoid "permanent impairment" of environment).

The Bureau's analyses indicate that potential economic impacts of the closures are nonexistent in the context of the 12 million acres of public land at issue and negligible for the handful of private grazing operations affected by the closures. Indeed, only a handful of the twenty-nine affected grazing operations sought to intervene in this case, and only one, Cahill Ranches, ever challenged the 2015 ARMPA's RNA closures decision within the six-year statute of limitations for doing so. *See* ORS_PUB_0109 (Bureau table listing Key RNAs permittees).

In 2015, the Bureau found only a general "potential for economic impacts" for the affected permittees. ORS_07462 (2015 FEIS at 4-202). In 2018, the Bureau found that the number of AUMs no longer available in the closed areas was in fact 25% smaller than the

agency had originally calculated. OR_094781 (2018 FEIS 3-21) ("the estimated unavailable

AUM numbers changed from 2,388 [in 2015] to 1,772."). Even for the higher number of

eliminated AUMs (much less the lower recalculated figure) there would be "negligible or no

impact on livestock grazing and range management." ORS_07445 (2015 FEIS at 4-185).

Because the Bureau has already determined that any economic impacts are insignificant, and

because the Key RNA closures are essential for sage-grouse conservation, and the "primary

purpose" of the RNAs is for scientific research, not to support private ranching operations, this

factor tips in ONDA's favor.

### C.  The Bureau Has Unwaveringly Identified Science-Based Conservation of Sage-Grouse as a Top Priority (Factor 4).

The fourth factor considers "the effect of expediting delayed action on agency activities

of a higher or competing priority." *TRAC*, 750 F.2d at 80. The Bureau has long understood that

sage-grouse conservation is a top management priority across the West, needed to "stop the

bleeding of continued population declines and habitat losses." *W. Watersheds Proj. v. Bernhardt*,

519 F. Supp. 3d 763, 772 (D. Idaho 2021) (internal quotation marks omitted). In 2015, the

Secretary of the Interior declared that "[t]his collaborative, science-based greater sage-grouse

strategy is the largest land conservation effort in U.S. history." *See supra* n.4. Since then, the

Bureau's focus on the climate crisis, biodiversity, and landscape-scale conservation has only

increased.[15] By closing scientifically-identified research areas to grazing, the ARMPA

unambiguously prioritizes sage-grouse over livestock grazing in the Key RNAs. *See, e.g.*, *W.*

*Watersheds Proj. v. Salazar*, 843 F. Supp. 2d 1105, 1131 (D. Idaho 2012) ("[u]nder the priorities

---

[15] *See, e.g.*, Executive Order 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*. 86 Fed. Reg. 7,037, 7,037 (Jan. 25, 2021) (describing commitment to promoting and protecting public health and the environment and announcing policy "to listen to the science").

set by the Owyhee RMP, livestock grazing must yield to the sage grouse" where "there is a conflict between sage grouse and livestock"); *cf. Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, No. 2:10-cv-1331-SU, 2014 WL 4832218, *33 (D. Or. Sept. 29, 2014) (distinguishing *Western Watersheds* where land use plan language instead left Bureau discretion to "maintain, restore, *or* enhance populations and habitats of special status animal species").

In a litigation declaration, the State Director contends that other projects are higher priority than this one. Bushue Decl. ¶¶ 10, 17, 23. But the Bureau, in the 2015 ROD, ARMPA, and FEIS, conclusively decided otherwise. *See supra* pp. 25, 30–31. No deference is due to "an agency's convenient litigating position," particularly when it conflicts with the position the agency adopted in the governing land use plan amendment. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212–13 (1988). Seven years ago, the Bureau declared that Key RNAs are "priority areas for [sage-grouse] management." ORS_07909 (2015 FEIS at 8-21). The linchpin of the 2015 ARMPA is scientifically-informed adaptive management. *See* ORS_06671 (2015 ARMPA at J-1) ("Careful monitoring of these outcomes [from management actions] both advances scientific understanding and helps with adjusting resource management directions."). Given the acknowledged importance of immediate implementation of the plan's sweeping requirements and the Bureau's emphasis on science-based decisionmaking, this factor tips in ONDA's favor.

### D.  A Finding of Impropriety Is Not Required (Factor 6).

The sixth factor, bad faith, is not required for a finding of unreasonable delay. *TRAC*, 750 F.2d at 80 ("[T]he court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." (internal quotation marks omitted)). Nevertheless, it was improper for the Trump administration to refuse to implement the 2015 plan and then to issue the unlawful 2019 decision—which was swiftly enjoined—purporting to

abandon the closures and research altogether. And there was never a lawfully-appointed BLM Director at any time during President Trump's four years in office—meaning the Bureau could never have "properly" amended the plans even if it had followed every other procedural and substantive requirement of law. *See Bullock v. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1128–30 (D. Mont. 2020) (William Pendley's service as Acting BLM Director violated Appointments Clause and Federal Vacancies Reform Act); Second Am. Compl. (ECF 33) ¶¶ 75–88 (alleging same with regard to one of Pendley's predecessors, Brian Steed). And there is no good excuse for the Bureau's five-year delay in sending out boilerplate two-year notice letters formally advising permittees of the closures (much less its present failure to act on those notices).

In sum, all six *TRAC* factors support summary judgment in ONDA's favor and a Court order compelling the Bureau to finally do what it decided to do in 2015: close the Key RNAs to livestock grazing. The plain intent of Congress that the Bureau follow its land use plans, the Bureau's position emphasizing the importance of unprecedented, science-based land management to preserve the imperiled sage-grouse in Oregon, and the significant ecological risk associated with continuing to eschew key scientific research intended to inform ongoing management of lands and resources that belong in equal part to all Americans, all support a finding of unreasonable delay. The Bureau will be unable to meet its heavy burden to show otherwise.

## **CONCLUSION**

For these reasons, ONDA is entitled to summary judgment on its fourth claim for relief, and the Court should issue an order compelling the Bureau to implement its 2015 Key RNA closure decision and make the closed RNAs unavailable for grazing in 2023.

Respectfully submitted this 3rd day of June, 2022.

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiffs