**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
24242 S. Engstrom Rd.
Colton, OR 97017
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N**, *et al.* | No. 3:19-cv-01550-SI |
| Plaintiffs, | **RESPONSE TO INTERVENORS' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| **BARRY BUSHUE**, State Director, BLM Oregon/Washington, *et al.*, | |
| Defendants, | |
| and | |
| **CAHILL RANCHES, INC.**, | |
| Defendant-Intervenor, | |
| and | |

**MACKENZIE RANCH, LLC**, *et al.*,

                        Defendants-Intervenors,

     and

**TREE TOP RANCHES, LIMITED PARTNERSHIP**,

                        Defendant-Intervenor.

_____

<u>**TABLE OF CONTENTS**</u>

**TABLE OF AUTHORITIES** ...................................................................................*v*

**GLOSSARY OF ACRONYMS** .......................................................... *vii*

**ARGUMENT** .................................................................................... 2

I.   **MACKENZIE DOES NOT APPRECIATE THAT THE 2015 ARMPA ADOPTED THE DETAILED REQUIREMENTS FOR THE KEY RNA CLOSURES SET OUT IN THE 2015 FEIS, IS WRONG THAT THERE IS A "RIGHT" TO PUBLIC LANDS GRAZING, AND OVERSTATES THE ECONOMIC EFFECTS OF THE CLOSURES.**.................................2

    A.   **The Court can Compel the Bureau's Compliance With the Key RNA Closures Because the 2015 ARMPA Adopts and Incorporates by Reference the Detailed Requirements in the Proposed Plan/FEIS and Analyzes Their Effects.** .......................................................2

        1.   *The discrete requirements to close the Key RNAs within five years and to use fencing to do so are part of the 2015 ARMPA because it adopted the Proposed Plan in the 2015 FEIS without modifications.* ...............................2

        2.   *The 2015 ARMPA includes the decision exactly where to close the Key RNAs.*.................................................................. 6

        3.   *The 2015 FEIS contains site-specific analysis of the closure decision's impacts.*............................................................. 6

        4.   *The Key RNA closure decisions are "Immediate Decisions," not "One-Time Future Decisions."*........................................... 7

    B.   **Mackenzie is Wrong That There are "Valid Existing Rights" yet to be Resolved Because There is no "Right" to Graze Livestock on the Public Lands.** ............................................................................10

    C.   **The *TRAC* Factors Also Favor Summary Judgment in Favor of ONDA.** .......12

    D.   **The Bureau Determined in 2015 That Socioeconomic and Other Practical Effects of the Key RNA Closures Would be Negligible or Non-Existent, and the Mackenzie Intervenors Overstate the Economic Effects of the Closures.** ....................................................................14

*1.*     *The Bureau's detailed analysis in the 2015 FEIS determined that there would be negligible effects from the RNA closures.* .................................... 15

*2.*     *The livestock operators have been on notice for years that their operations would have to adjust to the closures.* ............................................. 18

*3.*     *The effects of the Key RNA closures on individual operators are exaggerated.* ........................................................................................ 19

E.     **If the Court Rules that the Bureau has Unlawfully Withheld or Unreasonably Delayed the Key RNA Closures, the Onus Will be on the Bureau to Complete the Fencing or Otherwise Ensure the RNAs are Not Grazed in 2023.** ...................................................................................24

II.    **CAHILL MAKES NO DIFFERENT MERITS ARGUMENTS BUT MISSTATES SEVERAL FACTS RELATED TO THE CLOSURES.** ...................24

III.   **TREE TOP IS WRONG ON CONTROLLING LAW AND JURISDICTION.** ....27

A.     **Factual Background Regarding Tree Top.** ..........................................................28

B.     **ONDA's Complaint Alleges Claims Based on Both the 2015 ARMPA and the 2019 ARMPA.** ..................................................................................29

C.     **The Bureau's 2020 ROD Expressly is "*Not* a New Planning Decision."** ..........30

D.     **ONDA's Fourth Claim for Relief is Ripe and Not Moot.** ...............................31

**CONCLUSION** ....................................................................................................... 33

## TABLE OF AUTHORITIES

**CASES**

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .............................................. 9

*Buford v. Houtz*, 133 U.S. 320 (1890) .......................................................................... 11

*Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982) .................................................................. 4

*Ctr. for Biol. Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137 (N.D. Cal. 2014) ........... 14

*Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) ............................ 9

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1124 (D. Mont. 2016) ........................... 5

*Light v. United States*, 220 U.S. 523 (1911) .............................................................. 11

*McKart v. United States*, 395 U.S. 185 (1969) ........................................................... 32

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077 (9th Cir. 2020) .................... 4, 5

*Nat'l Wildlife Fed'n v. Cosgriffe*, 21 F. Supp. 2d 1211 (D. Or. 1998) ................................. 14, 15

*Nat'l Wildlife Fed'n v. Johanns*, No. C04-2169Z,
  2005 WL 1189583 (W.D. Wash. May 19, 2005) ....................................................... 32

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................................. 4, 7, 9, 32, 33

*Omaechevarria v. Idaho*, 246 U.S. 343 (1918) ........................................................... 11

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) ................... 11

*Osborne v. United States*, 145 F.2d 892 (9th Cir. 1944) ........................................... 11

*Pub. Lands Council v. Babbitt*, 529 U.S. 728 (2000) ................................................ 10

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
  468 F. Supp. 3d 1148 (D. Alaska 2020) ................................................................ 5

*United States v. Kama*, 394 F.3d 1236 (9th Cir. 2005) ............................................. 32, 34

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................................... 13

*Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068 (9th Cir. 2016) ................................ 9

*W. Watersheds Proj. v. Bernhardt*, 428 F. Supp. 3d 327 (D. Or. 2019) ...................... 13, 21

*W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019)..................... 14, 30, 31

**STATUTES**

43 U.S.C. § 1752(g) .................................................................................................. 11

43 U.S.C. § 315b ................................................................................................. 10, 11

**OTHER AUTHORITIES**

Environmental Working Group, USDA SUBSIDY INFORMATION FOR CAHILL RANCHES INC,
   https://farm.ewg.org/persondetail.php?custnumber=A09419901............................................. 26

Environmental Working Group, USDA SUBSIDY INFORMATION FOR LAIRD RANCH LLC,
   https://farm.ewg.org/persondetail.php?custnumber=A12242562............................................. 21

Environmental Working Group, USDA SUBSIDY INFORMATION FOR MACKENZIE RANCH LLC,
   https://farm.ewg.org/persondetail.php?custnumber=A12616285............................................. 22

**REGULATIONS**

43 C.F.R. § 1610.5-5................................................................................................ 31

43 C.F.R. § 4110.4-2(b) .......................................................................................... 11

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| ARMPA | Approved Resource Management Plan Amendment |
| AUM | Animal Unit Month |
| BLM or "the Bureau" | United States Bureau of Land Management |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act of 1973 |
| FEIS | Final Environmental Impact Statement |
| FSEIS | Final Supplemental Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| MD | Management Decision |
| NEPA | National Environmental Policy Act of 1969 |
| ONDA | Oregon Natural Desert Association |
| RMP | Resource Management Plan |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| 2015 FEIS | 2015 Proposed Resource Management Plan Amendments and Final Environmental Impact Statement |

## INTRODUCTION

ONDA submits this consolidated response to the cross-motions for summary judgment filed by Cahill Ranches Inc. ("Cahill") (ECF 137), Mackenzie Ranch, LLC *et al*. ("Mackenzie") (ECF 135), and Tree Top Ranches LP ("Tree Top") (ECF 133). All of these parties neglect the fact that grazing livestock on federal public lands is a privilege, not a right, and their permits are revocable at will by the federal government. In 2015, the Bureau of Land Management exercised its sovereign right to make 22,765 acres of public land in thirteen Key RNAs in eastern Oregon unavailable for grazing, instead allocating these lands to scientific research—research it deemed a fundamental prerequisite to understanding how best to manage the more than 12 million acres of grazed public lands in Oregon to avoid the extinction of the greater sage-grouse. Of the nine grazing operators who intervened in this case, only two administratively protested the Bureau's 2015 decision, and only one challenged the closure in court. For most of these intervenors, their attempts to piggy-back new complaints onto this action are too little, too late. Since the Bureau made its "immediate decision" in 2015 to make the Key RNAs unavailable for livestock grazing, these permittees have had ample time to adjust their operations—indeed, they have benefitted from the agency's unlawful delay and eked out several additional years of grazing in vital sagebrush plant communities that ought to have been off-limits to livestock by September 2020.

Mackenzie and Cahill misconstrue the plain language of the 2015 ROD, ARMPA, and FEIS, erroneously claiming that the *Approved* Plan Amendments do not include binding commitments adopted, without modification, from the Proposed Plan amendments that were an integral part of the 2015 FEIS. Tree Top misreads ONDA's complaint, fails to advise the Court that the 2020 Record of Decision actually states that it is *not* a decision to amend the land use plans, and confuses ripeness with mootness.

## ARGUMENT

I. **MACKENZIE DOES NOT APPRECIATE THAT THE 2015 ARMPA ADOPTED THE DETAILED REQUIREMENTS FOR THE KEY RNA CLOSURES SET OUT IN THE 2015 FEIS, IS WRONG THAT THERE IS A "RIGHT" TO PUBLIC LANDS GRAZING, AND OVERSTATES THE ECONOMIC EFFECTS OF THE CLOSURES.**

A. **The Court can Compel the Bureau's Compliance With the Key RNA Closures Because the 2015 ARMPA Adopts and Incorporates by Reference the Detailed Requirements in the Proposed Plan/FEIS and Analyzes Their Effects.**

1. *The discrete requirements to close the Key RNAs within five years and to use fencing to do so are part of the 2015 ARMPA because it adopted the Proposed Plan in the 2015 FEIS without modification.*

The crux of Mackenzie's cross-motion is that the 2015 ARMPA and 2015 ROD do not "dictate when, where, or how the [Bureau] must withdraw grazing from the RNAs." Mackenzie Br. at 15. Mackenzie is wrong on all three points. It fundamentally misunderstands the nature of the document all parties refer to as the "2015 FEIS," dismissing it a mere "study of potential environmental impacts." *Id*. at 12. In fact, the "2015 FEIS" contains both the Proposed Plan amendments *and* related environmental analysis. What Mackenzie dismisses as "predictions," *id*.—the requirements to use fencing to carry out the carefully-identified Key RNA closures and to make them "unavailable for grazing within 5 years" of the September 21, 2015 effective date of the closure decisions—are in fact binding commitments in the "Proposed Plan" detailed in the 2015 FEIS that were approved in and adopted by the ARMPA and ROD.

The full title of the 2015 FEIS is the "Proposed Resource Management Plan Amendment and Final Environmental Impact Statement." ORS_06768 (2015 FEIS cover page). The 2015 FEIS set out and described in detail the "Proposed Plan." ORS_06871–911 (2015 FEIS at 2-13 to -53) (section titled "Proposed Plan Amendment," with "Proposed Plan" detailed over 39 pages). The 2015 ARMPA then "*adopts the management described in* the Oregon Greater Sage-grouse

Proposed Resource Management Plan Amendment and Final Environmental Impact Statement (2015), with modifications and clarifications, as described in the *Modifications and Clarifications* section of the ROD." ORS_06480 (2015 ARMPA at 2-1) (emphasis added). That is: any management commitment in the 2015 FEIS's Proposed Plan Amendment became part of the 2015 ARMPA *unless* changed in the ROD's "Modifications and Clarifications" section.

The "Proposed Plan" in the 2015 FEIS that the ARMPA adopted included specific and detailed requirements for the method and deadline by which the specific acreages in Key RNAs would be made physically "unavailable for grazing." ORS_06904 (2015 FEIS at 2-46). The Proposed Plan provided that "*Fencing* 21,957 acres with *approximately 39 miles of fence* in 13 RNAs would provide areas where natural successional processes would proceed for long-term monitoring of the plant communities important for [sage-grouse] and research." *Id.* (emphasis added). The Proposed Plan also specified that "to minimize *fencing* miles, and to avoid disturbance to existing leks, and use *existing pasture fences*, it is *necessary* to *fence* 800 acres of small areas adjacent to 9 of the 15 RNAs in order to reduce the miles of *fence*, tie into *existing pasture fences*, and minimize any impacts on existing leks." *Id.* (emphasis added).

When pressed by commenters about the fencing proposal, the Bureau responded that, "[t]o *remove grazing* from all or portions of the 13 Key RNAs (2 of them are *already fenced*), the Proposed Plan estimated 39 miles of *new fence* would be *needed*." ORS_08407 (2015 FEIS at V-32) (emphasis added). "*Fencing would be necessary* to address landownership patterns, and the Proposed Plan *minimizes fencing* and uses *existing allotment fences*." *Id.* (emphasis added). No other method for carrying out the closures is proposed, and no further decisionmaking or analysis for how to carry out the closures is contemplated—because the decision of how to do so is made in the agency's Proposed Plan, later adopted by reference into the ARMPA.

The Proposed Plan also provides a firm deadline for completing the Key RNA closures: "[p]ermitted livestock grazing would be unavailable for grazing *within 5 years* on all or portions of 13 of the 15 key RNAs." ORS_06904 (2015 FEIS at 2-46) (emphasis added). The five-year deadline and the "necessary" 39 miles of new fence are requirements in the Proposed Plan that the 2015 ARMPA adopted by reference, without change: the "*Modifications and Clarifications* section of the ROD" changes neither of those commitments. ORS_06480 (2015 ARMPA at 2-1); ORS_010631–33, _010637–38 (2015 ROD at 2-3 to 2-5, 2-9 to -10). The Bureau *did* provide a deadline—not just "could have"—by defining the interplay of the three documents that comprise its decision to amend its Oregon land use plans. Mackenzie Br. at 13. Because 39 miles of new fence and a five-year deadline were part of the Proposed Plan the 2015 ARMPA adopted without modification, Mackenzie is wrong that the 2015 FEIS is purely procedural. *Id.* at 12.

Mackenzie incorrectly asserts that land use plans *only* describe actions that require further specific plans, selectively quoting from *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"). Mackenzie Br. at 16–17. But *SUWA* teaches that "an action called for in a [land use] plan *may be compelled . . .* when *language in the plan itself* creates a commitment binding on the agency." *SUWA*, 542 U.S. at 71 (emphasis added). Although land use plans "generally" do not involve site-specific decisions, "a single 'federal action' for purposes of NEPA can be both broad-scale and site-specific, and can be evaluated at both of those levels in a single EIS." *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1082, 1087–90 (9th Cir. 2020) (describing combined land use plan/EIS for 22.6-million-acre National Petroleum Reserve that included site-specific analyses of leasing). Even a programmatic EIS can "consist[ ] of both a broad-scale management plan and a series of site-specific critical decisions," as the ARMPA does here. *Id.* at 1087 (citing *Cal. v. Block*, 690 F.2d 753, 761–63 (9th Cir. 1982)).

A court determines whether a provision of a land use plan is a "site-specific critical decision" by "look[ing] to the actual federal action being taken"—the substance of the decisions and analyses in the NEPA documents and land use plans. *Id.* at 1087–88; *see Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1152–53 & n.35 (D. Alaska 2020) (reviewing court must look to the substance of an analysis and not the label assigned to it). The 2015 decision to close the Key RNAs to grazing, using fencing and within five years, has all the hallmarks of a site-specific action. It is unique among the ARMPA's provisions in specifying exactly how many acres are unavailable for grazing on each Key RNA, exactly what areas will be closed (described in the next subsection), how many miles of new fence are "necessary," and that they will be carried out so that the Key RNAs are "unavailable for grazing within 5 years."

*Friends of Animals v. Sparks* stands for the principle that an agency can make a binding commitment in the course of its land use planning, in the form of a deadline to complete an action, and that legally required commitment is enforceable by a court—just as ONDA requests here. 200 F. Supp. 3d 1114, 1125 (D. Mont. 2016); *see* Mackenzie Br. at 13. That court held that a provision the agency developed during its land use planning process—that the "[appropriate management level for feral horses] *will* be recalculated *within five years*"—was binding on the agency. 200 F. Supp. 3d at 1120 (emphasis added), 1125. The same is true here, where the 2015 ARMPA adopted the commitments in the Proposed Plan to use fencing to make the Key RNAs "unavailable to grazing within 5 years." ORS_06904 (2015 FEIS at 2-46). The language used makes the commitment enforceable—whether a plaintiff seeks to compel an action unlawfully withheld under APA § 706(1), or, as in *Friends of Animals*, to challenge a later agency action (there, a decision to gather up feral horses) under APA § 706(2)(A) as being not in accordance with law because the agency action did not comply with the binding commitment in its decision.

##### 2. *The 2015 ARMPA includes the decision exactly where to close the Key RNAs.*

Mackenzie incorrectly claims that the Bureau has not yet delineated which portions of the Key RNAs will be closed, arguing that this delineation was left to the agency's future discretion. Mackenzie Br. at 11, 13 This is not true. In fact, the 2015 ARMPA includes a figure showing the mapped Key RNA areas the Bureau made unavailable to grazing as part of the 2015 ARMPA. ORS_6556 (2015 ARMPA App'x A, Fig. 2-3). The closed RNAs shown on that map correspond to the many maps in the Bureau's planning record, *see* ONDA Motion for PI/TRO at 16–17 (citing maps throughout the record), as well as to the maps that the Bureau again provided to the permittees in letters in January 2020. *See, e.g.*, OR_016275–78 (maps showing Rahilly-Gravelly RNA closure area and location of "2 miles of new fence"); ORS_0509 (showing same Rahilly-Gravelly RNA closure area).[1] Tellingly, the Bureau has never disputed that it already decided the precise locations and acreages for each of the thirteen Key RNA closures in 2015. It only claims it retains discretion as to the method and timing of the closures—which ONDA has refuted.

##### 3. *The 2015 FEIS contains site-specific analysis of the closure decision's impacts.*

Not only do no further decisions remain about where, how, and when to carry out the closures, but the 2015 FEIS also evaluated the impacts of the site-specific closure decision: under "Environmental Consequences," the FEIS stated that the "Proposed Action would require additional fencing, with approximately 39 miles of fence in 13 key RNAs and an additional 800 acres fenced next to 9 key RNAs." ORS_07463 (2015 FEIS at 4-203). Although "[f]ences could impact the ability to distribute livestock, at additional cost to permittees . . . the ability to distribute livestock should generally be maintained, and impacts should be limited." *Id*. And

---

[1] Mackenzie appears to have been confused by the statement that "all or portions" of the RNAs are closed. *See* Mackenzie Br. at 13. This just means that some of the closures determined in 2015 are of "all" of an RNA and others only closed "portions" of an RNA. *See* ORS_06903 (2015 FEIS at Table 2-6) (distinguishing total RNA acres versus RNA acres made unavailable).

"[i]mplementing management [including fences required by the Proposed Plan] would not impair wilderness characteristics" and "could enhance naturalness, or, at a minimum, be complementary to management in [Wilderness Study Areas]." ORS_07533 (2015 FEIS at 4-273).

The Bureau also considered effects to sage-grouse leks, concluding, in a detailed section dedicated specifically to mitigating effects to leks, that "range improvements which provide a conservation benefit to [sage-grouse] such as fences for protecting important seasonal habitats, meet the lek buffer requirement." ORS_06570 (2015 ARMPA at B-2). It also carefully located the required fences beyond the Key RNA boundaries to "minimize any impacts on existing leks," determining that, to do so, it would be "*necessary to fence* 800 acres of small areas adjacent to 9 of the 15 RNAs." ORS_06904 (2015 FEIS at 2-46) (emphasis added). Accordingly, the Bureau's land use plan decision to make the thirteen Key RNAs unavailable to grazing, using fencing, and within five years from the effective date of the ROD, is precisely the kind of site-specific, fully-analyzed, non-discretionary, specifically articulated land use plan language and requirement that the Supreme Court has said "may be compelled" under APA § 706(1). *SUWA*, 542 U.S. at 71.

### 4. The Key RNA closure decisions are "Immediate Decisions," not "One-Time Future Decisions."

Mackenzie concedes that the 2015 ARMPA's closure of the RNAs by making them "unavailable to grazing" is set out in "Objectives" and a "Management Decision," and that these are "decisions meant to take effect once the ROD issued [in September 2015], or 'Immediate Decisions.'" Mackenzie Br. at 7, 11.[2] Given this concession, Mackenzie is wrong in later contending that "the 2015 ARMPA and ROD *expressly* excluded the closure requirement from the category of 'Immediate Decisions' and instead classified it as a 'One-Time Future

---

[2] The Bureau also acknowledges that its decisions making the Key RNAs "unavailable" to grazing—in Objectives LG 2, SD 1, and SD 4 and Management Decision LG 1—were, by definition, "Immediate Decisions." BLM Br. at 11 (ECF 126) (citing 2015 ROD at 1-41).

Decision.'" Mackenzie Br. at 15–16 (citing ORS_06518 (2015 ARMPA at 4-1), ORS_010627 (2015 ROD at 1-41)) (emphasis added). Nothing on the pages cited supports that contention.

Mackenzie notes that Management Decision ("MD") LG 1 directed the Bureau to make a future determination whether to *remove* existing "fences, corrals, or water storage facilities" left behind after the Key RNA closure fences are completed. Mackenzie Br. at 11 (citing ORS_06498, 2015 ARMPA at 2-19). But MD LG 1 *did not* direct the Bureau to do any additional analysis or make any new "determinations" regarding the "39 miles of new fence" the Bureau had deemed "necessary" to make the RNAs physically unavailable to livestock grazing. ORS_08407 (2015 FEIS at V-32). Nowhere in MD LG 1 or Objectives LG 2, SD 1, and SD 4— nor anywhere else in the plan—does the Bureau require or even mention needing additional determinations or analysis of how or when to complete the Key RNA closures, because it had already determined those details in 2015. Mackenzie's assertion that the method for carrying out the Key RNA closures "would necessarily fall within" the category of future determinations thus finds no support in the record. Mackenzie Br. at 11–12. There also is no support for its claim that the 2015 ARMPA "*expressly* recognized that site-specific implementation decisions and further specific plans would be necessary to close portions of the RNAs." *Id*. at 17 (emphasis added).

Ultimately, Mackenzie, like the Bureau, can only resort to pure post hoc rationalization to try to characterize the Key RNA closures as future decisions, because nothing in the ROD, ARMPA, or FEIS classifies them that way. The examples given for "future decisions"—broad-scale travel planning and mineral withdrawal—do not resemble the detailed, site-specific decisions the Bureau made in the Proposed Plan and ARMPA for closing the Key RNAs to livestock within five years after September 21, 2015. *See* ORS_06518 (2015 ARMPA at 2-18). Post hoc rationalizations and "litigating positions" by counsel, whether from the government or

intervenors, are not entitled to deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (no deference to litigation positions nor counsel's interpretations).

The language the agency uses in its land use plan defines the extent of the duty that a Court may compel under § 706(1). *See SUWA*, 542 U.S. at 71 ("an action called for in a [land use] plan may be compelled . . . when language in the plan itself creates a commitment binding on the agency"). *Firebaugh Canal Co. v. United States* reflects this principle. 203 F.3d 568 (9th Cir. 2000). In that case, the Ninth Circuit held that statutory language requiring an agency to provide "necessary . . . drains" as part of a federal reclamation project created a binding duty requiring the agency to "act promptly to provide drainage service" for the project. *Id*. at 573–74, 578. But subsequent legislation opened alternative ways for providing drainage, modifying the prior statutory duty, and thus the agency had discretion as to how to provide drainage. *Id*. at 577.

In this case, the Bureau's land use plan specifies "necessary" fencing to complete the Key RNA closures within five years in the locations determined during the land use planning process. Unlike *Firebaugh*, there is no language in the land use plan, nor any subsequent legislation, that leaves the Bureau discretion to alter these specific commitments—unless it again amends its land use plans. FLPMA commands that the agency "shall manage the public lands . . . in accordance with" land use plan requirements—also cabining the agency's discretion. 43 U.S.C. § 1732(a).

Mackenzie is also wrong about the import of *Vietnam Veterans of America v. CIA*, 811 F.3d 1068 (9th Cir. 2016). Mackenzie Br. at 17–18. The express commitment in the Army's regulations was a "[d]uty to warn" volunteers about the risks of participating in research. *Vietnam Veterans*, 811 F.3d at 1076. But that provision did not detail how to identify subjects who participated in past experiments or exactly what the notices had to say. *Id*. The Ninth Circuit held that the Army had an ongoing duty to warn and had "refused to perform that duty"—but

after compelling the duty according to the language of the regulation, that court recognized that identifying whom to notify and the contents of the notices "necessarily entail some discretionary judgment." *Id*. at 1079. In this case, the language of the Bureau's land use plan includes specific commitments as to where, how, and when the Key RNA closures are to be carried out, as well as a site-specific analysis of the effects of the closures and the necessary new fencing—leaving the Bureau only limited discretion as to "the manner in which the duty may be carried out." *Id*.

### B. Mackenzie is Wrong That There are "Valid Existing Rights" yet to be Resolved Because There is no "Right" to Graze Livestock on the Public Lands.

Mackenzie mistakenly asserts that the Bureau still needs to make determinations regarding "rights under existing grazing permits." Mackenzie Br. at 7, 17. This is false. There is no such thing as a grazing "right." The Taylor Grazing Act of 1934, which governs grazing on federal public lands, states that a permit to graze livestock on public lands "shall not create any right, title, interest, or estate in or to the lands." 43 U.S.C. § 315b. A federally-issued grazing permit gives the holder only a revocable license to graze livestock on the public lands. The Bureau always retains the "power to modify, fail to renew, or cancel a permit or lease for various reasons." *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 735 (2000) (noting the "leasehold nature of grazing privileges" and that "the grant of grazing privileges [is] discretionary").

While the government may have allowed ranchers an "implied license" to graze on public lands a century and a half ago, it was never intended to "confer any vested right . . . nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes." *Light v. United States*, 220 U.S. 523, 535 (1911); *Buford v. Houtz*, 133 U.S. 320, 326 (1890). The Supreme Court held unambiguously that "Congress has not conferred upon citizens the right to graze stock upon the public lands. The government has merely suffered the lands to be so used." *Omaechevarria v. Idaho*, 246 U.S. 343, 352 (1918).

The Ninth Circuit has articulated that "it has always been the intention and policy of the government to regard the use of its public lands for stock grazing . . . as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation." *Osborne v. United States*, 145 F.2d 892, 896 (9th Cir. 1944). A permittee does not even have an expectation that its grazing privileges will remain the same from year to year: as the Ninth Circuit has also recognized, a permit "does not authorize the permit holder to graze continuously for the permit's ten-year duration" because agencies retain the power to modify or cancel them as needed. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 989 (9th Cir. 2006).

Mackenzie correctly states that "[t]he 2015 ARMPA characterized Objective LG 2 ["In key RNAs, 22,765 acres will be unavailable to livestock grazing"] and MD LG 1 ["All or portions of key RNAs will be unavailable to grazing"] as "decisions meant to take effect once the ROD issued." Mackenzie Br. at 11. The ROD explains that "[w]hat lands are available for livestock grazing" is a "land use allocation" that was effective starting September 21, 2015 when the ROD was signed. ORS_010629–30 (2015 ROD at 2-1 to 2-2). The ROD and ARMPA thus made the closed Key RNAs unavailable for grazing *as of September 2015*. At that point, the privilege to graze the public lands within the closed RNAs was effectively extinguished.

The Mackenzie intervenors did not object to that decision or challenge it, and cannot now do so. But, although the Taylor Grazing Act disclaims that permits confer any "right," it does provide that recognized grazing privileges "shall be adequately safeguarded." 43 U.S.C. § 315b. FLPMA and the Bureau's grazing regulations therefore require two years' notice before a permit can be cancelled, except in emergencies. 43 U.S.C. § 1752(g); 43 C.F.R. § 4110.4-2(b). The livestock operators who use the lands where the closed Key RNAs lie have been on notice that those lands are unavailable for grazing for seven years. More than 30 months ago they received

additional letters reiterating this legal fact. Because there is no "right" to graze on the federal

public lands, because the Bureau can revoke grazing privileges at will and without

compensation, and because the Bureau's 2015 decision made the RNAs unavailable for grazing

when the ROD was signed on September 21, 2015, there are no "rights" related to the permits to

be resolved—and there never were. The affected operators have received all the procedural

safeguards due, allowing more than ample time to adjust their operations to conform to the fact

that, seven years ago, small portions of the lands they grazed became unavailable for grazing.

### C.  The *TRAC* Factors Also Favor Summary Judgment in Favor of ONDA.

Mackenzie makes no argument with respect to any of the *TRAC* factors except the third,

and so has waived any argument on the other factors in its reply. As to the third factor—"delays

. . . are less tolerable when human health and welfare are at stake"—Mackenzie tries to relitigate

the Bureau's 2015 findings in its careful environmental analysis that the small AUM reductions

across thirteen Key RNAs would result at most in an output reduction of $200,000 (borne by 28

permittees). ORS_07591 (2015 FEIS at 4-331). Implementing the Key RNA closures—termed

"special designations," ORS_06876 (2015 FEIS at 2-18)—would have "negligible or no impact

on livestock grazing and range management" and "negligible or no impact on socioeconomics

and environmental justice" in eastern Oregon. ORS_07445, _07586 (2015 FEIS at 4-185, 4-326).

The Bureau also found that these modest changes to grazing on two-tenths of a percent of

sagebrush lands in eastern Oregon would have no noticeable effect on the risk of wildfire.

ORS_07592 (2015 FEIS at 4-332) ("No noticeable effect of reductions in permitted AUMs on

the likelihood of postfire outcomes would be expected under . . . the Proposed Plan.").[3]

---

[3] This is consistent with the reduction of just 1,772 AUMs being spread over thirteen allotments, and with the chance that grazing can result in an "*increased* risk of wildfire" as well as allegedly mitigating that risk. *W. Watersheds Proj. v. Bernhardt*, 428 F. Supp. 3d 327, 353 (D. Or. 2019).

Because the Mackenzie intervenors did not contest them, the Bureau's findings in the 2015 FEIS with respect to the need for ungrazed reference areas to conduct scientific research, the lack of risk from wildfire from the Key RNA closures, and the benefit to the conservation of sage-grouse to be gleaned from the essential ungrazed reference sites are conclusive on these parties. *See* Mackenzie Br. at 10 ("The determination of whether an agency's decision regarding such an action can be compelled . . . depends on the reasoning found in that decision and the administrative record."). Findings at the preliminary injunction stage are not binding on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("findings of fact and conclusions of law made by a court [ruling on an emergency motion] are not binding at trial on the merits").

Mackenzie cites no case where alleged *positive* (or at least desirable-to-some-parties) outcomes from unlawful delay have been factored into a *TRAC* analysis. This is because the third factor focuses on the harmful effects to human health and welfare of delaying a required action. The one case Mackenzie cites that considered the fourth factor in an environmental context held that the delay did not involve human health and welfare, where the action delayed was a long-term recovery plan for a sensitive plant—but that court did order a firm deadline for the required recovery plan, a date the agency itself had identified as the deadline for completing the plan. *Ctr. for Biol. Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1154–55 (N.D. Cal. 2014).

This case, however, is more like this Court's decision in *National Wildlife Federation v. Cosgriffe*, 21 F. Supp. 2d 1211 (D. Or. 1998). At issue was the failure to prepare management plans for two Wild and Scenic Rivers. *Id.* at 1217–18. The Court noted that "the consequences of the BLM's failure fall neither into the economic realm nor specifically into the realm of human health and welfare." *Id.* at 1219. But the Court found that, related to this factor, "the public has a significant interest in the preparation of a comprehensive management plan" because of the

statute's purpose to "ensure the public that the BLM is properly managing the river to enhance such important values as wildlife, scenery, cultural resources, and recreational opportunities." *Id.*

In this case, Congress, through FLMPA and the Endangered Species Act ("ESA"), has declared the conservation of sage-grouse and prevention of its extinction to be of paramount public importance. *See W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1325 (D. Idaho 2019) (explaining that "[the Fish and Wildlife Service]'s determination [in 2010 that sage-grouse were 'warranted' for listing under the ESA] prompted the BLM and Forest Service, along with several States, to consider protections for the sage grouse to avoid a future ESA listing"). The 2015 ARMPA was designed to avoid listing the sage-grouse as threatened or endangered—a benefit not only to the public's interest in the survival of this iconic bird (and hundreds of other species in the sagebrush biome), but also, paradoxically, to the welfare of cattle ranches that would face far heavier regulatory burdens if the bird were listed and critical habitat designated. The Bureau's unlawful withholding of the Key RNA closures, as specified in the 2015 ARMPA, prevents the collection of unique and currently unavailable data that, according to the Bureau, will foster scientific management of grazed lands and promote the public's interest in seeing the sage-grouse survive. Under *Cosgriffe*, this factor tips in ONDA's favor. 21 F. Supp. 2d at 1219.

### D. The Bureau Determined in 2015 That Socioeconomic and Other Practical Effects of the Key RNA Closures Would be Negligible or Non-Existent, and the Mackenzie Intervenors Overstate the Economic Effects of the Closures.

Mackenzie offers a broad discussion of alleged harms that livestock operators making up this intervenor group would suffer from the Key RNA closures, as well as the alleged benefits of grazing. Mackenzie Br. at 2–6. The fundamental problem with its discussion—besides exaggerating the impacts of the tiny reductions in acreage and AUMs the permittees face from the closures—is that none of these permittees made these arguments to the Bureau when they

had the opportunity to protest the agency's 2015 decision to close and fence the Key RNAs and make a total of 5,259 acres on the five allotments these permittees use unavailable for grazing.[4] Except for Laird Land Company LLC ("Laird"), none of the Mackenzie intervenors lodged a protest, and none filed a challenge to the 2015 decision before the statute of limitations ran last year. The Bureau reasonably determined that making a total of 22,765 acres on thirteen Key RNAs unavailable for livestock grazing was necessary to help ensure that the sage-grouse is not listed as threatened or endangered. The Mackenzie intervenors are attempting a collateral attack on the wisdom of the Bureau's 2015 decision, which they lack standing to make.

### 1.  *The Bureau's detailed analysis in the 2015 FEIS determined that there would be negligible effects from the RNA closures.*

Following a planning process that began in 2011, the Bureau in 2015 placed livestock operators affected by the Key RNA closures on notice that they would need to adjust to those small areas being unavailable for grazing, and they have had seven years to prepare for the end of grazing in the closed RNAs. ORS_06839 (2015 FEIS at 1-18) (planning process overview); ORS_07032, _07441 (2015 FEIS at 2-174, 4-181) (likely need to locate alternative forage, increase in costs, and change to livestock rotations); ORS_06497 (2015 ARMPA at 2-18) (table identifying closed acreages). The economic harm claimed is exaggerated, and none of these intervenors raised these issues in 2015 in a protest during the administrative process that led to the "immediate decision" to make the Key RNAs unavailable for grazing. The Bureau's most recent calculation is that the closures would result in a reduction of just 1,772 AUMs, about 25% less than the 2,388 AUM reduction estimated in 2015. OR_094781 (2018 FEIS at 3-21); *see* ORS_06497 (2015 ARMPA at 2-18) (listing AUM reductions). The Bureau had determined in

---

[4] The Spring Mountain, Mahogany Ridge, South Bull Canyon, Foley Lake, and Toppin Creek Butte Key RNAs are located on allotments grazed by the Mackenzie intervenors. ORS_0475, _0483, _0487, _0495, _0503, _0526, _0534 (January 21, 2020 letters to livestock operators).

2015 that even the higher 2,388 AUM figure would have "negligible or no impact" on "grazing" or "socioeconomics." ORS_07445, _07586 (2015 FEIS at 4-185, 4-326).

Mackenzie paints a picture of economic and societal devastation that would follow in the wake of these essential research closures. Mackenzie Br. at 3–4. But none of the Mackenzie permittees raised any of these concerns in any protest to the Bureau before the agency decided in 2015 to close the Key RNAs, nor do they point to any documentary evidence supporting their assertions, so the dire statements ring hollow in 2022. But they also dramatically overstate the significance of the reductions, and of grazing to the eastern Oregon economy.

As of 2010, the Farm sector, of which livestock grazing is a subset, accounted for only 1.8% of the combined labor and non-labor income in the seven-county area in eastern Oregon for which the 2015 FEIS evaluated socioeconomic impacts.[5] ORS_07225–26 (2015 FEIS at 3-174 to 3-175). Grazing itself accounts for 53.3% of the Farm sector earnings. ORS_07233 (2015 FEIS at 3-182). Even in vast Lake, Malheur, and Harney counties, grazing accounts for just 4.9%, 3.8%, and 3.2%, respectively, of all earnings. *Id.*[6]

And the 2,388 AUMs unavailable for grazing in the 2015 Key RNA closures represent only about two-tenths of one percent (0.24%) of the 998,919 active AUMs in eastern Oregon. ORS_06903, _07234 (2015 FEIS at 2-45, 3-183). Under the Bureau's updated 2018 estimate of only a 1,772 AUM reduction, this percentage shrinks to 0.18%. OR_094781 (2018 FEIS at 3-21). Even using the higher figure, a very rough calculation shows that the tiny reduction in permitted AUMs would decrease income from livestock grazing, as a portion of the regional

---

[5] Farm income in the study area in 2010 was $69.9 million; total labor earnings $1,997.2 million; non-labor income, including dividends, retirement and disability benefits, and contributions to government social insurance, $1,698.9 million. ORS_07225–26 (2015 FEIS at 3-174 to 3-175).

[6] These are obtained by multiplying the farm earnings as a share of all earnings for each county by the share of farm cash receipts attributable to livestock. ORS_07233 (2015 FEIS at 3-182).

economy, by a total of only about $89,416—a far cry from the upheaval Mackenzie alleges.[7]

      This is consistent with the Bureau's own analysis of the impact of the Proposed Plan in the 2015 FEIS: it estimated that the Key RNA closures would result in a range of direct and indirect economic effects, from no effect at all up to a high estimate of $100,000 in lost labor earnings and $200,000 in annual output—across all 28 permittees affected by the closures—still probably higher than the actual likely effects because the Bureau later calculated that only 1,772 AUM will actually be reduced. ORS_07591 (2015 FEIS at 4-331); ORS_0567–68 (list of affected permittees). The Bureau factored these adjustments to grazing into its analysis, noting that "more complex pasture rotations" and "changes in livestock rotation or season of grazing," could increase costs for permittees. ORS__07445, 07591 (2015 FEIS at 4-191, 4-331).

      These findings by the Bureau—not protested by any of the Mackenzie intervenors before the Bureau decided to close the thirteen Key RNAs—bely their undocumented assertions of dire consequences. *See* OR_098780–02 (Laird protest not mentioning any economic impacts). The negligible effect of the RNA closures is underscored by the fact that, after the 22,765 acres in the RNAs are closed to grazing, 12,083,622 acres of Bureau-administered lands in eastern Oregon will remain available for livestock grazing—including many other allotments grazed by intervenors. ORS_06497 (2015 ARMPA at 2-18); *see, e.g.*, ORS_09332 (V Box Land permitted 15,730 AUMs on five allotments), _03788 (Laird permitted 5,394 AUMs on four allotments), _08893 (Cahill permitted 4,631 AUMs on six allotments), _08856 (Tree Top permitted 13,888 AUMs on three allotments). The Bureau's decision to close the Key RNAs made less than 0.2% of the public lands it administers in eastern Oregon unavailable for livestock grazing.

---

[7] This figure multiplies the previously-cited figures for Farm sector income in 2010 in the seven-county area ($69.9 million) by 0.533 (the percentage of Farm earnings attributable to livestock) and then by 0.0024 (the percentage of active AUMs being reduced by the Key RNA closures).

In 2015, the Bureau recognized the need to make a paradigm shift in managing public lands in Oregon to protect sage-grouse and to avoid listing the bird as an endangered species—a result that would have far more extensive consequences for livestock operations throughout eastern Oregon. The Bureau carefully evaluated the socioeconomic impacts from closing 22,765 acres of public land on thirteen Key RNAs to livestock grazing and concluded that the economic impacts would be negligible. Ultimately, the Mackenzie intervenors' economic arguments are unavailing because the Bureau already made a decision, effective upon the signing of the 2015 ROD, making the Key RNAs unavailable for grazing—and none of these intervenors challenged that land use allocation. Their arguments try to relitigate a decision made seven years ago.

### 2. *The livestock operators have been on notice for years that their operations would have to adjust to the closures.*

Mackenzie alleges that compelling the ARMPA-mandated Key RNA closures would be "abrupt." Mackenzie Br. at 4. But the Key RNA closures are anything *but* abrupt. The affected operators have been on notice since September 2015 that the RNAs had been made "unavailable for grazing." The 2015 ARMPA included an "immediate decision," made effective the day the ROD was approved on September 21, 2015, to make identified acreages in the Key RNAs unavailable for grazing. ORS_06497 (2015 ARMPA at 2-18); ORS_010630 (2015 ROD at 2-2) ("lands available for livestock grazing" is a "land use allocation" effective when ROD issued).

The Bureau explained to affected operators, in the 2015 FEIS, that, as a result of the negligible AUM reductions due to the Key RNA closures, operators "would need to locate alternative forage sources and may face financial impacts." ORS_07032 (2015 FEIS at 2-174). The Bureau cautioned that, under the Proposed Plan that the 2015 ARMPA adopted, "management actions to enhance habitat for [sage-grouse] could affect livestock grazing management . . . by . . . closing some areas to grazing, or changing livestock rotation patterns,"

and "operators could face costs or loss of farm efficiency associated with . . . changes in livestock rotation or season of grazing." ORS_07441, _07591 (2015 FEIS at 4-181, 4-331).

On January 21, 2020, the Bureau sent boilerplate letters to the permittees affected by the 2015 Key RNA closure decision, attaching the maps once again showing the precise areas that the 2015 decision had made unavailable for grazing. ORS_0465–565. Each letter cited the 2015 decision to make the Key RNAs unavailable for grazing, and advised each permittee that, "at the conclusion of the two-year notification period"—which ended on January 21, 2022—the agency would be "issu[ing] a grazing decision specifying the area that is no longer available to grazing." *See, e.g.*, ORS_0504. The Bureau explained that the intent of each letter was "to provide the grazing permittee time to make any necessary financial, business, or management adjustments" to account for the partial reduction in permitted AUMs. *See, e.g.*, ORS_0503. The permittees have had seven years now—including more than 30 months since the January 2020 letters—to make any needed adjustments to their operations, so there would be nothing "abrupt" about the Court enforcing the binding commitments in the Bureau's 2015 decision.

### 3.    The effects of the Key RNA closures on individual operators are exaggerated.

The Mackenzie intervenors also exaggerate the likely effects of the Key RNA closures on individual livestock operators. The Bureau estimates the average market price for private grazing land leasing in Oregon to be $18.00 per AUM, yet charges public lands grazing privilege holders only $1.35 per AUM. Salvo Decl. ¶ 42 n.5 (ECF 61). These operators receive a 92.5% federal subsidy over the market price of forage. What they ultimately are complaining about is having to pay market prices for a small portion of one of their business inputs.

The total cost of replacing all 1,722 reduced AUMs at market rates is thus about $28,671.30, spread among 28 livestock operations. But even that overstates the number of

AUMs that actually would need to be replaced. For example, Laird claims that it would need to pay $65,000 for two months of hay as a result of the RNA closure.[8] Mackenzie Br. at 3. But the Bureau's January 21, 2020 letter to Laird advised that 497 acres of the Juniper Mountain Allotment is unavailable for grazing as a result of the 2015 closure decision, and that "[t]he enclosure fence estimated to exclude this acreage would remove 20 AUMs from the allotment"—out of 4,417 AUMs permitted. ORS_0503. But the Bureau also advised that the 20 AUMs could be found elsewhere on the large allotment and, therefore, "no adjustment in your active use (AUMs) would be needed." *Id*. There is no hardship to Laird from the RNA closure.

Laird also complains about the loss of "the opportunity to incorporate the pastures its permit allows under its rotational grazing plan." Mackenzie Br. at 3. But the Bureau repeatedly advised permittees in the 2015 FEIS that the Key RNA closures could require changes to grazing rotations. *See, e.g.*, ORS_07591 (2015 FEIS at 4-331). There is nothing sacrosanct about rotational grazing plans, and—for Laird—no "rotational grazing plan" exists in practice. In its application for grazing in 2020, the permit terms are crossed out and new provisions written in, with different grazing periods and different cattle numbers than in the permit—which the Bureau approved. ORS_02509–2514. This document specified that "the dates applied for will remain flexible but will be adjusted in coordination with the BLM range specialist." ORS_02509.

In 2020, Laird's actual use was 3,522 of the 5,374 AUMs it holds permits to graze across four allotments. ORS_02509, _02513–14. In 2021, Laird decided not to use 3,343 of permitted AUMs on Juniper Mountain Allotment due to drought conditions, and grazed only 1,216 AUMs

---

[8] It is unclear whether Laird is referring to the RNA closure or a temporary prohibition on grazing the Flint Hills Pasture to protect the RNA until the closure fence is completed. In 2020, the last year Flint Hills Pasture was grazed, Laird grazed 943 AUMs on that pasture—a small fraction of the 3,343 AUMs it was able to successfully replace forage for in 2021—without going out of business. ORS_02513 (2020 actual use report); ORS_01633 (2021 actual use report showing 3,343 AUMs of "non-use"). It presumably could replace those AUMs again.

on public lands. ORS_01633, _01636. No "rotational" system was apparent—in fact, five of the

six pastures on the Juniper Mountain Allotment (where the Foley Lake Key RNA is located)

were not grazed in 2021. ORS_1633. Laird's operation survived, without four-fifths of its public

land AUMs, but any pretense to having some set-in-stone grazing rotation vanished last year.

These facts not only illustrate that changes to grazing plans are commonplace, but that

livestock operations that benefit from heavily-subsidized grazing on public lands routinely

absorb periods when they are unable to access the public lands. At least some of these periods

are still further offset by federal farm subsidies: Laird Ranch, for example, received $503,085 in

federal farm subsidies between 2015 and 2020.[9] As this Court observed regarding another

heavily-subsidized livestock operation in eastern Oregon, "significant government subsidies" can

"more than offset the cost of private grazing," and "many cattle grazing operations manage

without the privilege of public grazing." *W. Watersheds*, 428 F. Supp. 3d at 353.

Similarly, the Bureau in its January 2020 letter to Mackenzie Ranch estimated that

closure of the 682-acre Mahogany Ridge RNA, on an allotment Mackenzie Ranch is permitted to

graze along with one other permittee, would result in a mere 22 AUM reduction—only 11 for

Mackenzie Ranch. ORS_0483.[10] The letter advised Mackenzie Ranch, like the other permittees,

"to make any necessary financial, business, or management adjustments." *Id*. It has had years

now to figure out how to adjust its operations to account for changes that would reduce its public

lands grazing privileges by the equivalent of eleven cows grazing for one month.

---

[9] Environmental Working Group, USDA SUBSIDY INFORMATION FOR LAIRD RANCH LLC, https://farm.ewg.org/persondetail.php?custnumber=A12242562 (last visited Aug. 5, 2022).

[10] Four of the other intervenors will have similarly small numbers of AUMs reduced by the Key RNA closures. Burgess, Cow Creek, and Mark Mackenzie, who graze in common with one other permittee on the Spring Mountain Allotment, would each see a 35 AUM reduction. ORS_0475, _0487, _0526. V Box Land would see an 89 AUM reduction. ORS_0495.

Mackenzie Ranch claims, however, that the closure would force it to sell 200 cattle—half its herd. Mackenzie Br. at 3. Presumably it refers to the requested relief putting the East Mahogany Mountain Pasture, where the RNA is situated, off-limits to grazing if this Court holds that the Bureau has unlawfully withheld the closures required by the 2015 ARMPA, and the agency cannot build the 1.0 mile of fence it determined is needed to physically close the RNA to cattle before the 2023 grazing period begins. *See* ONDA Motion for PI/TRO (ECF 57) at *xi* (table showing Bureau-calculated miles of fence needed to close each Key RNA). But the claim that half its herd would need to be sold is not believable. Even when it grazed 2,372 AUMs in 2021, ORS_01376, compared to 2,662 AUMs in 2020, ORS_02216, the record shows that Mackenzie Ranch grazed the same number of animals (400) each of those years—evidently locating alternative sources of forage on other public lands allotments (or privately) to make up for the fewer AUMs used on the Mahogany Mountain Allotment in 2021. Like Laird, Mackenzie Ranch has reaped significant federal farm subsidies, totaling $204,928 between 2016 and 2020.[11] Such subsidies would likely be available if it were foreclosed from grazing that pasture in 2023.

Better yet, if the Court were to rule that the Bureau has unlawfully withheld the 2015 decision to close the Key RNAs, there would be ample time before the East Mahogany Mountain Pasture would be grazed beginning late next summer for the Bureau to construct the one mile of fence required by the 2015 ARMPA to physically make the Mahogany Ridge Key RNA into an ungrazed reference site—or at least to erect temporary fencing until permanent fencing can be installed. Or, as a last resort, exclude any grazing from East Mahogany Mountain Pasture until the fencing is complete. The map attached to the January 2020 letter to Mackenzie Ranch, shown on the next page, demarcates where the one mile of fence needs to be built, right along a road.

---

[11] Environmental Working Group, USDA Subsidy Information for Mackenzie Ranch LLC, https://farm.ewg.org/persondetail.php?custnumber=A12616285 (last visited Aug. 6, 2022).



ORS_0486.

Rocking Club claims that it will lose $285,600 if it loses "the [2,856] AUMs [its] permit allows" on the Anderson Allotment. Mackenzie Br. at 3. More hyperbole: the Bureau in 2018 calculated that the closure of the Toppin Creek Butte Key RNA will reduce AUMs by only 216 once that RNA is fenced. OR_094758 (2018 ARMPA at 2-8). Rocking Club only grazed 1,395 AUMs on the Anderson Allotment in 2020—nearly 1,500 AUMs fewer than its permit allows—and only planned to graze 1,901 AUMs on the allotment in 2022. ORS_02214, _01039. Even so, Rocking Club ran 367 cattle on the Anderson Allotment in 2020, but then 517 in 2021, and planned to run 521 in 2022. ORS_02213, _01160, _01035. So: *not* grazing nearly 1,500 permitted AUMs in 2020 nevertheless resulted in a *larger* herd in the following year. Rocking Club's claim that the "loss" of its full 2,856 AUMs would cost $100 per AUM to replace the forage beggars belief—and, in any event, it will only be replacing 216 AUMs after the closure.

Ultimately, the livestock operators' dire predictions and alleged unremitting commitment

to strict rotational grazing plans bear no resemblance to the undisputed evidence in the record that they repeatedly have adjusted grazing schedules and pasture rotations and actually used far fewer AUMs than their permits authorize. The Key RNA closures do not deprive them of anything they are entitled to: the Bureau advised them in 2015, and again in 2020, that their operations would need to change. They have had seven years to adjust—and, as the record shows, they are almost constantly adjusting grazing rotations and not using their full permitted AUMs on public lands. They simply no longer have the privilege of using a very small amount of public lands forage at a subsidized rate more than 90% below market price. Since only a small fraction of their costs will increase, the claims that this will drive them to sell their herds or go out of business are literally unbelievable. And none of these claims pertain to the central issue whether the Bureau has unlawfully withheld a discrete action it is required to take.

### E. If the Court Rules that the Bureau has Unlawfully Withheld or Unreasonably Delayed the Key RNA Closures, the Onus Will be on the Bureau to Complete the Fencing or Otherwise Ensure the RNAs are Not Grazed in 2023.

In the event the Court rules in ONDA's favor, as discussed above at page 22, the onus should be on the Bureau, which has unlawfully delayed a discrete action its land use plans require it to take, to come up with solutions that either guarantee the Key RNAs are fenced before the 2023 grazing periods begins or otherwise make those areas unavailable for grazing next year—if necessary, by putting the pastures that include the Key RNAs off-limits to grazing until the necessary fences can be built. If the Bureau cannot come up with a solution, the Court should order those pastures closed to grazing until the Bureau completes the Key RNA closures.

## II. CAHILL MAKES NO DIFFERENT MERITS ARGUMENTS BUT MISSTATES SEVERAL FACTS RELATED TO THE CLOSURES.

Cahill makes no merit arguments not already addressed above. Cahill Br. at 3–6. But it offers several factual misstatements and omits other facts relevant to the equities. The area that

the 2015 Key RNA closure made unavailable to grazing on the Rahilly-Gravelly Allotment is
8,282 acres—roughly one-quarter of that allotment's total 32,285 acres of federal public land—
which the Bureau most recently has estimated will reduce permitted AUMs by 586. OR_094758
(2018 ARMPA at 2-8); ORS_09096 (allotment assessment). Cahill holds Bureau-issued permits
to graze a total of 4,631 AUMs on six different public land allotments. ORS_08893 (Cahill
grazing permit). Like all of the permittees, Cahill has been on notice for seven years that the
RNA closures would result in "changes in livestock rotation" to which its operations would have
to adapt. ORS__07591 (2015 FEIS at 4-331); OR_099031 (2015 statement by the Bureau that
Cahill had "received proper notice of the changes to the RNA's AUM allocation"). Indeed, when
it renewed Cahill's grazing permit in 2014, the Bureau expressly advised Cahill of the agency's
right to "[a]djust allotment management including levels and areas of authorized use, seasons of
use, and grazing systems" to protect the Rahilly-Gravelly RNA. ORS_08906.

   Like all of the permittees, Cahill has no right to graze its cattle on public lands, and its
privilege is mutable even when it grazes: nothing about pasture rotations is sacrosanct. Its recent
grazing bears this out. In 2022, although the grazing rotation approved in 2014 authorized no
turnout on Sucker Creek Pasture before May 16, Cahill turned its cows out there on April 1st.
ORS_08932; Cahill TRO Resp. at 5 n.1 (ECF 72). In 2021, Cahill grazed only 2,297 of its 4,631
permitted AUMs, taking 861 AUMs of non-use on the Rahilly-Gravelly Allotment—more than
the 586 AUMs that the Key RNA closure reduces—yet its operation survived. ORS_01449–50.
In 2020, it grazed only 2,833 of its permitted AUMs. ORS_02232. In 2019, it grazed only 2,133;
in 2018, only 2,897; in 2017, only 2,459; in 2016, only 1,884. ORS_02833, _04204, _05651,
_06394. For half a decade, Cahill *consistently grazed only about half of its permitted AUMs*.

   And Cahill routinely grazed at different times than authorized in the grazing rotation the

Bureau approved in 2014. In 2016, for example, it grazed cattle on the Sucker Creek Pasture from March 23 until July 10, for a total of 839 AUMs, when the Bureau-approved schedule called for grazing only between May 16 and July 17. *Compare* ORS_06391 (2016 actual use report) *with* ORS_08932 (approved grazing schedule in 2014 Environmental Assessment). In 2020 and 2021, on the Hill Camp Allotment, Cahill applied for, and was approved for, grazing the North East, West, and Basin Pastures in both years—despite a supposedly iron-clad rest-rotation schedule that allows no two consecutive years in which all three pastures are grazed. ORS_02234 (2020 grazing application); _01451 (2021 grazing application); *see* ORS_08933 (approved grazing schedule for Hill Camp Allotment in 2014 Environmental Assessment).

In 2022, Cahill applied for, and was approved for, grazing the Rahilly-Gravelly Allotment's Sucker Creek, Rahilly, *and* Horse Creek Pastures—despite a putative rest-rotation system where the latter two pastures are "always" rested in years Sucker Creek Pasture is grazed. ORS_01363 (application to graze 250 cows on Sucker Creek Pasture from April 1–July 15, on Rahilly Pasture from July 16–August 30, and on Horse Creek Pasture from September 1–16, for a total of 1,306 AUMs); *see* ORS_08932. This belies any notion that its operations conform to a consistent—much less immutable—grazing rotation, and belies the claim that its operations could not absorb a reduction of 586 permitted AUMs due to the closure of the Rahilly-Gravelly Key RNA. And Cahill has received $515,799 in federal government farm subsidies to sustain its operations between 2015 and 2020, which likely would continue to be available to it.[12]

The Bureau conclusively determined in 2015 that closing the Rahilly-Gravelly Key RNA for scientific research will result in an overall net benefit to sage-grouse, despite necessary adjustments to Cahill's private livestock operations, and despite any additional cost for other

---

[12] Environmental Working Group, USDA SUBSIDY INFORMATION FOR CAHILL RANCHES INC, https://farm.ewg.org/persondetail.php?custnumber=A09419901 (last visited Aug. 5, 2022).

forage—assuming it could not simply adjust its grazing, as the Bureau warned it would have to, and move the 586 AUMs elsewhere among the six public land allotments for which it holds a permit. *See, e.g.*, ORS_06570 (2015 ARMPA at B-2) (discussing conservation benefit to sage-grouse from habitat-protective fencing); ORS_06904, _08407 (2015 FEIS at 2-46, V-32) (fencing RNAs is "necessary" to provide ungrazed reference sites). The Bureau, in 2015, decided the specific means and five-year deadline by which the physical closures of the Key RNA were to be carried out. The Court would in no way be "engag[ing] in land-use planning on behalf of the agency" if it compels the Bureau to follow the law and comply with the binding commitments the agency already made in its 2015 land use plan amendments. Cahill Br. at 9.

### III.    TREE TOP IS WRONG ON CONTROLLING LAW AND JURISDICTION.

Finally, Tree Top makes three erroneous and meritless arguments that do not mirror those of any other defendant or intervenor. It argues that ONDA and the federal defendants are barred from any arguments based on the 2015 ARMPA because of supposed "judicial admissions," notwithstanding the injunction by the U.S. District Court for the District of Idaho ordering that the 2015 ARMPA remains in effect. It argues that ONDA ignores an "elephant in the room"— the 2020 Final Supplemental EIS ("2020 FSEIS") and 2020 Record of Decision ("2020 ROD")—but the 2020 ROD plainly declares that it "is not a new planning decision," and thus cannot be a new and different plan amendment.[13] And it uses the words "not ripe" when it means "moot" in arguing that the Bureau's purported plan to implement the 2015 ARMPA's Key RNA closure over the next several years deprives this Court of jurisdiction. ONDA's claim that the agency failed to act and has unlawfully withheld the closures required by the 2015 ARMPA is ripe, and it is not moot because the Court can grant effective relief.

---

[13] The "2020 ROD" is labeled "January 2021" on its cover, ORS_011529, but was signed and approved on December 30, 2020. ORS_011540.

**A.  Factual Background Regarding Tree Top.**

Like the Mackenzie intervenors, Tree Top did not file suit challenging the Key RNAs

closure decision in the 2015 plan within the six-year statute of limitations for such challenges.

Tree Top also did not protest the Bureau's decision to fence off and close the Dry Creek Bench

Key RNA in 2015. *See* OR_98960–61 (protesting party index). It therefore has waived any

challenge to the validity of the Bureau's decision to close that RNA.

Tree Top avers that it holds permits authorizing a total of 13,888 AUMs of cattle grazing

on three public lands allotments. Tree Top Br. at 3. The largest of these permits, authorizing

10,366 AUMs, is for grazing on the 15-Mile Community Allotment, which Tree Top is allowed

to graze in common with six other permittees. *Id.*; ORS_0491 (2020 letter to Tree Top). The 15-

Mile Community Allotment spans 337,227 acres. Tree Top Br. at 4. It includes the Green Ponds

Pasture, within which lies the 1,637-acre Dry Creek Bench Key RNA, of which 622 acres were

closed for scientific research by the 2015 ARMPA. ORS_06497 (2015 ARMPA at 2-18).

On January 21, 2020, the Bureau sent a letter to Tree Top's owner, Larry Williams, in

Boise, Idaho, providing notice that the Dry Creek Bench Key RNA was unavailable for grazing

based on the September 21, 2015 ROD for the 2015 ARMPA, and that "at the conclusion of the

two-year notification period"—now many months past—the agency would be "issu[ing] a

grazing decision specifying the area that is no longer available to grazing." ORS_0492.[14]

The Bureau's letter advised Tree Top that 622 acres of the 337,227-acre 15-Mile

Community Allotment were closed to livestock grazing by the 2015 ARMPA, a reduction of

---

[14] Mr. Williams founded the Idaho Timber Corporation, and he and his wife have over
$15,800,000 in career earnings racing horses that are raised on Tree Top Ranches along with
cattle. https://www.americasbestracing.net/owners/williams-mr-and-mrs-larry-d (last visited
Aug. 4, 2022). In 2012, the Williamses pledged $5 million of their wealth to the expansion of the
Boise State University football stadium. https://www.businessinsider.com/horses-and-owners-
kentucky-derby-2012-5#larry-and-marianne-williams-14 (last visited Aug. 4, 2022).

0.0018% in the acreage of that allotment available to grazing. *See* ORS_0491. This reduced

acreage will result in an allotment-wide reduction of 101 AUMs, which Tree Top will split with

the single other permittee using Green Ponds Pasture—making Tree Top's reduction just over 50

AUMs, or 0.0048% of its permitted AUMs on the 15-Mile Community Allotment, or 0.0036% of

its total permitted AUMs in all of its public lands grazing permits. After ignoring the Bureau's

closure decision for seven years, and in light of the vanishingly small reductions in its public

lands grazing privileges from the closure of the Dry Creek Bench Key RNA and the vast wealth

of Tree Top's Idaho-based owner, Tree Top has no equitable grounds for objecting to an order

by this Court compelling the Bureau to carry out its 2015 closure decision and physically close a

small portion of the Dry Creek Bench Key RNA to grazing.

## B. ONDA's Complaint Alleges Claims Based on Both the 2015 ARMPA and the 2019 ARMPA.

Tree Top is wrong that pleadings in one case can override a judicial order in another, but

more fundamentally is wrong about what the pleadings here mean. ONDA's Second Amended

Complaint (ECF 33) makes a series of factual allegations about the 2015 ARMPA and the 2019

ARMPA, but nowhere does it allege that the 2019 ARMPA is "controlling." *E.g.* 2d Am. Compl.

¶ 2 (referring to both the 2015 ARMPA and the 2019 ARMPA), ¶ 28 (alleging that the 2015

ARMPA "closed 13 'key' RNAs to livestock grazing"), ¶ 48 (alleging that "[t]he 2019 ARMPA

reverses the 2015 ARMPA decision to close to livestock grazing, for scientific research and

study, the 13 'key' RNAs"). ONDA's Complaint includes claims based on both versions of the

ARMPA. *Id*. ¶¶ 59–88 (three claims based on enjoined 2019 ARMPA), ¶¶ 89–94 (claim that

Bureau unlawfully withheld or unreasonably delayed the closures required by 2015 ARMPA).

Tree Top argues that ONDA's allegation in paragraph 16 of the Second Amended

Complaint, and defendants' answer that they "admit" this, somehow operate as a judicial

admission that the 2019 ARMPA "controls." Tree Top Br. at 15–16. This requires a willful

misreading of what paragraph 16 actually says. Paragraph 16 is a description of one party to the

suit—the Bureau—and alleges that it is "charged with managing the public lands and resources

governed by the 2019 ARMPA at issue in this case." 2d Am. Compl. ¶ 16. There is no allegation

that the 2019 ARMPA "controls," only that the Bureau is the party that manages the public lands

and resources which the currently-enjoined 2019 ARMPA regulates—an unexceptional

proposition that makes no allegation regarding the legal status of the 2019 ARMPA.

     Tree Top also ignores the District Court for the District of Idaho's decree that, pending

further proceedings, "[t]he 2015 Plans [including the 2015 ARMPA] remain in effect" and the

Bureau "is enjoined from implementing the 2019 [ARMPA] for . . . Oregon." *W. Watersheds*,

417 F. Supp. 3d at 1335. Not surprisingly, Tree Top cites no case holding that a defendant's

admission in an Answer in one case overrides a court order in a separate case, much less any

case holding that a plaintiff's allegation alone in that first case can override a judicial

determination in the other case. Therefore, Tree Top's "judicial admission" argument fails.

     **C. The Bureau's 2020 ROD Expressly is "*Not* a New Planning Decision."**

     The 2020 ROD cannot be a "new and different amendment" that now controls sage-

grouse conservation West-wide because the 2020 ROD itself says that it is "*not* a new planning

decision." ORS_11534 (2020 ROD at 3) (emphasis added). Tree Top's brief omits this crucial

fact. The Bureau's purpose in preparing the 2020 FSEIS, in the dying days of the Trump

administration, was to "help the [Bureau] determine whether its 2015 and 2019 land use planning

and NEPA processes have sufficiently addressed sage-grouse habitat conservation *or whether the*

*BLM should initiate a new land use planning process* to consider additional alternatives or new

information." ORS_11108 (2020 FSEIS at 1-4) (emphasis added). The 2020 ROD's

"decision/determination" was that "no new land use planning process . . . is warranted." ORS_11534 (2020 ROD at 3). The Bureau not only stated that "[t]his determination is not a new planning decision," but also that "it is a determination *not* to amend the applicable land use plans"—another crucial phrase Tree Top omits from its brief. *Id.*

Because it was *not* a new planning decision and *not* a new land use plan amendment, it was "not subject to appeal or protest" as a new land use plan amendment would be. *Id.* While the 2020 ROD does say that the Bureau's "decision remains as identified in the 2019 ARMPA," *id.*, the 2019 ARMPA remains enjoined and the Bureau has since abandoned the 2019 amendments. *See W. Watersheds*, 417 F. Supp. 3d at 1335. The state director's "approval" that "reaffirms" the enjoined 2019 amendments cannot create any new or different land use plan amendment because the agency clearly disclaimed both propositions in the 2020 ROD. The only authority Tree Top cites, 43 C.F.R. § 1610.5-5, simply provides that "[a] resource management plan may be changed through amendment"—but the 2020 ROD avers it is a decision *not* to amend the plans. There is no elephant in the room. The 2015 ARMPA remains in effect under the Idaho court's injunction.

### D.  ONDA's Fourth Claim for Relief is Ripe and Not Moot.

Tree Top muddles three distinct jurisdictional doctrines in asserting that ONDA's claim that the Bureau has unlawfully withheld or unreasonably delayed the RNA closures required by the 2015 ARMPA is "premature, i.e. not ripe" for judicial review because the agency "is already implementing" the RNA provisions. Tree Top Br. at 22. This is not a "ripeness" argument, but rather an argument that ONDA's claim is moot. Tree Top cites no definition of ripeness, nor any case involving that doctrine, and does not allege any facts related to ripeness considerations, and thus makes no argument that ONDA's claim is unripe for judicial adjudication. In fact, a failure to act claim is ripe once "a plaintiff asserts that an agency failed to take a *discrete* agency action

that it is *required to take*," which ONDA has done here. *SUWA*, 542 U.S. at 64; *see Nat'l Wildlife Fed'n v. Johanns*, No. C04-2169Z, 2005 WL 1189583, at *10 (W.D. Wash. May 19, 2005) (obligation to allege discrete, required action is a "variant on the ripeness doctrine"). Because Tree Top "does not specifically and distinctly argue the issue in [its] opening brief," it waives the ripeness issue and may not articulate it for the first time in its reply brief. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005).[15]

Mootness ensures that a live controversy exists at all stages of a case. *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks and citation omitted). When Tree Top argues that the Bureau has begun implementing the closure decision, and therefore this Court lacks jurisdiction over ONDA's claim, it is invoking mootness, not ripeness. Tree Top Br. at 22. But "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SIEU, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks and citation omitted). "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Palmdale Hills Prop.*, 654 F.3d 868, 874 (9th Cir. 2011).

ONDA has identified discrete actions that the Bureau is required to take under the 2015 ARMPA, including the requirement that the Key RNAs be closed with fencing and be unavailable for grazing within five years of the 2015 ARMPA's promulgation in September

---

[15] The only case Tree Top cites in this section of its brief involved exhaustion of administrative remedies, not ripeness. *McKart v. United States*, 395 U.S. 185, 193–202 (1969). But exhaustion of administrative remedies is distinct from ripeness and involves any requirement to engage in administrative procedures *prior* to the issuance of a final agency action, such as the 2015 ROD and the 2019 ROD. *See id.* at 193–197. Tree Top alleges no facts related to exhaustion of remedies, and makes no argument, beyond the isolated quotation from *McKart*, alleging that ONDA did not exhaust administrative remedies, and therefore is barred from doing so in its reply. *Kama*, 394 F.3d at 1238; Tree Top Br. at 21. ONDA did in fact exhaust its administrative remedies, protesting both the 2015 and 2019 decisions. *See* OR_PUB_1408, OR_PUB_1444.

2015. ONDA has requested relief in the form of immediate implementation of the closures, now two years overdue, an order that the closures be implemented according to the terms of the 2015 ARMPA, and that the Key RNAs be unavailable for grazing in 2023. The Bureau has refused to commit to this, saying only that they may undertake a number of processes that will lead to several more years of delay before the Key RNAs actually become ungrazed. *See, e.g.*, Ryan Decl. ¶ 7 (ECF 128) and Ludwig Decl. ¶ 7 (ECF 130).

Even though the Bureau claims it is "working to exclude livestock grazing from the key RNAs," BLM Br. at 1, there remains effective relief this Court can grant if it holds that the agency has unlawfully withheld or unreasonably delayed the closures, including requiring that the Key RNAs be made unavailable for grazing in 2023. ONDA's claim accordingly is not moot. The Supreme Court in *SUWA* rejected a similar argument that the mere commencement of a monitoring program which respondent sought to compel under Section 706(1) rendered the claim moot. 542 U.S. at 68–69. And having made no attempt to carry the "heavy burden" of showing that no effective relief remains available for ONDA's claim, and having failed to "specifically and distinctly argue the issue," Tree Top has waived further argument regarding mootness, too. *Kama*, 394 F.3d at 1238.

## **CONCLUSION**

For these reasons, ONDA is entitled to summary judgment and relief on its fourth claim.

Respectfully submitted this 12th day of August, 2022.

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiffs