# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**OREGON NATURAL DESERT ASS'N,
AUDUBON SOCIETY OF PORTLAND,**
and **DEFENDERS OF WILDLIFE**,

            Plaintiffs,

    v.

**BARRY BUSHUE**, State Director of BLM
Oregon/Washington, and **BUREAU OF
LAND MANAGEMENT**, an agency of the
United States Department of Interior,

            Defendants,

               and

**CAHILL RANCHES INC**., an Oregon
Corporation,

            Defendant-Intervenor,

               and

**MACKENZIE RANCH, LLC, LAIRD
LAND COMPANY LLC, COW CREEK
RANCH, INC., DOUG BURGESS, DBA
BURGESS ANGUS RANCH, ROCKING
CLUB CATTLE, LLC, V BOX LAND &
LIVESTOCK, INC.,** and **MARK
MACKENZIE LLC,** Oregon Corporations**,**

            Defendant-Intervenors,

               and

**TREE TOP RANCHES, L.P.,** an Oregon
Limited Partnership,

            Defendant-Intervenor.

Case No. 3:19-cv-1550-SI

**OPINION AND ORDER**

Peter Macnamara Lacy, OREGON NATURAL DESERT ASSOCIATION, 2009 NE Alberta Street, Suite 207, Portland, OR 97211; and David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 24242 S Engstrom Road, Colton, OR 97017. Of Attorneys for Plaintiffs.

Barclay T. Samford, Arwyn Carroll, and Luther Langdon Hajek, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, 1961 Stout Street, 8th Floor, Denver, CO 80294. Of Attorneys for Defendants Barry Bushue and Bureau of Land Management.

Caroline Lobdell and Tate F. Justesen, WESTERN RESOURCES LEGAL CENTER, 9220 SW Barbur Blvd., Suite 327, Portland, OR 97219. Of Attorneys for Defendant-Intervenor Cahill Ranches Inc.

Elizabeth E. Howard and Jeremy Wood, SCHWABE WILLIAMSON & WYATT, P.C., 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant-Intervenors Mackenzie Ranch, LLC; Laird Land Company LLC; Cow Creek Ranch, Inc.; Doug Burgess, DBA Burgess Angus Ranch; Rocking Club Cattle, LLC; V Box Land & Livestock, Inc.; and Mark Mackenzie LLC.

Laura A. Schroeder, SCHROEDER LAW OFFICES, 1915 NE Cesar E. Chavez Boulevard, Portland, OR 97212; and W. Alan Schroeder, SCHROEDER LAW, Tulip S Building, Suite 110, 1149 South David Lane, Boise, ID 83705. Of Attorneys for Defendant-Intervenor Tree Top Ranches, Limited Partnership.

**Michael H. Simon, District Judge.**

Pending before the Court are five cross-motions for summary judgment concerning the implementation of the conservation plan for the greater sage-grouse. Oregon Natural Desert Association, Audubon Society of Portland, and Defenders of Wildlife (collectively, Plaintiffs) bring this case. Plaintiffs ask the Court to declare that the Bureau of Land Management (BLM) violated the Federal Land Policy and Management Act (FLPMA) and the Administrative Procedure Act (APA) by unlawfully withholding the closure of 13 research natural areas (RNAs) to livestock grazing. Plaintiffs contend that these closures were required to be completed within five years by the agency's 2015 land use plan, the Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment (2015 ARMPA), and are thus years overdue. Plaintiffs also ask that the Court compel BLM to complete the closures as specified in the 2015 ARMPA,

and order and enjoin BLM from authorizing livestock grazing in any of the 13 key RNAs or the smallest fenced pasture necessary to comply with the 2015 ARMPA.

State Director Bushue and BLM (collectively, the Federal Defendants or BLM) and each of the Defendant-Intervenors, Cahill Ranches, Inc. (Cahill), Mackenzie, et al. (Mackenzie), and Tree Top Ranches, L.P., (TTR), oppose Plaintiffs' motion for partial summary judgment and cross-move for partial summary judgment. Defendants collectively contend that there is no five-year deadline to implement the key RNA closures in the 2015 ARMPA, no requirement to use fencing as the method for closure, and no unreasonable delay. TTR adds that the 2019 ARMPA, which is currently enjoined by another court, is the proper controlling document, not the 2015 ARMPA, and therefore Plaintiffs are not entitled to relief under FLPMA or the APA. For the reasons stated below, the Court grants Plaintiffs' motion and denies Federal Defendants' and Defendant-Intervenors' motions for partial summary judgment.

## STANDARDS

**A.  Federal Land Policy and Management Act**

FLPMA requires BLM, through the Secretary of the Interior, to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed . . . when they are available." 43 U.S.C. § 1732(a); *see also id.* § 1712(a) ("The Secretary shall, with public involvement . . . develop, maintain, and, when appropriate, revise land use plans . . . for the use of the public lands."). "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 59 (2004). Land use plans are adopted and revised through extensive public notice, comment, and review procedures. 43 U.S.C. § 1712. A land use plan "is not a final implementation decision on actions which require further specific

plans, process steps, or decisions under specific provisions of law and regulations." 43 C.F.R.
§ 1601.0-5.

In managing public lands in accordance with land use plans, BLM must also
"contemporaneously enforc[e] relevant environmental laws governing the use of public lands."
*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011) (citing 43 U.S.C.
§§ 1701(a)(8), 1732(b)). Approval of a land use plan requires preparation of an Environmental
Impact Statement (EIS) under National Environmental Policy Act (NEPA). 43 C.F.R. § 1601.0-
6. "The land use plan is the 'proposed action' contemplated by the regulation." *SUWA*, 542 U.S.
at 73. Changing a land use plan also requires extensive procedure, because "[a]mending a
resource management plan ordinarily constitutes 'major federal action' requiring NEPA
analysis." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 647 (9th Cir.
2010). "Whether new information [after the EIS is finalized] requires supplemental analysis is a
'classic example of a factual dispute the resolution of which implicates substantial agency
expertise.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012)
(quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989)).

**B.  Administrative Procedure Act**

Claims under FLPMA are reviewed under the standards of the APA. *See Mont.
Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013); *W. Watersheds Project v.
Abbey*, 719 F.3d 1035, 1041 (9th Cir. 2013); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468
F.3d 549, 554 (9th Cir. 2006). The APA allows for limited judicial review of final agency
actions. 5 U.S.C. §§ 701-706. Under the relevant section of the APA, reviewing courts "shall
compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). In the context
of compelling agency action, "[t]he term 'shall' is usually regarded as making a provision
mandatory, and the rules of statutory construction presume that the term is used in its ordinary

sense unless there is clear evidence to the contrary." *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000). "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

The main purpose of the limited scope of judicial review under the APA is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66. Although a reviewing court's inquiry "must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quotation marks omitted).

Section 706(1) of the APA does not give courts license to compel agency action whenever an agency is withholding or delaying some action. Instead, the court's ability to "'compel agency action' is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010). The plaintiff must "assert[ ] that an agency failed to take *a discrete agency action* that it is *required to take*." *SUWA,* 542 U.S. at 64 (emphasis in original). Although the reviewing court has the power to compel agency action under § 706(1), "the manner of its action is left to the agency's discretion." *Id.* at 65. In other words, "a court can compel the agency to act, but has no power to specify what the action must be." *Id.*

## C.  National Environmental Policy Act

NEPA directs relevant government agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "NEPA

requires that 'to the fullest extent possible . . . all agencies of the Federal Government shall' complete an [EIS] in connection with 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'" *San Luis*, 747 F.3d at 640-41 (alteration in original) (quoting 42 U.S.C. § 4332(2)(C)). In addition to the proposed agency action, every EIS must explore and objectively evaluate all reasonable alternatives to that action. *See* 40 C.F.R. § 1502.14.

The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

## D.  Motion for Summary Judgment in APA Cases

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute of any material fact. Rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). In an APA-review case, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770; *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 479 F. Supp. 3d 1003 (D. Or. 2020).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard.").

## BACKGROUND

### A.  Sage-Grouse

Once plentiful across Western sagebrush landscapes, fewer than 16,000 of the greater sage-grouse remain in Oregon today. Sage-grouse depend on expansive sagebrush habitat for food, cover, breeding, nesting, brood-rearing, and winter survival. *See Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 565-66 (9th Cir. 2016). Yet sagebrush is "one of the most imperiled ecosystems in North America." 75 Fed. Reg. 13,910, 13,916 (Mar. 23, 2010). As their sagebrush habitats are split apart or destroyed through agriculture, development, wildfire, and climate change, sage-grouse face escalating threats to their survival.

Livestock grazing is one potential threat to sage-grouse and their sagebrush habitat. *See W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1255 (D. Or. 2019) (discussing how livestock grazing is likely to cause destruction of sage-grouse habitat). BLM and the U.S. Forest Service (USFS) have determined that livestock disturb sage-grouse habitat by consuming native plants, trampling shrubs, contributing to soil erosion, and spreading weeds. Other factors, however, also impact sage-grouse habitat, such as the spread of juniper and wildfires. Grazing also may have some effect on these factors. But the actual consequences of livestock grazing are difficult to assess because of the lack of ungrazed habitat reference sites for scientific study.

The precarious position of the sage-grouse and its habitat prompted the U.S. Fish and

Wildlife Service (FWS) in 2010 to find that Endangered Species Act (ESA) protection was

"warranted but precluded" for the species. FWS named inadequacy of existing regulatory

mechanisms as a key factor in its determination. 75 Fed. Reg. at 13,973. To avoid a future ESA

listing, which would mandate strict protections for sage-grouse and their critical habitat, BLM

and USFS, along with several western states, considered more rigorous conservation plans. *See*

*W. Watersheds Project v. Schneider,* 417 F. Supp. 3d 1319, 1325 (D. Idaho 2019). BLM and

USFS launched the National Greater Sage-Grouse Planning Strategy in 2011 and conducted a

robust, multi-year public process to define these plans. The process resulted in the 2015 Record

of Decisions adopting sage-grouse plans that covered ten states, including the ARMPA at issue.

The 2015 plans shifted federal land management policy so significantly that they

mollified FWS's concerns. FWS explained,

> These Federal Plans now include substantial provisions for
> addressing activities that occur in sage-grouse habitats and affect
> the species, including those threats identified in 2010 as having
> inadequate regulatory measures. . . . We are confident that these
> Federal Plans will be implemented and that the new changes,
> which are based on the scientific literature, will effectively reduce
> and minimize impacts to the species and its habitat.

80 Fed. Reg. at 59,887. Relying on these conservation plans, FWS determined that an ESA

listing was not warranted for the sage-grouse at that time.

## B.  The 2015 Oregon Sage-Grouse Conservation Plan: Proposed RMPA, ARMPA, and ROD

Three documents are relevant to Oregon's conservation plan for the sage-grouse: the

Proposed RMPA and Final EIS (Proposed RMPA), the 2015 ARMPA, and the 2015 Record of

Decision (2015 ROD). The cumulative goal of the plan they contain is to conserve, enhance, and

restore sage-grouse habitat across the species' remaining range and to ensure that BLM land use

decisions in sage-grouse habitat can conserve the species. The parties disagree over the precise

relationship between these documents and which provisions constitute the final agency decision.

The 2015 ARMPA amends BLM's prior land use plans. It establishes conservation

measures to protect and restore sage-grouse habitat in Oregon on BLM-administered lands

through roughly150 goals, objectives, and management directions. One section sets aside

portions of 15 key RNAs as unavailable for livestock grazing:

> **Objective LG 2:** On BLM-managed lands, 12,083,622 acres will
> continue to be available for livestock grazing in Greater Sage-
> grouse habitat. In key RNAs, 22,765 acres will be unavailable to
> livestock grazing. [Table 2-6 specifies how many acres will be
> unavailable to grazing in each RNA.] . . .

> **MD [Management Decision] LG 1:** All or portions of key RNAs
> will be unavailable to grazing (Table 2-6). Determine whether to
> remove fences, corrals, or water storage facilities (e.g. reservoirs,
> catchments, ponds).

2015 ARMPA at 2-18 to -19. The purpose of the key RNAs is to establish an "undisturbed

baseline reference" for sagebrush to help determine the effectiveness of BLM's actions to protect

sage-grouse. *Id.* at 2-33. The ARMPA also includes a map depicting "livestock grazing

decisions" and marking which areas are unavailable for livestock grazing. *Id.* at App'x A (Fig. 2-

3, "Oregon Livestock Grazing").

The 2015 ARMPA came into effect with the 2015 ROD, which approved and adopted the

new land use plans on September 21, 2015. The 2015 ROD and its attached set of ARMPAs,

including the 2015 ARMPA for southeastern Oregon, provide a final set of management

decisions to enact specific sage-grouse conservation measures on BLM-administered lands

across the Great Basin Region. Yet the ROD is not the last word on all matters: BLM must still

make implementation decisions, or activity-level decisions, to execute on-the-ground activities.

The ROD clarifies that "[t]hese ARMPAs do not contain implementation decisions." 2015 ROD

at 2-3. Future implementation decisions based on the goals and objectives in the ARMPA may require further environmental analysis. "Although decisions identified in the ARMPAs are final and effective when this ROD is signed, implementing on-the-ground activities requires additional steps before any of them can begin. BLM will conduct NEPA analyses, as necessary, for such implementation decisions." *Id.* at 2-1.

Every major federal action, including comprehensive resource management plans like the 2015 ARMPA, must be joined by a NEPA analysis of environmental impacts. *See* 42 U.S.C. §§ 4321 *et seq.* To fulfill this requirement, BLM prepared an EIS for the Draft RMPA for Oregon. This document assessed potential plans and incorporated analyses and input from the general public, Native American tribes, agencies, organizations, and BLM resource specialists. Publication of the draft initiated 90 days of public comment. BLM received thousands of comments, which they considered and addressed in the Proposed RMPAs and Final EISs. BLM released the Proposed RMPA, containing the Final EIS, on May 29, 2015, for another review and comment period. After this lengthy process, the Proposed Plan Amendments, with slight modifications, became the 2015 ARMPA.

Significant portions of the Proposed RMPA are not found in the 2015 ARMPA. The Proposed RMPA and Final EIS contains 2094 pages, and the ARMPA is only 241 pages. But the actual proposed plan, without all of the accompanying environmental analysis, is 46 pages. *See* Proposed RMPA, 2-13 to 2-59. One paragraph from the proposed plan omitted from the ARMPA details specifics about how and when the RNAs should be closed to grazing:

> Permitted livestock grazing would be unavailable for grazing within 5 years on all or portions of 13 of the 15 key RNAs. Permitted livestock grazing has already been removed from 2 of the 15 key RNAs . . . . Fencing 21,957 acres with approximately 39 miles of fence in 13 RNAs would provide areas where natural successional processes would proceed for long-term monitoring of

the plant communities important for [sage-grouse] and research. Additionally, to minimize fencing miles, and to avoid disturbance to existing leks, and use existing pasture fences, it is necessary to fence 800 acres of small areas adjacent to 9 of the 15 RNAs in order to reduce the miles of fence, tie into existing pasture fences, and minimize any impacts on existing leks. Grazing would continue to be authorized in the remaining pastures within the allotments and in the remaining open areas in the RNA following the current AMPs. Site specific RNA activity plans identifying actions to conserve and manage the RNA values and to utilize these areas for baseline research for plant communities important for [sage-grouse] will be developed for the 15 Key RNAs within 5 years following BLM Manual 1613 and Oregon State Office BLM Manual Supplement 1623.

Proposed RMPA at 2-46. The chapter on Environmental Consequences and a response to comments also specify 39 miles of fence in 13 key RNAs. *See id.* at 4-202 to 4-203, V-30 to V-32. These sections refer to fencing as "necessary" and "require[d]." *Id.* Other portions of the environmental analysis assess the choice of fencing, including its potential to fragment habitat and harm sage-grouse when they collide with barbed wire. *See, e.g.*, *id.* at 4-72. Neither the five-year timeline nor the new fencing specifications appear in the 2015 ROD or the 2015 ARMPA.

## C. 2019 Oregon ARMPA

By 2015, grazing had ceased in only two of the 15 key RNAs. Proposed RMPA at 2-46. BLM began implementing the 2015 ARMPA after it was finalized in September 2015 while balancing its competing priorities. Bushue Decl. ¶¶ 12-17, ECF 69. In June 2017, Defendant-Intervenor Cahill filed a lawsuit, *Cahill Ranches, Inc. v. Bureau of Land Mgmt.*, No. 1:17-cv-960 (D. Or. filed Jun. 19, 2017), challenging the 2015 ARMPA and its land use plan action to close a key RNA to grazing. The District of Oregon dismissed Cahill's case when an amendment to the Oregon ARMPA appeared to reinstate grazing on the RNA at issue.

This amendment began in 2017, under a new administration. BLM issued a "Notice of Intent to Amend Land Use Plans Regarding Greater Sage-Grouse Conservation and Prepare

Associated Environmental Impact Statements or Environmental Assessments." 82 Fed.

Reg. 47,248 (Oct. 11, 2017). The notice stated BLM's intent to consider amending the 2015

ARMPAs for several states, including Oregon. *Id.* On March 15, 2019, BLM finalized and

approved the Oregon Greater Sage-Grouse Record of Decision and Approved Resource

Management Plan Amendment (2019 ARMPA). Unlike the 2015 Oregon ARMPA, the 2019

Oregon ARMPA did not require the closure of the 13 key RNAs. 2019 ARMPA at 1-6 ("[A]ll or

portions of the 13 key [RNAs] that were made unavailable to livestock grazing in the 2015

Oregon Greater Sage-Grouse ROD/ARMPA are now available to livestock grazing."). On

September 9, 2019, while the 2019 ARMPA was in effect, BLM issued one new grazing permit

within the key RNAs.

On October 16, 2019, the U.S. District Court for the District of Idaho preliminarily

enjoined the 2019 ARMPAs in seven states, including Oregon. The injunction returned the 2015

ARMPAs as the controlling land use plan. *Schneider*, 417 F. Supp. 3d at 1335. At that time,

BLM resumed implementing the 2015 Oregon ARMPA by issuing two-year notice letters in

January 2020 to grazing permittees and lessees regarding the key RNA closures and related field

work. Bushue Decl. ¶¶ 22-25. In December 2021 and January 2022, BLM issued notices for a

public comment and tribal consultation period on site-specific NEPA analyses for the effects on

the environment of fencing and other mechanisms for closures. *Id.* ¶ 26. Following the public

comment periods, the BLM Malheur Field Office expects that it will issue preliminary

environmental documents for public review regarding the effects of closing the key RNAs within

its jurisdiction between October 2022 and September 2024. Ryan Decl. ¶ 7, ECF 128. The BLM

Lakeview Field Office expects that it will issue a preliminary environmental document analyzing

the effects of closing the key RNAs within its jurisdiction in early spring 2023. Ludwig Decl.

¶ 7, ECF 130. The issue now before the Court is whether BLM unlawfully withheld or unreasonably delayed the key RNA closures.

## D.  Procedural Background

On September 27, 2019, Plaintiffs filed this lawsuit challenging the validity of the 2019 ARMPA. Plaintiffs assert four claims: (1) BLM violated NEPA and its implementing regulations by issuing the 2019 ROD, 2019 ARMPA, and the accompanying EIS; (2) BLM violated FLPMA and its implementing regulations by issuing the 2019 ROD, 2019 ARMPA, and the accompanying EIS; (3) BLM violated the U.S. Constitution, the Federal Vacancies Reform Act, and the APA because Brian Steed improperly exercised the authority of BLM Director at the time the 2019 ARMPA was finalized; and (4) BLM unlawfully withheld or unreasonably delayed implementing the 2015 ROD and the 2015 Oregon ARMPA by failing to implement the key RNA closures. In December 2019, U.S. Magistrate Judge Beckerman granted Defendant-Intervenor Cahill's unopposed motion to intervene.

This Court issued two prior Opinions and Orders in this case. The Court has not previously analyzed the merits of Plaintiffs' claims. In March 2022, the Court denied Plaintiffs' motion for a temporary restraining order that sought to enjoin Federal Defendants from allowing grazing on the key RNAs. In May 2022, the Court granted motions to intervene filed by TTR and Mackenzie (including Mackenzie Ranch, LLC; Laird Ranch, LLC; Cow Creek Ranch, Inc.; Doug Burgess dba Burgess Angus Ranch; Rocking Club Cattle, LLC; V Box Land & Livestock, Inc.; and Mark Mackenzie, LLC). Pending before the Court are five cross motions for partial summary judgment.

## E.  Pending Motions

Plaintiffs move for partial summary judgment on their fourth claim for relief in Plaintiffs' Second Amended Complaint. ECF 125. Plaintiffs' fourth claim seeks a declaration that BLM

violated FLPMA and the APA by unlawfully withholding the closure of the 13 key RNAs to livestock grazing as required in the 2015 Oregon ARMPA. Plaintiffs also ask that the Court compel BLM to complete the closures as specified in the 2015 Oregon ARMPA, and order and enjoin BLM from authorizing livestock grazing in any of the 13 key RNAs or the smallest fenced pasture necessary to comply with the 2015 Oregon ARMPA.

Federal Defendants oppose Plaintiffs' motion for partial summary judgment and cross-move for partial summary judgment. ECF 127. Federal Defendants contend that there is no five-year timeline for implementation of the key RNA closures, nor a fencing requirement, in the 2015 Oregon ARMPA, and therefore the Court cannot compel RNA closures under the APA. The Federal Defendants ask the Court to find in their favor on the fourth claim asserted by Plaintiffs in the Second Amended Complaint.

Each of the Defendant-Intervenors also cross-move for partial summary judgment. ECF 133, 135, 137. Asserting many of the same arguments as Federal Defendants, Defendant-Intervenors ask the Court to find in favor of Federal Defendants and Defendant-Intervenors on Plaintiffs' fourth claim in the Second Amended Complaint, and deny Plaintiffs' motion for partial summary judgment. Defendant-Intervenors Mackenzie add that injunctive relief is inappropriate because the 2015 Oregon ARMPA left decisions to BLM's discretion, the Court cannot dictate how BLM carries out its land use plans, and Plaintiffs are simply dissatisfied with the steps BLM has taken to complete the key RNA closures to date. Defendant-Intervenor Cahill requests that the Court consider a full briefing on the equities before considering whether to grant an injunction, given the alleged irreparable financial harm an injunction would cause to Cahill Ranches. Defendant-Intervenor Cahill seeks to protect its interest in grazing on the Sucker Creek Pasture. Cahill Decl. ¶ 9, ECF 73. Defendant-Intervenor TTR additionally argues that

the 2019 ARMPAs, rather than the 2015 ARMPAs, control, and therefore Plaintiffs are entitled

to no relief under FLPMA or the APA.

## DISCUSSION

### A.  The 2015 Oregon ARMPA Controls in This Case

Defendant-Intervenor TTR argues that the 2019 ARMPA controls. This position

contradicts the U.S. District Court for the District Court of Idaho's decision to enjoin BLM from

implementing the 2019 ARMPAs. Despite BLM's temporary imposition of the 2019 Oregon

ARMPA, the 2015 ARMPA controls in this case.

In October 2019, the U.S. District Court for the District of Idaho issued a preliminary

injunction to enjoin BLM from implementing the 2019 ARMPAs and reinstated the 2015

ARMPAs until that court reviews the claims of its case on the merits. *Schneider*, 417 F. Supp. 3d

at 1335. The preliminary injunction still stands. In a November 7, 2022, status report for

*Schneider*, BLM advised the Idaho court of its ongoing efforts to amend sage-grouse land use

plans to "address inclusion of any new information and revisit the deficiencies previously

identified by the Court." Defs.' Status Report, *W. Watersheds Project v. Schneider*, No. 1:16-

CV-83-BLW (D. Idaho Nov. 7, 2022), ECF 308; *see also* 86 Fed. Reg. 66,331 (Nov. 22, 2021)

(announcing the new planning process). The District Court of Idaho has not yet evaluated the

sufficiency of BLM's efforts. Until that case is decided on its merits or the preliminary

injunction is dissolved, there is a fixed decree that "[t]he 2015 Plans remain in effect" and "BLM

is enjoined from implementing the 2019 [ARMPA] for . . . Oregon." *Schneider*, 417 F. Supp. 3d

at 1335.

Defendant-Intervenor TTR asserts that the 2019 ARMPA controls in this case because:

(1) Plaintiffs referenced the 2019 ARMPA in their Second Amended Complaint at ¶ 16, and

(2) rather than adjudicate the merits in *Schneider*, BLM issued a Final Supplemental EIS and

ROD (2020 FSEIS / 2020 ROD) that makes the preliminary injunction moot. Defendant-Intervenor TTR's assertions fail because BLM remains bound by the preliminary injunction in the case before the U.S. District Court in Idaho.

TTR erroneously claims that Plaintiffs made a "judicial admission" in discussing the 2019 ARMPA in the amended complaint and challenging its legal authority as a governing land use plan.[1] Even if this Court were to assume that TTR had correctly identified a "judicial admission," TTR is mistaken that the pleadings in one case could override an injunction issued by a federal court. TTR may disagree with the breadth of the injunction in *Schneider*, but it is for the Ninth Circuit, not this Court, to overturn or narrow another court's injunction.

District courts have discretion to issue injunctive relief that extends beyond the plaintiff. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425, n.1 (2018) (Thomas, J., concurring) (explaining that a universal injunction "would not be invalid simply because it governed the defendant's conduct nationwide"). Injunctions with broad implications are especially appropriate when a party brings a facial challenge to federal agency actions under the APA. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407-08 (D.C. Cir. 1998) (invalidating an agency rule and

---

[1] Judicial admissions are formal, *factual* admissions in the pleadings that withdraw a fact from issue and dispense wholly with the need for proof of that fact. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Statements of fact contained in a brief may be considered admissions of the party at the discretion of the district court. *Id.* at 227. Plaintiffs' reference to the 2019 land use plan at paragraph 16 of their complaint is not a statement of fact about the controlling land use plan, but a description of the BLM and the public lands it is tasked with managing. It does not withdraw any *fact* from issue. Nor does this Court consider a decontextualized reference to the 2019 plan to be an admission. Both Plaintiffs' amended complaint, which specifically alleges the fact of the 2019 injunction issued in *Schneider*, and Federal Defendants' actions to implement the 2015 ARMPAs show that the parties recognize the 2015 Oregon ARMPA as controlling in this case.

affirming a nationwide injunction). Under the APA, 5 U.S.C. § 706(2), courts are required to

"hold unlawful and set aside" agency action found to be invalid, such that the rule can no longer

apply to anyone. "When a reviewing court determines that agency regulations are unlawful, the

ordinary result is that the rules are vacated—not that their application to the individual

petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see

also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) ("[I]f the

plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its

application to a particular individual.").

     The District of Idaho enjoined BLM from implementing all the 2019 ARMPAs after

finding that the environmental challengers would likely demonstrate that BLM failed to conduct

an adequate NEPA analysis for these amendments, thereby violating the APA. *See

Schneider*, 417 F. Supp. 3d at 1333. TTR has not proposed a theory to challenge or seek to lift

the injunction from BLM in this lawsuit.[2] And BLM has not yet appealed or petitioned the

District of Idaho to vacate or modify the *Schneider* preliminary injunction on the 2019 ARMPA.

     TTR, however, asserts that two other documents prepared by BLM, the 2020 Final

Supplemental EIS (2020 FSEIS) and 2020 Record of Decision (2020 ROD), render the

preliminary injunction moot and restore the 2019 ARMPAs as the governing land use plans. This

is not the case because the 2020 ROD did not alter the 2019 plan. "A resource management plan

---

     [2] TTR misstates the "binding authority principle" when arguing that an injunction from
one court does not bind another district court. The binding authority principle stands for the
proposition that district courts are bound only to appellate decisions, not to the findings of other
trial courts. *Hart v. Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001). But an injunction is binding
on a party, in this case, a federal agency—not this Court—so the binding authority principle does
not apply. As discussed in this section, a court's power to bind parties is not coextensive with the
court's geographic jurisdiction. BLM is not just bound by the injunction in Idaho, but wherever
the improper ARMPAs reach.

may be changed through amendment," 43 C.F.R. § 1610.5-5, but the 2020 ROD is a decision *not* to amend the plans. The ROD makes explicit, "[t]his determination is not a new planning decision. Instead, it is a determination *not* to amend the applicable land use plans. Thus, it is not subject to appeal or protest. BLM's decision remains as identified in the 2019 ARMPA." 2020 ROD at 3 (emphasis in original). Because it was not a new planning decision and not a new land use plan amendment, the 2020 ROD leaves the 2019 ARMPA in place. Director Bushue's "approval" that "reaffirms" the enjoined 2019 amendments without the full process of appeal and comment does not create any new or different land use plan amendment. Without a judicial order on the matter, it is irrelevant that the 2020 FSEIS was prepared "specifically to address the preliminary injunction order." 2020 FSEIS at App-D-3. This Court concludes that the District Court of Idaho's preliminary injunction applies to the 2019 ARMPA and the 2015 ARMPA controls.[3]

## B.  The Proposed RMPA Is Not Controlling

The outcome of these motions for partial summary judgment depends on the relationship between three documents: the Proposed RMPA, the 2015 ARMPA, and the 2015 ROD. This relationship determines what, if anything, the Court may compel BLM to do. Plaintiffs say there is "no daylight" between these documents, as they together constitute BLM's 2015 plan for sage-

---

[3] It may soon be the case that a new land use plan will permit a court to find the injunction moot. In November 2021, BLM issued a notice of intent to amend its land use plans for sage-grouse conservation: "[T]he BLM has found that 2019 [ARMPAs] are potentially inconsistent with new science and rapid changes affecting the BLM's management of the public lands, including the effects of climate change." 86 Fed. Reg. 66,331, 66,331 (Nov. 22, 2021). The notice acknowledges "[t]he land use planning process will address the management of [sage-grouse] and sagebrush habitat on BLM-managed public lands in . . . Oregon. . . ." *Id.* Through this process, "BLM is reviewing the 2015 and 2019 [ARMPAs] and coordinating with other Federal and State agencies to identify issues that warrant clarification or reconsideration." *Id.* at 66,332. The public comment period closed on February 7, 2022. *Id.* at 66,331. Absent further developments, however, the 2015 ARMPA controls.

grouse conservation in Oregon. Though neither the five-year timeline nor the new fencing specifications appear in the 2015 ROD or the 2015 ARMPA, Plaintiffs see these provisions as part of the final plan. Federal Defendants view the 2015 ARMPA as the final land use plan and believe the 2015 ARMPA does not incorporate omitted portions of the Proposed RMPA.

Plaintiffs' interpretation relies on the following sentence: "The ARMPA adopts the management described in the [Proposed RMPA], with modifications and clarifications, as described in the *Modifications and Clarifications* section of the ROD." 2015 ARMPA at 2-1. Plaintiffs point out the *absence* of any modifications or clarifications to the grazing plan in the ROD. *See* 2015 ROD at 2-9, 2-10. Under Plaintiffs' interpretation, the lack of modifications means the 2015 ARMPA adopts the Proposed RMPA's grazing section in its entirety. Portions of the Proposed RMPA do appear in the 2015 ARMPA verbatim. *Compare* Proposed RMPA at 2-16 to 2-17 *with* 2015 ARMPA at 2-17 to 2-18 (Objectives); Proposed RMPA at 2-25 to 2-27 *with* 2015 ARMPA 2-19 to 2-21 (Management Decisions). These sections do not mention fencing or a five-year timeline; those details only appear in the narrative paragraphs later in the Proposed RMPA. *See* Proposed RMPA at 2-45 to 2-46. Even though the narrative paragraphs are not copied into the ARMPA, Plaintiffs see the details as essential elaborations necessarily included in the final plan. Plaintiffs stress that the details would have been explicitly omitted had BLM intended to read them out of the plan.

Plaintiffs' argument reaches too far, blurring the distinctions between environmental analysis and decision documents and between proposed and final plans. Only the 2015 ARMPA is the land use plan for Oregon. As part of a NEPA analysis, the Final EIS lays out the proposed land use plan and discloses the anticipated environmental effects of that proposal. *See* 40 C.F.R. § 1502.14. NEPA does not mandate particular results or substantive outcomes; rather, it

ensures agencies consider the environmental impacts of their actions in the decision-making

process. *Id.* § 1500.1(a). NEPA review does not dictate a final agency decision until the agency

adopts the proposed alternative with a ROD. *See id.* §§ 1505.2, 1506.11. The ROD is a final

agency action subject to judicial review under the APA. 5 U.S.C. § 702; *Friends of Yosemite*

*Valley v. Scarlett*, 439 F. Supp. 2d 1074, 1090 (E.D. Cal. 2006), *aff'd sub nom. Friends of*

*Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008). If the ROD fully adopts one of

the alternatives analyzed in an EIS as the final management decision, the Court may look to that

portion of the EIS as the final plan. *See N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983

F.3d 1077, 1082 (9th Cir. 2020) (discussing a ROD that finalized BLM's decision to manage a

reserve under the preferred alternative in the EIS).[4]

      Here, however, the ROD adopted the 2015 ARMPA, not the preferred alternative in the

Proposed RMPA. The ROD "serves as the final decision establishing the resource management

plan amendment decisions outlined in the ARMPAs . . . ." 2015 ROD at 2-1. Only the final 2015

ARMPA is the "Approved Resource Management Plan Amendment" for Oregon. 2015 ARMPA

at 1-1. And the ARMPA adopts the management described in the Proposed RMPA *with changes*.

If the ARMPA and ROD simply adopted the Proposed RMPA word-for-word, except for the

changes explained in the ROD, then issuing a final 2015 ARMPA document would have been

unnecessary. The single sentence about modifications and clarifications does not support

---

[4] Plaintiffs point to this case for authority to support their interpretation of the agency
documents. In *Northern Alaska Environmental Center*, BLM had prepared a single, combined
management plan and EIS for the National Petroleum Reserve. The management plan contained
both broad provisions and site-specific decisions in a preferred alternative that BLM adopted
through a ROD. *Id.* at 1082, 1087-88. But the Ninth Circuit did not address differences between
a proposed and final agency decision. Rather, it assessed the sufficiency of a programmatic-level
NEPA analysis for a site-specific action, holding that a single NEPA document was sufficient for
both. *Id.* at 1088. This case does not support Plaintiffs' interpretation of which planning
document could be binding on the agency.

PAGE 20 – OPINION AND ORDER

Plaintiffs' broad claim that *any* statements in the proposed plan that were not carried forward into the final plan continue to apply unless BLM expressly noted and explained their omission in the ROD's summary of changes.

As a result, the Proposed RMPA does not impose on the agency any management requirements separate from or in addition to the final 2015 ARMPA. The excluded statements in the Proposed RMPA do not have the authority of those directions that were carried through to the final ARMPA, or those contained in the ROD itself. *Cf. Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1125 (D. Mont. 2016) (finding a five-year timeframe contained within a ROD was a clear mandate). Although the excluded statements may clarify what agency actions are reasonable, or indicate what in 2015 BLM envisioned for sage-grouse conservation, Plaintiffs are incorrect that these narrative paragraphs in the Proposed RMPA *bind* the agency. Nor is there any indication that BLM's current interpretation of the ARMPA conflicts with an earlier interpretation. *Cf. Watt v. Alaska*, 451 U.S. 259, 273 (1981) ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference."). Without stronger authority directing the Court to depart from the agency's interpretation of its own regulations, the Court cannot hold BLM to statements exclusively found in a planning document.

The Court finds that BLM was not legally required under the key RNA provision in the 2015 ARMPA to close the remaining key RNAs to ongoing grazing *within five years* and to make those key RNAs unavailable *through fencing*. The Court may not compel this timeline or method.

The Court will, however, consider Plaintiffs' argument that the Federal Defendants failed to take an action that is entirely contained within the 2015 ARMPA: making 13 key RNAs

unavailable to grazing. In their motion for summary judgment, Plaintiffs ask the Court to compel the key RNA closures "as specified in and required by the ARMPA" under APA § 706(1). The Court will evaluate whether the closures, limited to the provisions in the 2015 ARMPA, may be compelled under § 706(1).

## C.  Closure of Key RNAs as a Discrete Agency Action that Is Legally Required

Section 706(1) of the APA states that reviewing courts "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As a threshold matter, Plaintiffs must first demonstrate that BLM has failed to take a discrete agency action that is legally required. In *SUWA*, the Supreme Court restricted the scope of judicial review under § 706(1). *SUWA* established two constraints on § 706(1) claims for failure to act, holding that a court may only compel agency action when "an agency failed to take a *discrete* agency action that it is *required to take*." 542 U.S. at 64 (emphasis in original). Courts do not have the authority to "enter general orders compelling compliance with broad statutory mandates." *Id.* at 66. Unless BLM's closure of the key RNAs is a discrete and legally required action, Plaintiffs' § 706(1) claim must be dismissed for lack of jurisdiction. *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1019-20 (9th Cir. 2007).

### 1.  Discrete Agency Action

Plaintiffs must first establish that the agency action they seek to compel is discrete. Under the APA, a plaintiff must "direct its attack against some particular 'agency action' that causes it harm." *Lujan*, 497 U.S. at 891. A discrete agency action can be "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." *SUWA*, 542 U.S. at 62 (emphasis added in *SUWA*) (quoting the definition of "agency action" in 5 U.S.C. § 551(13)). Limiting the Court's review to discrete agency actions precludes "broad programmatic attack[s]." *Id.* at 64; *see also Lujan*, 497 U.S. at 891 (noting that the plaintiffs

"cannot seek *wholesale* improvement . . . by court decree, rather than in the offices of the [federal agency] or the halls of Congress, where programmatic improvements are normally made" (emphasis in original)).

There is no clear precedent for identifying actions within land use plans as discrete agency actions. In *SUWA*, the Supreme Court declined to determine whether actions envisioned in a land use plan were discrete agency actions. *SUWA*, 542 U.S. at 72 (reasoning that because a land use plan provision was not legally required under the second part of the test, it was "unnecessary to consider whether the action . . . is sufficiently discrete to be amenable to compulsion under the APA").[5]

After *SUWA*, courts have taken various approaches to distinguish discrete from non-discrete or "programmatic" action. In *Vietnam Veterans of America v. Central Intelligence Agency*, the Ninth Circuit's decision turned on whether there existed a discrete action, as it was clear that the Army had failed to fulfill duties legally required by its regulations. 811 F.3d 1068, 1079, 1081 (9th Cir. 2016). The Ninth Circuit rejected the Army's interpretation of its regulations and held that its duties were discrete and therefore enforceable. *Id.* at 1082-83. For one such duty, to provide relevant medical care to former test subjects, the language of the regulation did not specify when, how, or for how long test subjects would receive care. It simply stated "[v]olunteers are authorized all necessary medical care for injury or disease that is a proximate result of their participation in research." *Id.* at 1080 (quoting Chapter 3-1(k) of AR 70-25). In explaining how the broad text of the regulation amounted to a discrete action, the Ninth

---

[5] The parties muddle the two parts of the *SUWA* test, quoting the Supreme Court's discussion of whether land use plans contain legal requirements when analyzing whether the provision at issue is discrete. The Supreme Court's analysis of discreteness is confined to a broad statutory provision of FLPMA, which the Court held "lack[ed] the specificity requisite for agency action." *SUWA*, 542 U.S. at 66.

Circuit pointed to the finite group of past test subjects. The limited population affected would not require a broad restructuring of Army programs and operations, as the agency claimed. "Instead, the Army would be required to provide medical care to a relatively small group of living veterans . . . . This is a discrete action specifically mandated by [the regulation], for which judicial enforcement pursuant to § 706(1) is required." *Id.* at 1082.

Other cases have also equated a finite set of recipients or tasks with a discrete agency action. For example, District Judge Ancer Haggerty of this District Court found a forest plan provision specifying "the maintenance of a wild horse herd averaging 100 head" discrete. *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1279 (D. Or. 2012). Judge Haggerty reasoned that USFS had decided already that 100 was the right number of horses—there would be no risk of the court substituting its judgment for that of the USFS were the court to enforce this standard. *Id.* (rejecting the § 706(1) claim because the provision, although discrete, was not legally required). In *Oregon Natural Desert Association v. U.S. Forest Service*, the plaintiffs challenged more than 100 annual operating instructions and permit decisions. 2018 WL 1811467 (D. Or. 2018), *aff'd*, 957 F.3d 1024 (9th Cir. 2020). The agency claimed this was a programmatic challenge. District Judge Michael W. Mosman allowed the challenge, reasoning that it was directed at specific agency actions, not an "entire program," because each permit decision on its own was a final agency action. *Id.* at *2. *But see City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 433-34 (4th Cir. 2019) (discounting similar logic because enforcing individual discrete actions would require the agency to "transmit tens of thousands of records" and implement "wholesale improvements," which would be non-discrete tasks).

Agency action can "involve[] the exercise of judgment and discretion" and remain "discrete" enough for a court to compel the action. *See SUWA*, 542 U.S. at 66. For example,

"when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65. Permitting some discretion is practical: there will always be some small decision left to the agency, down to which color of pen the administrator should use to sign a permit. The question becomes how much discretion is allowed. *SUWA* prohibits enforcing a provision with "a great deal of discretion in deciding how to achieve it" as lacking "the clarity necessary to support judicial action under § 706(1)." *Id.* at 66. The Supreme Court in *SUWA* pointed to other examples of too much discretion:

> [A] plaintiff might allege that the Secretary had failed to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the New Orleans Jazz National Historical Park in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the Steens Mountain Cooperative Management and Protection Area for the benefit of present and future generations." 16 U.S.C. §§ 1333(a), 410bbb-2(a)(1), 460nnn-12(b). The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

*Id.* at 67 (alterations omitted). These examples direct an agency to "manage . . . in a manner," which is such a broad directive that a court would have to substitute its discretion for that of the agency.

This is not to say that discrete action cannot involve some agency discretion. In *Vietnam Veterans*, when evaluating the Army's duty to warn former test subjects of newly acquired information pertinent to their health, the Ninth Circuit acknowledged:

> The precise efforts the Army must take to identify human subjects in past experiments, and the precise content of the notice to those subjects who have been identified, necessarily entail some discretionary judgment. But discretion in the manner in which the duty may be carried out does not mean that the Army does not

> have a duty to perform a "discrete action" within the meaning of
> § 706[(1)] and *SUWA*.

*Vietnam Veterans*, 811 F.3d at 1079. In another case, the Ninth Circuit upheld the district court's

decision to compel the Department of Interior to implement a drainage solution in the Westlands

Water District under § 706(1), despite significant agency discretion in how to implement that

solution. *Firebaugh Canal Co.*, 203 F.3d at 578. In fact, the Ninth Circuit protected the agency's

discretion, reversing part of the judgment that foreclosed certain drain solutions. "Although the

district court can compel the Department of Interior to provide drainage service as mandated by

the San Luis Act, the district court cannot eliminate agency discretion as to how it satisfies the

drainage requirement." *Id.* Finally, another district court ruled that BLM's obligation to comply

with the state law requiring dam operators to allow "sufficient river flow for fish passage" was a

discrete, required action, not a "general statutory directive," and distinguished *SUWA* on that

ground. *Nat. Res. Def. Council v. Patterson*, 333 F. Supp. 2d 906, 916 (E.D. Cal. 2004). The

court did not define what amount of water would be sufficient. These cases indicate that some

amount of discretion is not fatal to § 706(1) enforcement.

In this case, the key RNAs closure requirement in the 2015 ARMPA applies to 13

precisely identified RNAs. Unlike other portions of the ARMPA, this provision is not a broad

projection because the RNA closures are tied to specific locations and details. As in *Vietnam

Veterans* and *Stout*, the action is limited to a finite set of parameters, here, pastures. BLM

identified the exact acreage unavailable to grazing within each RNA. ARMPA at 2-18 (Table 2-

6). The 2015 ARMPA locates each of the closed areas, which appear on a map. *Id.* at App'x A

(Fig. 2-3). In this map, BLM has clearly charted the distinction between areas available and

unavailable for livestock grazing. *Id.* The ARPMA also describes the specific nature of the

closure as "unavailable for livestock grazing" and the purpose of the closed portions of key

RNAs "as undisturbed baseline reference areas for the sagebrush plant communities they represent that are important for Greater Sage-Grouse." 2015 ARMPA at 2-18, 2-33. Some discretion may need to be exercised during implementation—for example, finetuning closure boundaries and acreages during field work to minimize impacts to wilderness values or relocating existing facilities like watering troughs. But this modicum of discretion does not make Objective LG-2 or Management Decision LG-1 non-discrete.

Defendants argue that the closure cannot be a discrete action because the 2015 ARMPA and 2015 ROD do not specify how to complete the closures, nor do these documents require the closures to be completed in a specific manner or by a certain time. As in *Vietnam Veterans*, *Firebaugh Canal Co.*, and *Patterson*, some aspects of closing RNA acres can remain up to the agency's discretion without introducing risks that the Court will substitute its judgment for that of BLM. The Court is not doing so. BLM already has established its discrete duty to close the specified portions of key RNAs, and that is the discrete action focused on by the Court.

Defendants also argue that closures cannot be "discrete agency actions" because BLM must complete site-specific NEPA analyses and further administrative actions before it may implement the key RNAs closures. Defendants, however, cite no authority showing how further NEPA analysis makes an action non-discrete. Moreover, such a conclusion is logically incompatible with the scope of NEPA. If courts were barred from enforcing any discrete, mandatory action that required some further NEPA analysis, many environmental statutes, regulations, and provisions would be unenforceable. Agencies cannot excuse their failure to act on a perpetual series of procedural requirements.

Additionally, the required NEPA analysis to close portions of 15 RNAs has already occurred. BLM published the results of its multi-year, public NEPA process in the Final EIS

attached to the Proposed RMPA. The extensive environmental analysis in that document led to final agency decisions about which portions of 15 RNAs to make unavailable to grazing, down to the specific acreage. *See* 2015 ARMPA at 2-19. "[N]othing in NEPA or [Ninth Circuit] caselaw prevents agencies from using a single document to undertake both a programmatic-level analysis and a site-specific analysis . . . ." *N. Alaska Env't Ctr.*, 983 F.3d at 1088. Although further NEPA analysis may occur before constructing fences that do not qualify for a categorical exclusion, 40 C.F.R. § 1501.4, no additional NEPA assessment is required to make portions of the 13 remaining key RNAs unavailable to grazing. The Court finds that, like in *Northern Alaska Environmental Center*, the extensive NEPA review already performed serves as a site-specific analysis for RNA closures. As a result, the ARMPA defines an action discrete enough for this Court to enforce as it stands.

Similar reasoning applies to regulations for notice to permittees. Even though BLM's regulations require at least two years notice to permittees before reducing or cancelling their grazing permits, *see* 43 C.F.R. § 4110.4-2(b), BLM's need to give notice does not preclude courts from enforcing a rule closing specific pastures to future grazing. Like the notices to test subjects in *Vietnam Veterans*, the specific notices to ranchers may involve agency discretion, but this discretion does not make BLM's duty so broad as to preclude enforcement. In fact, the 2015 ARMPA should have triggered the regulatory process of sending notice letters to affected ranchers as soon as the RNA portions were made unavailable, as an automatic next step. In sum, the agency knows what it has to do with enough specificity to pass the first part of the *SUWA* test for a viable § 706(1) claim.

### 2. Legally Required

The second part of the *SUWA* test asks whether the 2015 land use plan *legally requires* BLM to close the key RNAs. An action is legally required if there is "a specific, unequivocal

command" placed on the agency. *SUWA*, 542 U.S. at 63 (quoting *ICC v. New York, N.H. & H.R. Co.*, 287 U.S. 178, 204 (1932)); *see also Plaskett v. Wormuth*, 18 F.4th 1072, 1081-82 (9th Cir. 2021) ("[T]he showing required to support a request for an order under § 706(1) compelling an agency to take a discrete action mirrors the showing that is required to obtain mandamus-type relief."); *Vietnam Veterans*, 811 F.3d at 1081 (noting that legally required actions are "unequivocally compelled by statute or regulation"). In other words, the agency action must be dictated by a legal obligation "so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010). An agency's mandate to act need not be contained in a regulation or statute; a provision in a land use plan may also bind an agency. *SUWA*, 542 U.S. at 71.

Plaintiffs argue that the RNA closures are legally required because BLM has a statutory duty under FLMPA to manage the public lands "in accordance with" the land use plan. 43 U.S.C. § 1732(a). FLMPA alone, however, is not enough to compel any specific provision of a land use plan. Despite the statutory mandate in FLPMA that BLM must manage public lands in accordance with land use plans, FLPMA's mandates are not tantamount to a "specific statutory command requiring" agency action. *SUWA*, 542 U.S. at 67; *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1222 (9th Cir. 2011). Under *SUWA*, the land use plan itself must create a binding commitment. 542 U.S. at 71. Thus, the issue here is whether the 2015 ARMPA constitutes a "binding commitment" that can compel agency action.

Cases seeking to compel actions in land use plans under § 706(1) are infrequent. In *SUWA*, the Supreme Court noted that courts cannot compel provisions of land use plans under § 706(1) "absent clear indication of binding commitment in the terms of the plan." 542 U.S. at 69. *SUWA* characterizes a land use plan as a "statement of priorities" that "guides and

constrains action, but does not (at least in the usual case) prescribe them." 542 U.S. at 71. The Supreme Court reasoned that "allowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities." *Id.* But *SUWA* notes that actions called for in a land use plan "may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency." *Id.*

What constitutes a binding commitment in a land use plan of the type that can be compelled under § 706(1) remains open to interpretation. *SUWA* held that there was no legally binding commitment to implement a full-scale monitoring program in a land use plan stating that off-road vehicle use "will be monitored and closed if warranted." *Id.* at 72. Under *SUWA*, such monitoring and analysis requirements in land use plans are unenforceable. *See id.* Courts have also pointed to implicit budgetary constraints and measures of discretion in denying enforcement of land use plan provisions. *See, e.g.*, *Stout*, 869 F. Supp. 2d at 1280 (finding no binding commitment to maintain a wild horse herd because of the cost of horse gathers, explicit budgetary disclaimers in later plans, and preliminary determinations leaving discretion to the agency). And courts find that discretionary triggers indicate a provision is non-binding. *See, e.g.*, *Gardner*, 638 F.3d at 1223 (holding agency's duty to close trails and other areas depended on an initial agency determination of "considerable adverse effects"); *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1078 (D. Idaho 2011) (finding no mandatory duty to close trails because agency did not need to act unless it first determined vehicles were causing adverse effects).

By contrast, clear language of commitment requires a court to enforce a land use plan. In *Soda Mountain Wilderness Council v. Norton*, the ROD adopting a land use plan stated, "This

PAGE 30 – OPINION AND ORDER

document represents BLM's commitment to these public desires and constitutes a compact with the public." 424 F. Supp. 2d 1241, 1260 (E.D. Cal. 2006). The Eastern District of California found that statement binding because the agency "went out of its way to make clear it was committing to a certain process" such that "withdrawing from that 'compact with the public' would appear to subject the agency to suit under § 706(1)." *Id.* Even without overt dedications of commitment, "will" statements can be binding. In *Friends of Animals v. Sparks*, a plan required that "the [appropriate management level for wild horses] will be re-calculated within five years or after the revision to the Billings [Resource Management Plan], whichever comes first." 200 F. Supp. 3d at 1125. The court found that BLM had made a binding commitment to recalculate the 2009 AML within five years. *Id.* "If this language does not constitute a commitment, then no language would suffice." *Id. Friends of Animals* therefore overcame *SUWA*'s warning that "a statement in a plan that BLM 'will' take this, that, or the other action" is not "a binding commitment that can be compelled under § 706(1) . . . absent clear indication of binding commitment in the terms of the plan." *SUWA*, 542 U.S. at 69.

The Ninth Circuit has suggested that a defined prohibitions, even if broadly applicable and without deadlines, is legally enforceable. In *Hells Canyon*, the court acknowledged that a statute providing that "there shall be no . . . motor vehicles . . . within any such [wilderness] area" "plainly require[d]" USFS to prohibit vehicles, but rejected the § 706(1) claim by holding that the agency had already done so. *Hells Canyon Pres. Council*, 593 F.3d at 932 (referring to 16 U.S.C. § 1133(c)). Judge Graber's partial concurrence emphasized that "[i]t cannot seriously be disputed that the Forest Service must prohibit the use of motor vehicles within the Wilderness area." *Id.* at 934 (Graber, J., concurring in part and dissenting in part).

As in *Friends of Animals* and *Soda Mountain Wilderness Council*, the text of the grazing provisions in the ARMPA establishes a binding commitment of BLM to make the key RPMs unavailable to grazing. This commitment cannot be construed as a broad statutory mandate in the same manner as might provisions to "monitor" or "determine." Rather, the 2015 ARMPA contains a "a specific, unequivocal command" placed on the agency to make key RNAs unavailable to grazing. BLM's decision to make 13 specified areas unavailable to grazing is different from nearly every other provision in the plan. By designating the exact acreages and specific locations in the ARMPA, BLM "went out of its way to make clear it was committing to a certain process" of closing specific areas to grazing. *See Friends of Animals*, 200 F. Supp. 3d at 1125. If provisions that certain specific acreages "will be unavailable" is not enough to prohibit grazing authorization, "then no language would suffice." *See id.* This provision is precisely the kind of site-specific, non-discretionary, expressly articulated land use plan requirement that the Supreme Court instructs "may be compelled" under Section 706(1). *SUWA*, 542 U.S. at 71.

Moreover, like in *Hells Canyon*, it "cannot be seriously disputed" that BLM must make these areas unavailable to grazing. *See* 593 F.3d at 934. In fact, BLM does not dispute this requirement. Federal Defendants acknowledge that the signing of the 2015 ROD constituted an immediate decision to make the key RNAs unavailable to grazing authorizations. ECF 127 at 22-23, Feds.' Br. 13-14 (describing the "*immediately effective* plan decision to make the lands unavailable to grazing" and stating "[i]n short, the lands became unavailable to livestock grazing when the ROD was signed"). "Immediate Decisions" are those that "go into effect when the ROD is signed" and "require no additional analysis." 2015 ROD at 1-41. The plain language of the ROD makes clear that the "land use allocation[s]" in Management Decision LG 1 and

Objectives LG 2, the provisions making areas unavailable for grazing, were immediate

decisions.[6] It may be true that "[a]lthough decisions identified in the ARMPAs are final and

effective when this ROD is signed, implementing on-the-ground activities requires additional

steps before any of them can begin." 2015 ROD at 2-1. But these extra steps or site-specific

NEPA analyses do not render this provision voluntary or optional. In other words, it is not "[a]

statement by BLM about what it plans to do, at some point, provided it has the funds and there

are not more pressing priorities," as in *SUWA*. 542 U.S. at 71. It is an immediate, binding

commitment to set aside 22,765 acres as unavailable to grazing. The Court thus finds that the key

RNA closure is a binding commitment that BLM has a duty to implement.

### D.  Compelling the Key RNA Closures Under 5 U.S.C. § 706(1) as Actions Unlawfully Withheld or Unreasonably Delayed

Unlike the plaintiffs in *SUWA*, Plaintiffs have met their burden to show that BLM had

both a legal duty to perform a discrete agency action and failed to perform that action. The

question that remains is whether BLM has unlawfully withheld or unreasonably delayed making

key RNAs unavailable to grazing. Only then may the Court compel the action under APA

§ 706(1). 5 U.S.C. § 706(1).

---

[6] Federal Defendants seek to distinguish the present situation from *Friends of Animals* by arguing that the provision at issue in that case was contained within the ROD, not the land use plan. The court in that case did point to the ROD when stating *SUWA* did not apply (though the court found a binding commitment even under *SUWA*). 200 F. Supp. 3d at 1125. But the ROD here adopts the ARMPA and enacts the relevant provisions as "immediate decisions." *See* 2015 ROD at 1-41. Therefore, these provisions in the ARMPA are "commitment[s] . . . plainly made in the decision record," just as commitments made in a ROD would be. *See Friends of Animals*, 200 F. Supp. 3d at 1125. It is also irrelevant that *Friends of Animals* ended in summary judgment under § 706(2). *Id.* at 1126. The basis of that conclusion was the court's finding that "[w]ithdrawing from [the ROD's] commitment seems to violate § 706(1) under *SUWA*," *id.* at 1125, and it is this analysis of "binding commitment" on which Plaintiffs rely.

Neither the text of the APA nor its legislative history distinguishes between "unlawfully withheld" and "unreasonably delayed" agency actions. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1189-90 (10th Cir. 1999) (noting "the ambiguity" of the statute and explaining how the legislative history "provide[s] little guidance regarding any possible distinction" between the two terms). In *Forest Guardians*, the Tenth Circuit concluded that the distinction between agency action "unlawfully withheld" and "unreasonably delayed" "turns on whether Congress imposed a date-certain deadline on agency action." *Id.* at 1190 (stating that the court was "apply[ing] the most straight forward common sense reading of these two phrases"). The Tenth Circuit explained:

> In our opinion, when an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable. However, when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline.

*Id.* "[W]hen an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act." *Id.* But without a "concrete deadline establishing a date by which it must act . . . a court must compel only action that is delayed unreasonably." *Id.*

The Ninth Circuit has not addressed this distinction directly but endorses the significance of a concrete deadline in determining whether an action has been unlawfully withheld. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002) (noting that where "Congress has specifically provided a deadline for performance by" the agency, the action has been unlawfully withheld if the deadline is not met and "no balancing of [equitable] factors is required or permitted."). District courts within the Ninth Circuit also have found the Tenth Circuit's rationale for distinguishing agency actions in *Forest Guardians* persuasive. *See, e.g.*,

*Ctr. for Food Safety v. Hamburg*, 954 F. Supp. 2d 965, 970-71 (N.D. Cal. 2013); *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1131 (N.D. Cal. 2007); *Butte Env't Council v. White*, 145 F. Supp. 2d 1180, 1184 (E.D. Cal. 2001). The Court agrees. Thus, for an action to have been "unlawfully withheld," the action must have a concrete deadline.

### 1. Unlawfully Withheld

Congress did not impose a concrete deadline for BLM to complete the key RNA closures, as envisioned by *Forest Guardians*. The question, then, is whether the agency's final planning decisions in the ROD, ARMPA, or Proposed RMPA contain a deadline that can bind agency action. The Court assumes without deciding that a set deadline in a land management plan can be considered a concrete deadline under § 706(1) of the APA, as that term is used in *Forest Guardians*. Relying on one sentence in the Proposed RMPA, Plaintiffs argue that BLM missed its deadline to complete the closures within five years and therefore per se violated the law. Federal Defendants assert that the five-year text in the Proposed RMPA was only an estimate, and because no specific deadline was imposed on BLM in the 2015 ROD or 2015 Oregon ARMPA, the key RNA closures have not been unlawfully withheld.

BLM is not required to make the key RNAs unavailable to grazing by a specific date because a single reference to a five-year timeline in the Proposed RMPA is not a concrete, legally binding deadline. The Proposed RMPA states, "[p]ermitted livestock grazing *would be unavailable* for grazing *within 5 years* on all or portions of 13 of the 15 key RNAs." Proposed RMPA at 2-46 (emphasis added). This timeline, however, is not contained in a final land use plan amendment. As discussed in Part B, *supra*, only the final 2015 ARMPA is the "Approved Resource Management Plan Amendment" for Oregon. 2015 ARMPA at 1-1. BLM has not unlawfully withheld the key RNA closures.

## 2. Unreasonably Delayed

In assessing if an agency's actions have been unreasonably delayed, courts apply a six-factor standard, known as the *TRAC* factors, established in *Telecommunications Research and Action Center v. F.C.C.* (*TRAC*), 750 F.2d 70, 79-80 (D.C. Cir. 1984). The Ninth Circuit adopted the *TRAC* factors in *Independence Mining Company v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997). The six *TRAC* factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (quotation marks and citations omitted).

Although not dispositive, the first factor in the *TRAC* analysis is the most important. *In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017). The first factor hinges on "whether the time for agency action has been reasonable." *In re Nat. Res. Def. Council v. EPA*, 956 F.3d 1134, 1139 (9th Cir. 2020). "[T]here is no per se rule as to how long is too long" to wait for agency action. *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992). In assessing an "appropriate timeline for agency action, the Ninth Circuit has instructed district courts to follow a standard of reasonableness." *Audubon Soc. of Portland v. Jewell*, 104 F. Supp. 3d 1099, 1102 (D. Or. 2015). But "courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years." *Nat. Res. Def. Council*, 956 F.3d at 1139 (quotation marks omitted). On this issue, "the more developed law of the District of

Columbia Circuit has held that a six-year-plus delay is nothing less than egregious." *Id.* (quotation marks and citation omitted).

"The cases in which courts have afforded relief have involved delays of years . . . ." *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1125 (9th Cir. 2001). For example, an eight-year delay with no concrete timeline to reach a final ruling was a "roadmap for further delay" that "stretched the 'rule of reason' beyond its limits." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015). Some progress towards the goal does not excuse delay. In *Community Voice*, the Ninth Circuit found egregious delay even though the agency "appears to have done some work." 878 F.3d at 783.

Federal Defendants acknowledge that the signing of the 2015 ROD constituted an immediate decision to make the key RNAs unavailable to grazing. Yet these RNAs are still open to grazing. Federal Defendants state that BLM is working "diligently" to implement closures of the key RNAs to existing grazing permits consistent with the agency's regulations and statutory obligations. Federal Defendants argue that multiple obstacles have blocked their progress, including a change of administration leading to new directives under the 2019 ARMPA and further NEPA review.[7]

It is true that BLM was interrupted in its implementation of the 2015 ARMPA by the temporary imposition of the 2019 ARMPA and that the agency has other competing priorities. But it is now seven years since the 2015 ROD was adopted, and yet grazing continues to this day

---

[7] The Court notes that BLM has made one key RNA, the East Fork Trout Creek RNA, unavailable to grazing by drawing a "Range Line Agreement." BLM did so without further NEPA review, indicating that all closures may not require years' worth of site-specific analysis. Moreover, as discussed in Part C.1, *supra*, the NEPA review for the key RNA closures is already complete. The extensive environmental analysis in the Final EIS led to final agency decisions about which portions of 15 RNAs to make unavailable, down to the specific acreage.

on the acres mandated to be "unavailable for grazing." BLM's delay has not been one of weeks or months, but of years. *Nat. Res. Def. Council*, 956 F.3d at 1140. BLM promises that it is conducting additional NEPA reviews and will be done by sometime in 2024, a full nine years after the 2015 ROD disallowed grazing on these lands, and five years after the District of Idaho's injunction reinstated the 2015 ARMPA. BLM gives no exact timeline on when the actual closures will be completed. Although the five-year timeline in the Proposed RMPA is not binding, it does provide a benchmark for evaluating whether to accept a delay of multiple years under the Ninth's Circuit's rule of reason. In comparing expectations to reality, the rule of reason "tip[s] sharply in favor" of granting the requested relief. *Pesticide Action Network*, 798 F.3d at 814.

BLM also cites delay from the statutorily required two-year notice obligations for canceling existing grazing permits. BLM regulations require it to provide grazing operators with a two-year notification before their grazing permit and grazing preference may be cancelled. 43 CFR 4110.4-2(b) (2005). The intent of the two-year notification is to provide the grazing permittee time to make any necessary financial, business, or management adjustments should the permit be cancelled, in whole or in part. At the end of the two-year notification period, BLM "intend[ed] to issue a grazing decision specifying the area that is no longer available to grazing," allowing permittees to protest and appeal the decision under applicable regulations. *See, e.g.*, OR_PUB_0475 (Letter to Doug Burgess, Jan. 21, 2020). But BLM issued those two-year notices in January 2020 and has yet to issue its decision closing the key RNAs, despite the passage of more than two years. Instead, it continues to authorize grazing in the key RNAs.[8]

---

[8] Plaintiffs question BLM's renewal of expiring or transferred grazing permits and leases, and BLM's authorization of annual use under existing permits and leases. Plaintiffs assert that renewals, transfers, and continued issuance of grazing authorizations for existing permit holders

On the face of these facts, the Court questions the diligence through which BLM has pursued the mandated closures. The absence of any target fiscal year timeline for key RNA closure, the protruded timelines for NEPA review, and the failure to make final grazing decisions suggest that BLM has committed to a "roadmap for further delay." *Pesticide Action Network*, 798 F.3d at 814. This roadmap will not lead to closing the key RNAs within any reasonable timeframe. Given the initial estimates of a five-year timeframe, a nine-plus year timeframe "stretch[s] the 'rule of reason' beyond its limits." *See id*. The first *TRAC* factor strongly favors Plaintiffs.

The second and sixth factors merit little discussion because Congress has supplied no specific timetable for this type of action, and because there is no dispute that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed," *TRAC*, 750 F.2d at 79-80. *See Nat. Res. Def. Council*, 956 F.3d at 1140-41. These factors are neutral.

The third and fifth factors often overlap. *Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 509 (9th Cir. 1997). Under the third factor, delays are less reasonable if "human health and welfare are at stake," than when agency actions are delayed "in the sphere of economic

---

violates the 2015 ARMPA. It is true that grazing authorization decisions must be consistent with the governing land use plan. 43 U.S.C. § 1732(a); *see Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1077 (9th Cir. 2010); *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 738 (2000). "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *SUWA*, 542 U.S. at 69. But those actions should be challenged as contrary to law under 5 U.S.C. § 706(2), not § 706(1). *See id.*; *Oregon Nat. Desert Ass'n v. Taylor*, 2005 WL 106599, at *7 (D. Or. Jan. 18, 2005) (stating that bringing a claim under § 706(2) would be "the appropriate way to evaluate BLM's actions . . . , rather than under the umbrella of agency inaction"). Plaintiffs do not bring a § 706(2) claim. The Court therefore evaluates BLM's reissuance of permits only in the context of unreasonable delay.

regulation." *TRAC*, 750 F.2d at 80. The fifth factor directs courts to "take into account the nature and extent of the interests prejudiced by delay." *Id.*

Plaintiffs cite NEPA in arguing that environmental regulations are closer to human health and welfare than economic regulations. *See* 42 U.S.C. § 4331 ("Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."). Some courts have found that protection of non-human species does not bear on the third *TRAC* factor. *See, e.g.*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1154 (N.D. Cal. 2014), *aff'd*, 833 F.3d 1136 (9th Cir. 2016) (finding that failure to issue a recovery plan for an endangered plant species "does not involve human health and welfare," but still ordering a firm deadline for the required recovery plan). Plaintiffs do not draw a clear connection between delays in implementing the key RNA closures and effects on human health and welfare.

But even though BLM's failure to close the key RNAs may "fall neither into the economic realm nor specifically into the realm of human health and welfare," the public can still have a significant interest in agency management that promotes "such important values as wildlife, scenery, cultural resources, and recreational opportunities." *Nat'l Wildlife Fed'n v. Cosgriffe*, 21 F. Supp. 2d 1211, 1219 (D. Or. 1998). Under the fifth *TRAC* factor, the court must consider the interests prejudiced by delay. The scientific research intended to be conducted in the key RNAs after grazing is stopped will further sage-grouse conservation across its habitat. Delaying the closures prevents the collection of unique and unavailable data that will foster scientific management of grazed lands and promote the sage-grouse's survival. *See* 2015 ARMPA at 2-33 (stating that ungrazed reference sites provide opportunities to study plant communities important to sage-grouse). This significant public good is weighed against the

miniscule area unavailable to grazing: only 22,765 acres are to be closed, 0.19% of

the 12,083,622 acres that remain open to grazing. 2015 ARMPA at 2-18. The 2,388 animal unit

months (AUMs) unavailable for grazing in the 2015 key RNA closures represent only 0.24% of

the 998,919 active AUMs in eastern Oregon. Proposed RMPA at 2-45, 3-183. Significant public

benefit can be gained from a very limited set of closures.

When considering economic interests prejudiced by delay, Plaintiffs assert that any

economic effects of the key RNA closures are negligible, citing to BLM's own analysis. *See*

Proposed RMPA at 4-185, 4-326 (finding that special designations, including undisturbed

baseline reference areas within key RNAs, would have "negligible or no impact on livestock

grazing and range management" and "negligible or no impact on socioeconomics and

environmental justice" in eastern Oregon). Defendant-Intervenors dispute this position, stressing

the economic effects they and their communities will experience, and pointing to this Court's

prior TRO opinion. Indeed, the Court acknowledged the possible financial harm to these

ranchers when denying Plaintiffs' TRO earlier this year. *See Or. Nat. Desert Ass'n v. Bushue*,

2022 WL 910082, at *9 (D. Or. Mar. 29, 2022). But the TRO addressed Plaintiffs' demand to

close *immediately* the entire pastures that contain the key RNAs, not just the portions outlined in

the 2015 ARMPA. Now, much smaller portions of the RNAs are at issue: only about one-third of

the total key RNA acres are unavailable to grazing. 2015 ARMPA at 2-18 (Table 2-6). The

balancing of the hardships in the TRO, therefore, does not apply to this smaller acreage.

Despite the small acreage reduction, Defendant-Intervenors assert that closure will have

some economic impacts. Mackenzie Defendants argue that closure of the key RNA areas may

disrupt established grazing patterns, seasonal rotations, and other management strategies. Cahill

Intervenors add that ending grazing on the Sucker Creek pasture, one of the key RNAs

unavailable to grazing, "effectively forecloses" grazing on the remaining acreage of their permitted allotment due to their rest-rotation structure and cattle movement patterns. Cahill Decl. ¶ 13, ECF 10. Cahill stresses the lack of other public land grazing opportunities in the area in asserting that they may need to dispose of up to 250 cows. Plaintiffs respond that Cahill's estimates are overstated because Cahill has permits to six total public land allotments and has not needed to use its full allocation of AUMs on the Rahilly-Gravelly Allotment, voluntarily taking in 2021 more AUMs of non-use than the key RNA closure reduces.

The Court finds that the economic impacts do not weigh against Plaintiffs. In addition to the small size of the closures and BLM's earlier determination of no economic impact, Defendant-Intervenors have had more than two years of notice that BLM would be issuing grazing decisions in accordance with the mandated unavailable RNAs. BLM's own regulations indicate that two years are adequate to adjust to the cancellation or modification of a grazing permit. The 2015 ARMPA also contained a map of which key RNA areas would be unavailable to grazing, giving Defendant-Intervenors many years of notice that their grazing permits would require modification. 2015 ARMPA at App'x A (Fig. 2-3). New rest-rotation structures and cattle movement patterns can be developed. In fact, parties' briefs suggest grazing rotations already change frequently in response to drought conditions or other considerations. Moreover, of the nine Defendant-Intervenors with grazing operations, only two lodged administrative protests against the 2015 ARMPA and only one challenged the closure in court. These late challenges to the 2015 plan ring hollow. Finally, Mackenzie Defendants indicate that they have actively participated in the scoping process to influence how the closures are implemented, suggesting that BLM is not ignoring their concerns and has worked to accommodate Intervenor-Defendants' particularized needs.

The fourth factor asks courts to "consider the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. Courts defer to federal agencies on their priorities. *See San Luis*, 747 F.3d at 601 (courts may not substitute their judgment for that of the agency); *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987) ("[A]n administrative agency is entitled to considerable deference in establishing a timetable for completing its proceedings."). The Supreme Court in *SUWA* noted that "pervasive interference with BLM's own ordering of priorities" is a major concern with enforcing provisions of land use plans. 542 U.S. at 71.

Plaintiffs assert that the key RNA closures are the linchpin of BLM's sage-grouse conservation efforts, and the agency is not entitled to deference in its prioritization of other management actions in the 2015 Oregon ARMPA. Federal Defendants respond that the 2015 Oregon ARMPA is not the agency's only obligation, and BLM's prioritization of actions within the 2015 Oregon ARMPA is reasonable. Although the key RNA closures will help establish robust scientific evidence for sage-grouse habitat, the effects of expediting the key RNA closures could interfere with other important steps in BLM's larger agenda for sage-grouse conservation. State Director Bushue contends that RNA closures are moderate to low priority. Bushue Decl. ¶ 17. The Court is reluctant to interfere with BLM's own ordering of priorities. Yet no deference is due to "an agency's convenient litigating position," particularly when it conflicts with previous positions. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988). BLM's current ordering of priorities conflicts with the "immediate decision" in 2015 to make key RNAs unavailable for grazing and manage them as undisturbed baseline reference areas. 2015 ARMPA at 2-18, 2-33, 4-1. This factor, then, only slightly favors BLM.

Here, having weighed all the relevant factors, but giving significant weight to the first factor per *Community Voice*, the Court finds that the delay in completing the key RNA closures is not reasonable. Only the fourth factor favors BLM. But "even assuming that [the agency] has numerous competing priorities under the fourth factor and has acted in good faith under the sixth factor, the clear balance of the *TRAC* factors favors issuance of the writ." *Community Voice*, 878 F.3d at 787. The key RNA closures have been unreasonably delayed. Thus, Plaintiffs are entitled to relief under § 706(1).

**E.  Remedy**

The Court concludes that BLM has violated FLMPA and the APA by failing timely to close the 13 key RNAs. BLM must make unavailable to grazing the portions of the key RNAs specified in the 2015 ARMPA without further delay.

Plaintiffs ask this Court to grant partial summary judgment and relief in three ways: (1) declare that BLM violated FLPMA and the APA by failing to close the thirteen key RNAs in accordance with the 2015 ARMPA; (2) compel BLM to complete those closures as specified in and required by the 2015 ARMPA; and (3) order and enjoin BLM to no longer authorize livestock grazing in the thirteen Key RNAs, or the smallest fenced pasture necessary to guarantee that those areas will have no livestock grazing. The Court is mindful that "§ 706(1) empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." *SUWA*, 542 U.S. at 64 (emphasis in original).

Accordingly, the Court requests that the parties, after conferring to see if terms can be agreed upon, submit simultaneous briefs regarding an appropriate remedy consistent with the Court's conclusions in this Opinion and Order, without prejudice to any party's appellate position. Opening briefs shall be submitted not later than January 10, 2023, and response briefs

shall be submitted not later than February 10, 2023. Until the Court has issued its Order on remedy, BLM may not further authorize grazing on any portions of the 13 key RNAs designated unavailable to grazing.

**CONCLUSION**

The Court GRANTS Plaintiffs' partial motion for summary judgment, ECF 125, and DENIES Federal Defendants' and Defendant-Intervenors' cross-motions for partial summary judgment, ECF 127, 133, 135, 137, and ORDERS further briefing on remedy as stated in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 7th day of December, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge